| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT** **DISTRICT OF NEW JERSEY** *Caption in Compliance with D.N.J. LBR 9004-1(b)* SAUL EWING LLP Turner N. Falk, Esq. 1735 Market Street, 34th Floor Philadelphia, PA 19103 Telephone: (215) 972-7777 Email: turner.falk@saul.com *Counsel for Artsana USA, Inc.* | |
| In re: BED BATH & BEYOND, INC., *et al.*,[1] Debtors. | Chapter 11 Case No. 23-13359 (VFP) (Jointly Administered) |
| Michael Goldberg, as Plan Administrator for 20230930-DK-Butterfly-1, Inc. (f/k/a Bed Bath & Beyond Inc.),[2] Plaintiff, v. Artsana USA, Inc., Defendant. | Adv. No. 24-01336 (VFP) |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT WITH RESPECT TO PLAINTIFF'S CLAIMS AGAINST <u>DEFENDANT, ARTSANA USA, INC.</u>**

---

[1]   The last four digits of Debtor Bed Bath & Beyond Inc.'s tax identification number are 0488. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/bbby. The location of Debtor Bed Bath & Beyond Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 650 Liberty Avenue, Union, New Jersey 07083.

[2]   Pursuant to the Certificate of Amendment of the Certificate of Incorporation of Bed Bath & Beyond Inc., which was filed with the State of New York Department of State on September 21, 2023, the name of the entity formerly known as "Bed Bath & Beyond Inc." was changed to 20230930-DK-Butterfly, Inc. [Filing ID No. 230921001833 DOS ID 315602].

**TABLE OF CONTENTS**

**Page**

SUMMARY OF ARGUMENT ........................................................................................ 1

RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS .......... 3

    A.   Facts Concerning the Bankruptcy Cases ........................................................ 3

    B.   Facts Concerning the Adversary Proceeding .................................................. 5

    C.   Facts Regarding Preference Period Transfers Between Debtors and Defendant ................ 7

ARTSANA'S STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS .......... 10

ARGUMENT .................................................................................................................... 17

    A.   Summary Judgment Standard ......................................................................... 17

    B.   Artsana Does Not Dispute Plaintiff's Prima Facie Case Pursuant to 11 U.S.C. § 547 ...... 18

    C.   Plaintiff's Motion Must Be Denied ................................................................ 18

    D.   Artsana is Entitled to Summary Judgment on Count I ................................... 18

        i.   The Transfers Were Made in Accordance With Industry Standards ............ 18

        ii.  Creditor Collections Efforts are Irrelevant to the Objective Ordinary Course Defense 21

        iii.  The Transfers Were Made in the Ordinary Course of Business Between the Debtors and Artsana ................................................................................................ 23

        iv.  The Undisputed Facts Show the Debtors Did Not Make the Transfers in Response to Pressure from Artsana .................................................................................. 27

    E.   Artsana is Entitled to Summary Judgment on Count II ................................ 31

    F.   Artsana is Entitled to Summary Judgment on Counts III and IV ................. 32

CONCLUSION .............................................................................................................. 33

## TABLE OF AUTHORITIES

**CASES**

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)..........................................................................................................17, 18

*Branch v. Ropes & Gray (In re Bank of New England Corp.)*,
   161 B.R. 557 (Bankr. Mass. 1993) ...............................................................................25

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)........................................................................................................17

*Comm. Unsecured Creditors of Gregg Appliances v. Curtis Int'l Ltd. (In re HHGregg, Inc.)*,
   636 B.R. 545 (Bankr. S.D.Ind. 2022) ...........................................................................27

*Dietz v. Jacobs*,
   No. CIV. 12-1628 JNE/JJG, 2014 WL 1153502 (D. Minn. Mar. 21, 2014) .....................3, 20

*Esser v. First Fed. Fin. Serv. (In re Carini)*,
   245 B.R. 319 (Bankr. E.D. Wis. 2000) ..........................................................................27

*FBI Wind Down Inc. Liquidating Tr. v. All American Poly Corp. (In re FBI Wind Down, Inc.)*,
    581 B.R. 116 (Bankr. D. Del. 2018) .............................................................................25

*Fiber Lite Corp. v. Molded Acoustical Prods., Inc. (In re Molded Acoustical Prods., Inc.)*,
   18 F.3d 217 (3d Cir. 1994)........................................................................................19, 27

*Forman v. Moran Towing Cop. (In re AES Thames, LLC)*,
   547 B.R. 99 (Bankr. D. Del. 2016) ................................................................................25

*Hechinger Liquidation Trust v. James Austin Co. (In re Hechinger Inv. Co. of Del., Inc.)*,
   320 B.R. 541 (Bankr. D. Del. 2004) ..............................................................................25

*Huffman v. New Jersey Steel Corp. (In re Valley Steel Corp.)*,
   182 B.R. 728 (Bankr. W.D. Va. 1995) ..........................................................................25

*Hunter v. Amerisource Corp. (In re Parkview Hospital)*,
   213 B.R. 509 (Bankr. N.D. Ohio 1997) .........................................................................25

*In re AE Liquidation, Inc.*,
   No. 08-13031 (MFW), 2013 WL 5488476 (Bankr. D. Del. Oct. 2, 2013) .....................28

*In re AES Thames, LLC,*
   No. 11-10334 (KJC), 2016 WL 11595116 (Bankr. D. Del. Oct. 28, 2016) .................3, 20, 21

*In re Am. Home Mortg. Holdings, Inc.*,
   476 B.R. 124 (Bankr. D. Del. 2012) ........................................................................20, 25

04/14/2026

*In re Big Wheel Holding Co., Inc.*,
    223 B.R. 669 (Bankr. D. Del. 1998) ...................................................................................29

*In re CCG 1355, Inc.*,
    276 B.R. 377 (Bankr. D.N.J. 2002) ...................................................................................24

*In re CL H Winddown LLC, No. 21-10527 (JTD),*
    2023 WL 5740195 (Bankr. D. Del. Sept. 5, 2023) ........................................................ 32-33

*In re Ctr. City Healthcare, LLC*,
    664 B.R. 208 (Bankr. D. Del. 2024), aff'd, No. AP 21-50920 (MFW),
    2025 WL 3205002 (D. Del. Nov. 17, 2025) .........................................................3, 21, 22, 23

*In re FBI Wind Down, Inc.*,
    614 B.R. 460 (Bankr. D. Del. 2020) ...............................................................................24, 28

*In re Fitzpatrick Container Co.*,
    670 B.R. 425 (Bankr. E.D. Pa. 2025) ...............................................................................32

*In re Fred's Inc.*,
    No. 19-11984 (CTG), 2025 WL 208536 (Bankr. D. Del. Jan. 15, 2025) ..........................19, 22

*In re Hechinger Inv. Co. of Delaware, Inc.*,
    489 F.3d 568 (3d Cir. 2007) ...........................................................................................30

*In re JSL Chem. Corp.*,
    424 B.R. 573 (Bankr. S.D. Fla. 2010) .............................................................................24

*In re Murray, Inc.*,
    392 B.R. 288 (B.A.P. 6th Cir. 2008).............................................................................2, 20

*In re Powerwave Techs., Inc.*,
    No. 13-10134 (MFW), 2017 WL 1373252 (Bankr. D. Del. Apr. 13, 2017).......................19, 24

*In re Tennessee Valley Steel Corp.*,
    201 B.R. 927 (Bankr. E.D.Tenn. 1996) ...........................................................................30

*In re Tolona Pizza Prods. Corp.*,
    3 F.3d 1029 (7th Cir. 1993) ............................................................................................19

*In re United Tax Grp., LLC*,
    No. 14-10486 (LSS), 2021 WL 6138214 (Bankr. D. Del. Sept. 2, 2021) ...............................24

*Lightfoot v. Ameilia Mar. Serv., Inc. (In re Sea Bridge Marine, Inc.)*,
    412 B.R. 868 (Bankr. E.D. La. 2008) ..............................................................................27

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).......................................................17

04/14/2026

*Miller v. Fla. Mining & Materials (In re A.W. & Associates, Inc.),*
136 F.3d 1439 (11th Cir. 1998) ........................................................................19

*Miller v. JNJ Logistics, LLC (In re Proliance Int'l, Inc.),*
514 B.R. 426 (Bankr. D. Del. 2014) .................................................................17

*Miller v. Westfield Steel, Inc. (In re Elrod Holdings Corp.),*
426 B.R. 106(Bankr. D. Del. 2010) ..................................................................17

*Schwinn Plan Comm. v. AFS Cycle & Co., Ltd. (In re Schwinn Bicycle Co.),*
205 B.R. 557 (Bankr. N.D. Ill. 1997) ...............................................................27

**STATUTES**

11 U.S.C. § 502(d) ...............................................................................................2, 32

11 U.S.C. § 547 ........................................................................................................18

11 U.S.C. § 547(c)(2)(A) ..................................................................................1, 2, 23

11 U.S.C. § 547(c)(2)(B) ..............................................................1, 5, 13, 18, 19, 21

11 U.S.C. § 548 ......................................................................................................1, 31

11 U.S.C. § 550 .....................................................................................................2, 32

Fed. R. Bankr. P. 7056 ............................................................................................17

Fed. R. Civ. P. 56(a) ................................................................................................17

**OTHER AUTHORITIES**

Collier on Bankruptcy ¶ 547.04 [2] (16th ed. 2024)...............................................19

H.R. Rep. No. 95-595 (1977)...................................................................................19

iv

04/14/2026

Defendant, Artsana USA, Inc. ("Artsana"), hereby submits this Memorandum of Law in opposition to the *Motion for Summary Judgment with Respect to Plaintiff's Claims Against Defendant, Artsana USA, Inc.* (the "Motion") and in support of Artsana's *Cross-Motion for Summary Judgment* (the "Cross-Motion").

## SUMMARY OF ARGUMENT

Artsana received a transfer of $538,400.30 during the Preference Period, in payment of invoices for goods provided to the Debtors (the "Transfers").

Plaintiff has asserted a fraudulent transfer claim against Artsana but concedes that the Transfers were for reasonably equivalent value in satisfaction of the antecedent debts represented by the invoices paid.  Accordingly, the Transfers cannot be avoided as constructively fraudulent under 11 U.S.C. § 548.

Plaintiff also has asserted a preference claim against Artsana.  The undisputed facts establish that the Transfers were made (i) on account of obligations incurred in the ordinary course of business of the Debtors and Artsana (11 U.S.C. § 547(c)(2)); (ii) in the ordinary course of business between Artsana and the Debtors ("subjectively" ordinary under 11 U.S.C. § 547(c)(2)(A)); and (iii) according to ordinary business terms ("objectively" ordinary under 11 U.S.C. § 547(c)(2)(B)).  Accordingly, the Transfers cannot be avoided as the ordinary course defenses provided in 11 U.S.C. §§ 547(c)(2)(A) and (B), respectively, apply.

Plaintiff argues against application of Artsana's established ordinary course of business defenses by asserting that Artsana's advising Debtors that it could no longer ship goods unless the Debtors pre-paid for them was "undue" collection activity in respect of goods previously shipped. This assertion lacks both evidentiary support and any notion of causality.  The uncontroverted testimony by the designated Fed. R. Civ. P. 30(b)(6) representative of the Debtors was that

1

Artsana's decision had no influence on and did not pressure Debtors to make the Transfers which they did voluntarily.  The record in connection with this matter is closed as the time pursuant to this Court's scheduling order (which was extended several times from the original deadlines) for fact and expert discovery has lapsed.

The undisputed facts show that the Debtors did not make the Transfers in response to Artsana's decision to switch to pre-payments for future orders.  In making the Transfers the Debtors did not consider, and were not influenced by, Artsana's shipping decision or by any other collection activity whether relating to the antecedent obligations due or the agreement to make pre-payments moving forward.  There is no factual causal connection between the Transfers and such actions; thus, Plaintiff cannot rebut Artsana's subjective ordinary course defense under Section 547(c)(2)(A).

Moreover, as a matter of law, alleged creditor pressure is irrelevant to the Court's analysis of Artsana's "objective" or "industry standard" ordinary course defense, which is based on whether the Transfers were ordinary when considered in the context of the applicable industry. Artsana's expert witness has reliably opined that they were and Debtors' expert does not rebut that opinion.

Plaintiff's remaining claims under 11 U.S.C. §§ 502(d) and 550 rely on his prevailing on the alleged preference and fraudulent transfer claim. Because Plaintiff cannot prevail on such claims he also cannot prevail on his claims under 11 U.S.C. §§ 502(d) and 550.

Artsana is entitled to summary judgment on all counts in the Complaint.

**RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS**

Pursuant to LBR 7056-1, Artsana presents its responses to Plaintiff's Statement of Undisputed Material Facts following a recitation of each such offered fact.[1]

A.      **Facts Concerning the Bankruptcy Cases**

1.      On April 23, 2023 (the "Petition Date"), Bed Bath & Beyond Inc. and certain of its affiliates (collectively, the "Debtors") each commenced a voluntary case under chapter 11 of the Bankruptcy Code (the "Bankruptcy Cases"). The 90-day period before the Petition Date was January 23, 2023 through April 23, 2023 (the "Preference Period").

Response:      Artsana does not dispute the facts alleged in this paragraph.

2.      On April 24, 2023, the Court entered the Interim Order (I) Authorizing the Debtors to (A) Continue Use of Existing Business Forms and Records, (B) Maintain Existing Corporate Bank Accounts and Cash Management System, (C) Pay Prepetition Bank Fees Associated with the Cash Management System, and (D) Continue Performance of Intercompany Transactions; (II) Granting Administrative Expense Status to Postpetition Intercompany Balances, and (III) Waiving Certain U.S. Trustee Requirements for a Period Not to Exceed Thirty Days, incorporated here by reference (the "Cash Management Order").[2] The Cash Management Order approved the Debtors' continued use of their centralized cash management system, including the use of certain Concentration Accounts and Disbursement Accounts for the collection of revenues and the disbursement of accounts payable.[3]

---

[1] To aid the Court's review of the alleged undisputed facts, in this "Response to Plaintiff's Statement of Undisputed Facts" only, Artsana has retained the footnotes in Plaintiff's motion. Artsana does not a concede that any information in these footnotes is accurate.

[2] D.I. 78.

[3] See Cash Management Order and corresponding Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Use of Existing Business Forms and Records, (B) Maintain Existing Corporate Bank Accounts and Cash Management System, (C) Pay Prepetition Bank Fees Associated with the Cash

3

Response:    Artsana does not dispute the facts alleged in this paragraph.

3.    On September 14, 2023, the Court entered its Findings of Fact, Conclusions of Law, and Order (I) Approving the Disclosure Statement on a Final Basis and (II) Confirming the Second Amended Joint Chapter 11 Plan of Bed Bath & Beyond Inc. and its Debtor Affiliates (the "Confirmation Order" and "Plan," respectively).[4]

Response:    Artsana does not dispute the facts alleged in this paragraph.

4.    The effective date of the Plan (the "Effective Date") occurred on September 29,2023.[5]

Response:    Artsana does not dispute the facts alleged in this paragraph.

5.    In accordance with the Plan, Confirmation Order, and the Plan Administrator Agreement, Michael Goldberg was appointed as the Plan Administrator with all rights, powers, duties, and privileges of a trustee in bankruptcy and as exclusive representative of the Wind-Down Debtors.[6] A copy of Mr. Goldberg's supporting Declaration is attached hereto as **Exhibit A** (the "Goldberg Declaration").

Response:    Artsana does not dispute the facts alleged in this paragraph, but does not concede that all facts in the Goldberg Declaration are accurate or admissible upon summary judgment.

---

Management System, and (D) Continue Performance of Intercompany Transactions; (II) Granting Administrative Expense Status to Postpetition Intercompany Balances; and (III) Waiving Certain U.S. Trustee Requirements for a Period Not to Exceed Thirty Days [D.I. 18].

[4] D.I. 2172.

[5] D.I. 2311.

[6] *See* D.I. 2161 (the "Plan Administrator Agreement"), § 2.1.

4

6.      Pursuant to paragraph 47 of the Confirmation Order, "all Causes of Action shall automatically vest in the Wind-Down Debtors, and the Plan Administrator, subject to the oversight of the Oversight Committee, shall have the right and authority to investigate, commence, prosecute, or settle, as appropriate, any and all of the Non-Released Claims, whether arising before or after the Petition Date."[7]

Response:      Artsana does not dispute the facts alleged in this paragraph.

7.      Pursuant to Article III(D) of the *Amended Disclosure Statement Relating to the Amended Joint Chapter 11 Plan of Bed Bath & Beyond Inc. and its Debtor Affiliates* (the "Disclosure Statement"), general unsecured claims comprise an impaired class of creditors and are not expected to be paid in full.[8]

Response:      Artsana does not dispute the facts alleged in this paragraph.

**B.      Facts Concerning the Adversary Proceeding**

8.      On May 20, 2024, Plaintiff filed the Complaint to Avoid and Recover Transfers Pursuant to 11 U.S.C. §§ 547, 548 and 550 and to Disallow Claims Pursuant to 11 U.S.C. § 502, initiating this adversary proceeding (the "Adversary Proceeding").[9]

Response:      Artsana does not dispute the facts alleged in this paragraph.

9.      On February 18, 2025, Plaintiff filed the First Amended Complaint to Avoid and Recover Transfers Pursuant to 11 U.S.C. §§ 547, 548 and 550 and to Disallow Claims Pursuant to 11 U.S.C. § 502 (hereafter, the "Complaint").[10]

---

[7] D.I. 2172.

[8] D.I. 1716 (projecting recoveries to holders of general unsecured claims to be 0% - 2.5%). See also Goldberg Declaration ¶ 20.

[9] Adv. D.I. 1.

[10] Adv. D.I. 9.

Response:    Artsana does not dispute the facts alleged in this paragraph.

10.    On March 13, 2025, Defendant filed an answer ("Answer") to the Complaint.[11]

Response:    Artsana does not dispute the facts alleged in this paragraph.

11.    On April 16, 2025, Plaintiff caused to be served its amended written discovery requests and initial disclosures upon Defendant.[12]

Response:    Artsana does not dispute the facts alleged in this paragraph.

12.    On May 14, 2025, Defendant submitted responses to Plaintiff's amended written discovery requests, a copy of which is attached hereto as **Exhibit B** (the "Discovery Responses").

Response:    Artsana does not dispute the facts alleged in this paragraph.

13.    On September 8, 2025, Defendant conducted the deposition of the Debtors' representative, Laura Crossen, pursuant to Federal Rule 30(b)(6). A copy of Ms. Crossen's deposition transcript with exhibits is attached hereto as **Exhibit C** (the "Crossen Trans.").

Response:    Artsana does not dispute the facts alleged in this paragraph.

14.    On or about September 29, 2025, Plaintiff conducted the deposition of Defendant's representative, Thomas Gwiazdowski, pursuant to Bankruptcy Rule 30(b)(6). A copy of Mr. Gwiazdowski's deposition transcript with exhibits is attached hereto as **Exhibit D** (the "Gwiazdowski Trans.").

Response:    Artsana does not dispute the facts alleged in this paragraph.

---

[11] Adv. D.I. 14.

[12] Adv. D.I. 15.

**C.      Facts Regarding Preference Period Transfers Between Debtors and Defendant**

15.      Prior to the Petition Date, the Debtors and Defendant had a business relationship whereby Defendant sold goods including baby products to the Debtors. Crossen Trans. 13:9-19.[13]

Response:      Artsana does not dispute the facts alleged in this paragraph.

16.      Prior to the Preference Period, the Debtors purchased goods from Defendant on credit, with 60-day payment terms. Crossen Trans. 14:22 – 15:11; 22:14-20; Gwiazdowski Trans. 51:16-19.

Response:      Artsana does not dispute the facts alleged in this paragraph.

17.      In December and early January 2023, Defendant inquired with the Debtors on multiple occasions about the Debtors' intentions to pay past due invoice obligations. Crossen Trans., Ex. 5.

Response:      Artsana does not dispute the facts alleged in this paragraph.

18.      By early January 2023, Defendant determined the Debtors had amassed more than $5 million in accounts payable obligations owing to Defendant, including $2 million in past due payables. Crossen Trans. 51:12-20.

Response:      Artsana does not dispute the facts alleged in this paragraph.

19.      On January 4, 2023, Defendant informed the Debtors it was considering stopping all shipments to the Debtors. Crossen Trans. 40:19-25, Ex. 5; Goldberg Decl. ¶ 13., Ex. 2.

Response:      Artsana does not dispute the facts alleged in this paragraph.

20.      On January 7, 2023, Defendant imposed a freeze on all orders by the Debtors. Crossen Trans. 47:12-16, Ex. 6.

---

[13] Citations to deposition transcripts follow the following format: [Transcript Name] [page number]:[line number range]. In this example, the citation refers to page 13, lines 9 through 19 of Ms. Crossen's deposition transcript.

Response:     Artsana did not freeze all orders on or about January 7, 2023.  Artsana made a request to freeze "certain orders".  Crossen Trans. 47:12-16.

21.    On January 9, 2023, Defendant informed the Debtors it was holding all shipments. Goldberg Decl. ¶ 13, Ex. 2.

Response:     Artsana does not dispute that, on or about January 9, 2023, Artsana made the decision to stop shipment on unshipped import orders to the Debtors.  Gwiazdowski Trans. 51:16-19.   Artsana asserts that the Goldberg Declaration is not admissible evidence on the averments in this paragraph as it presents a summary of purported documents that speak for themselves, and involves hearsay and hearsay-within-hearsay.  Further, the Goldberg Declaration ¶ 13 refers to an Exhibit 2 "enclosed herewith," but no such exhibit is actually attached.

22.    On or about January 10, 2023, Defendant changed the parties' payment terms from credit to prepayment. Crossen Trans. 58:19-22; 59:8-12, Ex. 9; Gwiazdowski Trans. Ex. 12; Goldberg Decl. ¶ 13, Ex. 2. From this point forward, the Debtors were only permitted to buy goods from Defendant by payment in advance. Crossen Trans. 61:25 – 62:8.

Response:     Artsana does not dispute the facts alleged in this paragraph.

23.    During the Preference Period, the Debtors desired to order new goods from Defendant. Crossen Trans. 61:25 – 62:8; Gwiazdowski Trans. 63:21-23.

Response:     Artsana does not dispute the facts alleged in this paragraph.

24.    At the same time as the Debtors were placing (and paying in advance for) new orders, the Debtors arranged to simultaneously pay a portion of their outstanding past due invoice obligations to Artsana. Crossen Trans. 67:23 – 69:10; Gwiazdowski Trans. 63:21 – 64:21. Specifically, the Debtors arranged a payment to be allocated against past due invoices in an amount

8

equal to 50% of the amount of their prepayment for new goods. Crossen Trans. 63:13 – 64:21;67:23 – 69:10, Ex 7.

Response:     Artsana does not dispute the facts alleged in this paragraph.

25.     On or about February 24, 2023, the Debtors paid to Defendant $1,603,440.00 (the "February Payment"). *See* Discovery Responses, Defendant's Admission No. 26; Goldberg Decl. ¶ 9; Crossen Trans. 66:11-17, Exs. 3, 8. Of the February Payment sum, $538,400.30 (the "Transfers") was applied in satisfaction of past due invoices. Defendant's Admission No. 27; Gwiazdowski Trans. 12:12 – 13:10, Ex. 3; Goldberg Decl. ¶ 9.

Response:     Artsana does not dispute the facts alleged in this paragraph.

26.     The remaining amount of the February Payment, in the sum of $1,065,040, was applied as prepayments for future goods. Gwiazdowski Trans. 13:11 – 14:4, Ex. 3; Goldberg Decl.¶ 13, Ex. 2.

Response:     Artsana does not dispute the facts alleged in this paragraph.

27.     Defendant received the Transfers during the Preference Period. Defendant's Admission Nos. 1, 2.

Response:     Artsana does not dispute the facts alleged in this paragraph.

28.     The Transfers were made for Defendant's benefit in satisfaction of an antecedent debt. Defendant's Admission Nos. 3, 4, 6.

Response:     Artsana does not dispute the facts alleged in this paragraph.

29.     At the time of the Transfers, Defendant was a creditor of the Debtors. Defendant's Admission No. 5.

Response:     Artsana does not dispute the facts alleged in this paragraph.

30.    Defendant had a right to receive the Transfers in satisfaction of or on account of a then-existing obligation or debt owed to it by the Debtors at the time of the Transfers. Defendant's Admission No. 3.

Response:    Artsana does not dispute the facts alleged in this paragraph.

31.    Defendant did not hold a fully perfected security interest in the assets of the Debtors. Defendant's Admission No. 10.

Response:    Artsana does not dispute the facts alleged in this paragraph.

## ARTSANA'S STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS

### BUSINESS BACKGROUND AND PREPETITION EVENTS

32.    The business relationship between Artsana and the Debtors' Buy Buy Baby business segment ("BBB") lasted for over 20 years. *See* Declaration of Thomas Gwiazdowski (the "Gwiazdowski Declaration") ¶ 4.

33.    Given the ordering, shipping of product and invoicing practices of BBB and Artsana over the course of their business relationship, there usually was a running balance owed to Artsana exceeding several hundred thousand dollars.  Gwiazdowski Declaration ¶ 4.

34.    Payment on account of such running balances ordinarily were made by paying dozens or hundreds of invoices at once, via ACH transfer exceeding six figures.  Gwiazdowski Declaration ¶ 4.

35.    Artsana imposed a partial freeze on shipments to BBB on or about January 7, 2023 on account of a then existing large balance due on account of shipments made to BBB. Gwiazdowski Declaration ¶ 5.

36.    At this time, Artsana requested that BBB prepay for orders placed after January 10, 2023.  Gwiazdowski Declaration ¶ 6.

10

37.    Artsana did not, at this or any other time, condition future shipments on payment of the then existing amount due.  Gwiazdowski Declaration ¶ 7.

38.    BBB did not place any further orders with Artsana until after February 24, 2023, more than 51 days after the shipping freeze.  Gwiazdowski Declaration ¶ 8.

39.    The change in credit terms, from Net-60 to prepayment, was applicable only to go-forward orders.  Gwiazdowski Declaration ¶ 9.

40.    Artsana did not condition the fulfillment of any orders placed after January 10, 2023 upon the payment of any amount then due and owing. Rather, orders were processed once both the order and prepayment therefor was received by Artsana.  Gwiazdowski Declaration ¶ 10.

41.    Artsana was ready, willing and able to ship any prepaid order placed by the Debtors. In fact, Astana did fulfill prepaid orders placed after February 24, 2023.  Gwiazdowski Declaration ¶ 11.

42.    The Debtors freely offered to make prepayments, and pay an additional 50% of any prepayment amount, to be applied to existing arrearages.  Gwiazdowski Declaration ¶ 12.

43.    Artsana understood that the Debtors sought to catch up with their existing arrears over time, as they had done in the past.  Gwiazdowski Declaration ¶ 12.

44.    Artsana did not take any action to pressure or force the Debtors to pay existing arrearages.  Gwiazdowski Declaration ¶ 13.

45.    Artsana received a payment in the amount of $1,603,440.00 on February 24, 2023. In the remittance instructions to Artsana, the Debtors directed Artsana to apply $538,400.30 of such payment amount to existing invoices. The balance of such payment amount was to be applied to go-forward orders and shipments, and was applied in this manner.  Gwiazdowski Declaration ¶ 14.

11

46.    On September 8, 2025, Artsana conducted the deposition Laura Crossen, who was designated by Plaintiff as the Debtors' representative, pursuant to Federal Rule 30(b)(6). A copy of Ms. Crossen's deposition transcript with exhibits is attached as **Exhibit B** (the "Crossen Trans."). *See* Declaration of Turner N. Falk (the "Falk Declaration") ¶ 3.

47.    On or about September 29, 2025, Plaintiff conducted the deposition of Artsana's representative, Thomas Gwiazdowski, pursuant to Bankruptcy Rule 30(b)(6). A copy of Mr. Gwiazdowski's deposition transcript with exhibits is attached as **Exhibit C** (the "Gwiazdowski Trans."). Falk Declaration at ¶ 4.

**OBJECTIVE ORDINARY COURSE ANALYSIS**

48.    The industry that is applicable to both Artsana and BBB is the "Toy and Hobby Goods and Supplies Merchant Wholesalers Industry" (the "Applicable Industry"). It is this industry with respect to which industry data compiled by the Risk Management Association ("RMA") on billing, payment and collection practices was obtained. *See* Declaration of Harold A. Schaeffer ("Schaeffer Declaration") ¶ 11.

49.    Mr. Schaefer has prepared a report summarizing his analysis and opinions (the "Report") which is attached hereto as Exhibit A.

50.    In February 2023, the Transfers, a single payment on many invoices was made to Artsana, which payment Plaintiff seeks to avoid in this adversary proceeding. As set forth in greater detail in the Report, to determine whether the Transfers were made according to ordinary business terms, Mr. Schaeffer first assessed the "industry standard" with respect to the days after issuance of an invoice until payment of the invoice (i.e., "days to pay") using RMA data for a period including the challenged Transfers. Schaeffer Declaration ¶ 12.

12

51.     According to the RMA data, the most common credit terms in the applicable industry are Net-30, meaning payment is due 30 days after issuance of an invoice.   Schaeffer Declaration ¶ 13; Ex. A at 4.

52.     According to the RMA data, the "middle quartiles" (50%) of average days to pay in the Applicable Industry is 2 to 68 days.   Based on Net-30 terms, this means that in the Applicable Industry payments are generally made up to 38 days late.   Schaeffer Declaration ¶ 14; Ex. A at 5.

53.     Thus, payments made on invoices issued by Artsana within 38 days of their applicable due date are within the "industry standard."   Schaeffer Declaration ¶ 15; Ex. A at 6.

54.     Mr. Schaeffer calculated the number of days after issuance of each Artsana invoice until it was paid.   Invoices paid within 98 days of issuance were paid on or before 38 days late – within the industry standard.   Schaeffer Declaration ¶ 16; Ex. A at 5, 42.

55.     Only 80 of the invoices paid by the Transfers – totaling $42,966.04 – were paid outside of this days-to-pay range, and potentially outside the industry standard terms.   All other invoices paid by the Transfers were made according to ordinary business terms as contemplated by 11 U.S.C. § 547(c)(2)(B). Schaeffer Declaration ¶ 17; Ex. A at 5, 42.

## SUBJECTIVE ORDINARY COURSE OF BUSINESS ANALYSIS

56.     The Applicable Industry can experience seasonal differences in payment timing and order frequency.   To account for this, Mr. Schaeffer assessed industry data (including from RMA) and historical data with respect to Artsana's relationship with BBB from the month of February in the ordinary course analysis, as this is when the challenged payment was made.   Schaeffer Declaration ¶ 18.

57.     Payment history data for 2020 and 2021, both in the Applicable Industry and as between Artsana and BBB, likely was distorted by the Covid-19 pandemic, which included disruptions to worldwide supply chains, temporary changes in the purchasing behavior of

13

businesses and customers, and the creation and implementation of government subsidies and programs aimed at counteracting the economic disruption caused by the pandemic. To account for this, Mr. Schaeffer omitted 2020 and 2021 data from the analysis because it would unreasonably distort the data. Mr. Schaeffer used and assessed historical data for 2019 and 2022. These years are relatively free from the impact of the pandemic. Schaeffer Declaration ¶ 19.

58.    Use of February 2019 and February 2022 data nevertheless still provided sufficient information for Mr. Schaeffer to conduct a full analysis and form opinions, which are set forth in the Report. Schaeffer Declaration ¶ 20.

59.    In February 2019, the Debtors paid invoices 61 to 167 days after issuance – 1 to 107 days past due on the Net-60 terms applicable during the entire historical relationship between the Debtor and Artsana. Schaeffer Declaration ¶ 21; Ex. A at 7, 48-86.

60.    In February 2022, the Debtors paid invoices 62 to 195 days after issuance – 2 to 135 days past due on the Net-60 terms applicable during the entire historical relationship between the Debtor and Artsana. Schaeffer Declaration ¶ 22; Ex. A at 7, 86-108.

61.    During the Preference Period, all invoices paid by the Transfers were paid 76 days or less after due date. Schaeffer Declaration ¶ 23; Ex. A at 7-8, 109-110.

62.    Artsana provided an excel spreadsheet summary – both to Mr. Schaeffer and to the Plaintiff in discovery – including the invoice date and payment date for all invoice payments from the Debtors that cleared between April 7, 2022 and the Petition Date, which includes the challenged Transfers. Falk Declaration at ¶ 5.

63.    Based on that data, a mathematical analysis was performed of the average days to pay during that historical pre-preference period, the range of days to pay within one standard deviation of that average, and another range capturing 80% of all payments during that historical

pre-preference period (created by excluding the top and bottom 10% of the days-to-pay range).

The spreadsheet including mathematical analysis is attached as **Exhibit D**. Falk Declaration at ¶ 6.

64. Based on an analysis of transactions between the parties during the year prior to the Preference Period, the Debtors paid invoices on average 75.9 days after issuance, with a standard deviation range of 60.7 to 91 days to pay. 80% of all transactions during this period were paid between 59 and 93 days after invoicing. Falk Declaration at ¶ 7.

65. Of the Transfers, 447 of the invoices were paid within 90 days of invoicing, leaving at most $131,985.69 of Transfers paying off debts outstanding for more than 90 days. Falk Declaration at ¶ 8.

66. Of the Transfers, 449 of the invoices were paid within 97 days of invoicing, leaving at most $53,063.87 of Transfers paying off debts outstanding for more than 97 days. Falk Declaration at ¶ 9.

67. Of the Transfers, 505 of the invoices were paid within 14 days of the 91-days-to-pay historical window – within 115 days of invoicing, leaving at most $17,284.25 of Transfers paying off debts outstanding for more than 115 days. Falk Declaration at ¶ 10.

### LACK OF CREDITOR COLLECTION PRESSURE

68. The Debtors administered their inventory orders with Artsana through a "merchant" group and their accounts payable through a separate "accounts payable" group. Crossen Trans. 45:8-18.

69. The merchant group, responsible for ordering, knew that Artsana had suggested it would have to stop certain shipments on account of growing arrears. Crossen Trans. 45:12-46:7.

70. The possibility of a shipment freeze did not cause the Debtors to make a payment towards existing arrearages. Crossen Trans. 42:17.

15

71.     The limited shipping hold and switch to prepayment was aimed, from Artsana's perspective, at mitigating losses, not pressuring the Debtors for payment of antecedent debts. Gwiazdowski Trans. 46-49.

72.     Artsana's shipping hold on select orders was not communicated by Debtors' merchant group to the Debtors' accounts payable team. Crossen Trans. 50:2-13.

73.     Ms. Crossen, as Rule 30(b)(6) representative of the Debtors, testified that the Debtors (and thus Plaintiff as successor to the Debtors) has no evidence of how the switch to prepayment was negotiated, or how the Debtors reacted internally to this switch.  Crossen Trans. 57:2-22.

74.     Artsana did not make payment of arrears a condition to shipping product to the Debtors on a pre-pay basis.  Gwiazdowski Trans. 62:3-12.

75.     The agreement to continue providing goods to the Debtors through a pre-pay invoicing arrangement was not conditioned on Debtors making the Transfers and such also did not put any pressure on the Debtors to make the Transfers. Crossen Trans. 58:9-59:1.

76.     The Debtors decided to pay arrearages to Artsana around the time of the switch to prepayment, but did not feel pressured to make the Transfers. Crossen Trans. 61:6-24.

77.     The Debtors did not believe Artsana would hold prepaid orders if the Transfers were not made. Crossen Trans. 69:17-70:6.

78.     The Debtors intended to make the Transfers to pay the arrearage voluntarily if they had sufficient funds to do so, and Debtors made the Transfers when they did. Crossen Trans. 73:18-74:6.

## ARGUMENT

**A.    Summary Judgment Standard**

79.    Fed. R. Civ. P. 56, applicable pursuant to Fed. R. Bankr. P. 7056, sets the summary judgment standard.  Summary judgment may be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (explaining that the party moving for summary judgment has the initial burden of demonstrating the absence of a dispute of material fact). Once the movant presents sufficient proof in support of the motion, the burden shifts to the nonmoving party to show that "genuine issues of material fact still exist and that summary judgment is not appropriate." *Miller v. JNJ Logistics, LLC (In re Proliance Int'l, Inc.)*, 514 B.R. 426, 429 (Bankr. D. Del. 2014). Mere allegations are not enough to establish a genuine issue of material fact. *Id.* There must be sufficient evidence on which a reasonable trier of fact could return a verdict for the nonmoving party. *Miller v. Westfield Steel, Inc. (In re Elrod Holdings Corp.)*, 426 B.R. 106, 109 (Bankr. D. Del. 2010; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-51 (1986).  A fact is considered material if it might affect the outcome of the suit under governing law.  *See Id*. at 248.

80.    If the moving party satisfies its burden, the party opposing the motion "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). "The mere existence of a scintilla of evidence" in support of the non-moving party is not sufficient to show a genuine issue of material fact. *Anderson*, 477 U.S. at 252.

**B.**    **Artsana Does Not Dispute Plaintiff's Prima Facie Case Pursuant to 11 U.S.C. § 547**

81.    Based on the material undisputed facts, Artsana does not dispute that Plaintiff has made out a prima facie case under 11 U.S.C. § 547.  Artsana submits that it is entitled to summary judgment because the material undisputed facts demonstrate that Artsana has complete ordinary course of business defenses to this claim.

**C.**    **Plaintiff's Motion Must Be Denied**

82.    The Motion cannot be granted because Artsana has complete defenses to Count I and Count II and, thus, as to Counts III, IV and V as well, for the reasons discussed herein.

83.    Artsana does not contend that there are material facts in dispute, but does note that some of Plaintiff's alleged undisputed material facts are not backed by admissible evidence and should not be considered as properly-established facts by the Court.  Additionally, Plaintiff has characterized the record in a fundamentally inaccurate manner, to highlight alleged "pressure" that indisputably did not impact the Debtors' decision to make the Transfers.

84.    If the Court does not find on this record that Artsana is entitled to summary judgment, Artsana submits that the proper remedy is to deny Plaintiff's Motion.

**D.**    **Artsana is Entitled to Summary Judgment on Count I**

   i.    <u>The Transfers Were Made in Accordance With Industry Standards</u>

85.    The purpose of the defense provided by Section 547(c)(2)(B) of the Bankruptcy Code is:

> "to leave undisturbed normal financial relations" and to discourage "unusual actions," such as the imposition of credit pressure, that might destabilize a debtor nearing bankruptcy. This preservation of routine interactions is intended to encourage vendors to continue to deal with distressed companies on ordinary terms, and thus provide companies facing some measure of financial distress the opportunity to weather the storm and perhaps avoid a bankruptcy filing.

*In re Fred's Inc.*, No. 19-11984 (CTG), 2025 WL 208536, at *6 (Bankr. D. Del. Jan. 15, 2025).

The legislative history is in accord.  H.R. Rep. No. 95-595, at 373 (1977) (the purpose of Section

547(c)(2) is "to leave undisturbed normal financial relations."). *See also* Collier on Bankruptcy

¶ 547.04 [2] (16th ed. 2024) ("This section is intended to protect recurring, customary credit

transactions that are incurred and paid in the ordinary course of business of the debtor and the

debtor's transferee.").

86.      Pursuant to Bankruptcy Code section 547(c)(2)(B) a transfer is unavoidable if

made: (1) "in payment of a debt incurred by the debtor in the ordinary course of business or

financial affairs of the debtor and the transferee" and (2) "according to ***ordinary business terms***."

(emphasis added).

87.      The phrase "ordinary business terms" in section 547(c)(2)(B) refers to the practices

in the preference defendant's industry. *See Miller v. Fla. Mining & Materials (In re A.W. &*

*Associates, Inc.)*, 136 F.3d 1439, 1443 (11th Cir. 1998); *Fiber Lite Corp. v. Molded Acoustical*

*Prods., Inc. (In re Molded Acoustical Prods., Inc.)*, 18 F.3d 217, 220 (3d Cir. 1994); *In re Tolona*

*Pizza Prods. Corp.*, 3 F.3d 1029, 1033 (7th Cir. 1993).

88.      The phrase "ordinary business terms" means "the range of terms that encompasses

the practices in which firms similar in some general way to the creditor in question engage, and

that only dealing so idiosyncratic as to fall outside the broad range should be deemed extraordinary

and therefore outside the [exception]." *In re Powerwave Techs., Inc.*, No. 13-10134 (MFW), 2017

WL 1373252, at *8 (Bankr. D. Del. Apr. 13, 2017). The defense applies when the transfer

"comports with practices in the relevant industry." *Id.* The objective prong of the ordinary course

defense "is not an exacting standard." *Id.*  Artsana is entitled to "considerable latitude in defining

what the relevant industry is" and "departures from that relevant industry's norms which are not

19

so flagrant as to be 'unusual' remain within" the defense. *Id.* The evidentiary standard in proving

the defense is "**not formidable**." *In re Am. Home Mortg. Holdings, Inc.*, 476 B.R. 124, 141 (Bankr.

D. Del. 2012) (emphasis added).

89.     "[T]he applicable industry standard is to be ascertained based on the credit

arrangements of other debtors and creditors in a similar market." *In re AES Thames, LLC,* No. 11-

10334 (KJC), 2016 WL 11595116, at *10 (Bankr. D. Del. Oct. 28, 2016). Data "from the Risk

Management Association is [a] reliable" method to determine the industry standard. *Id.* at *9. For

example, where the "number of days between invoice date and payment date" between the parties

"fell within the payment range" of the applicable RMA data, Judge Carey concluded that the

transfers between the parties fell "within ordinary business terms." *Id.* at *10.

90.     Here, Artsana retained Harold A. Schaeffer to, among other things, assess the

applicable industry standards for payment.  *See Declaration of Harold A. Schaeffer* attached

hereto.  Artsana submits that Mr. Schaeffer is qualified to perform such an analysis and render an

opinion on the industry standard applicable in this case. Mr. Schaeffer has been accepted by courts

as an expert in ordinary course analyses and the methods he employed in this case repeatedly have

been held reliable and sound.  *In re Murray, Inc.*, 392 B.R. 288, 298 (B.A.P. 6th Cir. 2008)

(affirming bankruptcy court that "agreed with Schaeffer's analysis and concluded that the transfers

made during the preference period were in the ordinary course of business between these parties.");

*Dietz v. Jacobs*, No. CIV. 12-1628 JNE/JJG, 2014 WL 1153502, at *7 (D. Minn. Mar. 21, 2014)

(finding Mr. Schaeffer's report reliable and holding that "it was appropriate for Mr. Schaeffer's

report to conduct an analysis under both [the subjective and objective ordinary course defenses]);

*In re AES Thames, L.L.C.*, No. 11-10334 (KJC), 2016 WL 11595116, at *9 (Bankr. D. Del. Oct.

28, 2016) ("Mr. Schaeffer's analysis using RMA data to establish payment practices in the type of

industries that reflect the transactions between the Debtor and P&M Brick is relevant" and admitted).  The methods employed by Mr. Schaeffer in this case also have been employed by other expert witnesses and accepted by the courts.  See *In re Ctr. City Healthcare, LLC*, 664 B.R. 208, 217 (Bankr. D. Del. 2024), aff'd, No. AP 21-50920 (MFW), 2025 WL 3205002 (D. Del. Nov. 17, 2025) (accepting expert report using RMA data and similar methodology to find payments were made in the ordinary course of business).

91.    As set forth and explained in his Report and his Declaration, upon his analysis of the data relating to the Transfers and the Applicable Industry, Mr. Schaeffer concluded that payments made up to 38 days late are within the industry standard.

92.    As set forth in Mr. Schaeffer's Report, the vast majority of the over 592 invoices paid by the Transfers were less than 38 days late as of the time of payment and only 80 invoices – aggregating $42,966.04 – were paid more than 38 days after the due date.  All invoices other than these 80 thus were paid on ordinary business terms and are protected by the objective ordinary course of business defense under 11 U.S.C. § 547(c)(2)(B).

ii.    Creditor Collections Efforts are Irrelevant to the Objective Ordinary Course Defense

93.    Prior to 2005, a preference defendant had to prove that an alleged preference was both subjectively and objective "ordinary" in order to assert the ordinary course defense.  That changed with the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") became effective. After BAPCPA a preference defendant can rely on either the subjective **or** objective ordinariness of a transaction and does not have to prove both in order to prevail.  *See* 11 U.S.C. § 547(c)(2).

94.    Following BAPCPA, courts have pushed back on efforts to import elements of the subjective analysis into the objective analysis.  *See In re Fred's Inc.*, No. 19-11984 (CTG), 2025

21

WL 208536, at *8 (Bankr. D. Del. Jan. 15, 2025) (rejecting use of historical comparison showing how the relevant industry treated distressed companies and holding that the "purpose [of section 547(c)(2)(B)] requires the adoption of the "healthy debtor" standard for measuring what is ordinary in the relevant industry.").

95.    The one court that addressed this issue directly rejected the argument that the specific relationship between the debtor-transferor and the transferee, inclusive of asserted undue collections efforts, had any relevance to an industry standard-based ordinary course of business defense. In *In re Ctr. City Healthcare, LLC*, 664 B.R. 208 (Bankr. D. Del. 2024), aff'd, No. AP 21-50920 (MFW), 2025 WL 3205002 (D. Del. Nov. 17, 2025), the Delaware Bankruptcy Court explicitly held that "any evidence of the Defendant's collection activity, even if extraordinary or unusual, is not relevant to the objective ordinary course of business defense." *In re Ctr. City Healthcare, LLC*, 664 B.R. at 217.

96.    Also, as the *Fred's Inc.* court noted, the policy purpose of the objective or industry standard ordinary course defense is to offer protection to vendors that act within the bounds of their industry in extending credit – even if that behavior may vary from the historical interactions between the parties.  That purpose is undermined if the "creditor pressure" argument applicable to the subjective ordinary course defense is applied to an objective ordinary course preference analysis. *In re Fred's Inc.*, 2025 WL 208536, at *8

97.    The Transfers were made in the ordinary course of business, both subjectively and objectively.  Creditor collections efforts clearly have relevance to the subjective ordinariness of transfers – though here the undisputed facts show that collections efforts had no impact on the Debtors' decision to make the Transfers.

22

98. However, if a creditor undertakes collections efforts that do exert anomalous pressure, and then receives payment consistent with industry standards, the creditor must be able to assert the objective ordinary course defense or else the policy purposes of the defense are inverted. In Plaintiff's formulation, to take advantage of the "industry standard," the creditor must be paid on credit terms that are consistent with the applicable industry, and must not undertake any collections activity that is inconsistent with **the past dealings between the parties**.

99. Plaintiff cites numerous cases addressing the question, "what is sufficient creditor pressure?" But all of these cases either predate BAPCPA (which added the key disjunctive "or" between the objective and subjective ordinary course defenses) or address only the subjective ordinary course defense.

100. Plaintiff offers no on-point legal support for his position. The key case on this issue, *Ctr. City Healthcare, LLC*, holds that collections efforts are irrelevant to the objective ordinary course analysis. The policy purposes of the objective ordinary course defense are consistent with Artsana's position, and contrary to Plaintiff's. The Court must not import subjective standards into the objective defense. Creditor collections efforts have no impact on the objective ordinary course defense.

    iii.    <u>The Transfers Were Made in the Ordinary Course of Business Between the Debtors and Artsana</u>

101. To assess whether the Transfers were made in the ordinary course of business between the Debtors and Artsana, and thus protected by the subjective ordinary course defense of section 547(c)(2)(A), the Court should be guided by a number of factors including:

> (1) the length of time the parties engaged in the type of dealings at issue;
> (2) whether the subject transfers were in an amount more than usually paid;
> (3) whether payments at issue were tendered in a manner different from previous payments;
> (4) whether there appears to have been an unusual action by the debtor or creditor to collect on or pay the debt; and

(5) whether the creditor did anything to gain an advantage (such as additional security) in light of the debtor's deteriorating condition.

*In re FBI Wind Down, Inc.*, 614 B.R. 460, 487 (Bankr. D. Del. 2020).

102.    The key factor is the timing of payments.  "Late payments do not prevent a court from finding that section 547(c)(2)(A) applies when there is a pattern of late payments in both the historical and preference periods, thereby showing their ordinariness."  *In re Powerwave Techs., Inc.*, No. 13-10134 (MFW), 2017 WL 1373252, at *4 (Bankr. D. Del. Apr. 13, 2017).

103.    An ordinary-course analysis based on the range of historical payments is commonly called a "pure range" analysis.  "The pure range analysis is regularly used in this [the Bankruptcy Court for the District of Delaware] and is an acceptable methodology for an ordinary course analysis in appropriate circumstances."  *In re United Tax Grp., LLC*, No. 14-10486 (LSS), 2021 WL 6138214, at *6 (Bankr. D. Del. Sept. 2, 2021); *In re JSL Chem. Corp.*, 424 B.R. 573, 581 (Bankr. S.D. Fla. 2010) (Applying pure range analysis, "The Court finds that the Payment, which was 29 days late, is within the 0 to 33 day range of consistently late pre-preference payments made by the Debtor to the Defendant.").

104.    Average time intervals between the invoice date and payment date within the preference period and during the historical pre-preference period are "logical comparisons in making such an analysis." *See e.g., In re CCG 1355, Inc.*, 276 B.R. 377, 383 (Bankr. D.N.J. 2002) (citing *In re Gateway Pac. Corp.*, 153 F.3d 915, 918 (8th Cir. 1998)).

105.    Courts have found that preference period transfers with the following deviations from the historical period were within the ordinary course:

   a.    *Hunter v. Amerisource Corp. (In re Parkview Hospital)*, 213 B.R. 509, 515-16 (Bankr. N.D. Ohio 1997): 18 day difference in certain preference period

payments made in 50 days v. 32 days in the historical period, representing a 56% deviation;

b. *Branch v. Ropes & Gray (In re Bank of New England Corp.)*, 161 B.R. 557, 560 (Bankr. Mass. 1993): 16.3 day difference (54.7 v. 38.4) representing a 42% deviation;

c. *Hechinger Liquidation Trust v. James Austin Co. (In re Hechinger Inv. Co. of Del., Inc.),* 320 B.R. 541, 549 (Bankr. D. Del. 2004): 10 day difference (39 days late v. 29 days late) representing a 34.4% deviation;

d. *Huffman v. New Jersey Steel Corp. (In re Valley Steel Corp.)*, 182 B.R. 728, 737 (Bankr. W.D. Va. 1995): 13 day difference (67 v. 54) representing a 24% deviation;

e. *FBI Wind Down Inc. Liquidating Tr. v. All American Poly Corp., (In re FBI Wind Down, Inc.)*, 581 B.R. 116, 141 (Bankr. D. Del. 2018): 9.3 day difference (55.54 v. 46.24) representing a 20.1% deviation;

f. *Sass v. Vector Consulting, Inc. (In re Am. Home Mortg. Holdings, Inc.)*, 476 B.R. 124, 137 (Bankr. D. Del. 2012): 33 day difference (57.4 v. 24.7) representing a more than 100% deviation; and

g. *Forman v. Moran Towing Cop. (In re AES Thames, LLC)*, 547 B.R. 99, 105 (Bankr. D. Del. 2016): historical period payments made on average 2.45 days late while the preference period payments were made 15.63 days late, representing a 48% deviation.

106. As set forth in the Statement of Material Facts, the Debtors and Artsana had a longstanding relationship; during the course of that relationship Artsana offered the Debtors Net-

25

60 credit terms.  The invoices paid by the Transfers were issued in a manner consistent with past practices, invoiced on Net-60 terms, and paid in a manner no different from that previously used by the parties. For example, the Transfers were made on account of many invoices collected over a period of time and were paid by ACH, as were most prior payments by the Debtors.

107.    The Transfers were made on account of invoices beyond their 60 day due date, but the vast majority of the historical invoices paid also were paid beyond such terms.

108.    As reflected in his Report, Mr. Schaeffer also analyzed the relevant history between the parties.  *See Schaeffer Declaration*.  The applicable range of days to pay invoices in the time frame prior to the Preference Period was up to 135 days late.  See Ex. A at 7, 95. An even more restrictive view dictates that relevant historical payments were made up to 107 days late.  Ex. A at 7, 48.

109.    All the invoices paid by the Transfers were 76 days late or less.

110.    Based on an analysis of transactions between the parties during the year prior to the Preference Period, the Debtors paid invoices on average 75.9 days after issuance, with a standard deviation range of 60.7 to 91 days to pay.  80% of all transactions during this period were paid between 59 and 93 days after invoicing.

111.    Of the Transfers, 447 of the invoices were paid within 90 days of invoicing, leaving at most $131,985.69 of Transfers paying off debts outstanding for more than 90 days.

112.    Of the Transfers, 449 of the invoices were paid within 97 days of invoicing, leaving at most $53,063.87 of Transfers paying off debts outstanding for more than 97 days.

113.    Of the Transfers, 505 of the invoices were paid within 14 days of the 91-days-to-pay historical window – within 115 days of invoicing, leaving at most $17,284.25 of Transfers paying off debts outstanding for more than 115 days.

26

114. Each invoice paid by the Transfers was was solidly within the ordinary course of historical transactions between Artsana and the Debtors.

115. The undisputed facts show that the Transfers were made in the ordinary course and cannot be avoided as a preference.

      iv.    <u>The Undisputed Facts Show the Debtors Did Not Make the Transfers in Response to Pressure from Artsana</u>

116. Many creditor collections efforts are entirely appropriate either as a matter of common sense and/or when judged in the context of the parties' relationship. "Unusual" or "undue" efforts may impact a creditor's subjective ordinary course defense. *See e.g.*, *In re Molded Acoustical Prods., Inc.*, 18 F.3d 217 (3d Cir. 1994) (pressuring debtor to make larger payments as a condition to future shipments), *Lightfoot v. Ameilia Mar. Serv., Inc. (In re Sea Bridge Marine, Inc.)*, 412 B.R. 868, 874 (Bankr. E.D. La. 2008) (threatening legal action), and *Esser v. First Fed. Fin. Serv. (In re Carini)*, 245 B.R. 319, 324 (Bankr. E.D. Wis. 2000) (same), or *Schwinn Plan Comm. v. AFS Cycle & Co., Ltd. (In re Schwinn Bicycle Co.)*, 205 B.R. 557, 565-67 (Bankr. N.D. Ill. 1997) (making it clear that future product would not be shipped absent payment of the past due amounts).

117. As demonstrated by the undisputed facts, Artsana did none of these things.

118. Communications asking for payment, and suggestions that a vendor may have to stop doing business with a debtor if not paid are not unusual collections activities. *See e.g. Comm. Unsecured Creditors of Gregg Appliances v. Curtis Int'l Ltd. (In re HHGregg, Inc.)*, 636 B.R. 545, 551 (Bankr. S.D.Ind. 2022) (creditor's collection e-mails to the debtor in the preference period, although more frequent and more intense in tone, did not rise to the level of unusual collection activity); *In re FBI Wind Down, Inc.*, 614 B.R. 460 (Bankr. D. Del. 2020) (declining to find unusual collection activity based on the debtor's position that creditor had (i) noticeably shifted its

collection attitude, (ii) contacted debtor's A/P department to request payment, (iii) advised that absent payment the provision of temporary employees would have to stop, and (iv) referencing use of in-house legal counsel); *In re AE Liquidation, Inc.*, No. 08-13031 (MFW), 2013 WL 5488476 (Bankr. D. Del. Oct. 2, 2013) (letter to the debtor complaining about the debtor's failures to pay and advising that the creditor could not restart production unless payment was made was not an unusual collection activity).

119.    As the undisputed facts demonstrate, these legitimate actions are consistent with Artsana's conduct.

120.    Both these lines of cases have a theory in common: causality.  In the cases finding pressure, those courts held that the collections activity was communicated to the debtor and effectively forced the debtor to make a preferential transfer, which made that transfer inherently outside the ordinary.  In the cases finding no unusual pressure, the creditor's actions did not force the debtor to make a preferential transfer, so that transfer could still be considered ordinary.

121.    Causality is lacking here for two reasons.  First, the change to pre-payment on or about January 10, 2023 was for go-forward orders only.  That change had no impact on either Artsana's ability or willingness to continue shipping going forward or with the Debtors' decision to make the Transfers.  Second, the Debtors did not make the Transfer in response to the switch to pre-payment but rather based upon their own desire to pay and availability of cash to pay their vendors.

122.    Changes in go-forward business practices – or even the cessation of business –  is not unusual, undue or unwarranted collections activity when aimed at mitigating harm to the vendor, not pressuring the debtor.  In *In re Big Wheel Holding Co., Inc.*, 223 B.R. 669, 674–75 (Bankr. D. Del. 1998), the vendor "served a reclamation notice and stopped all shipments of goods

28

at that time." That court held that this fact did not prevent the vendor from succeeding on its ordinary course defense because doing so "would effectively engraft a fourth and conjunctive requirement onto section 547(c)(2), that the ordinary course exception to the preference rule is available only where the creditor 'continues dealing with a distressed Debtor so as to kindle its chances of survival without a costly detour through bankruptcy.'"

123.    The switch to prepayment can only be unusual collection activity if Artsana demanded payment of the invoices issued for shipments already made as a condition to continuing shipping after prepayment. Artsana did not make such a conditional arrangement, and the Debtors knew it. Rather, as their representative testified at her deposition, the Debtors decided to pay existing invoices voluntarily per their own desires and cash availability.

124.    There also was no implicit pressure from Artsana. There is no evidence in the record, and none exists otherwise, that the Debtors considered Artsana a crucial vendor, such that a threat to cease doing business would inherently apply pressure to the Debtors. Invoicing and shipping between Artsana and the Debtors historically was very frequent, often a daily activity. The 51-day delay between the shipping hold and the Debtors' commencement of prepaid ordering shows that the Debtors did not treat Artsana as a mission-critical vendor: no business would allow a vendor to stop necessary inventory shipments for that long if the vendor was critical to its survival. Artsana stood ready, willing and able to ship prepaid orders without payment of arrears. The Debtors then placed prepaid orders as soon as cash became available, and Artsana filled them.

125.    Where credit terms do not change during the preference period, courts are inclined to find a transaction was ordinary. *In re Tennessee Valley Steel Corp.*, 201 B.R. 927 (Bankr. E.D.Tenn. 1996) (challenged transaction was ordinary when made later than normal but consistent with historical lateness). It is only when a vendor changes the terms ***and then is paid on*** those

29

new terms – i.e., on invoices already issued under the old terms – that "unusual collections" have occurred. *See In re Hechinger Inv. Co. of Delaware, Inc.*, 489 F.3d 568, 576–78 (3d Cir. 2007) (payments were out of the ordinary where vendor "tightened its credit terms, imposed a credit limit, required [debtor] to make payments by wire transfer in large, lump-sum amounts, and required [debtor] to send remittance advices after making payment on invoices"). The switch to pre-payment, of course, had no impact on the credit terms applicable to already issued invoices for orders already shipped.

126.    Artsana did not change the credit terms on the invoices paid by the Transfers – those invoices were on the customary Net-60 terms with no other unusual features.   Like in *Tennessee Valley*,   those invoices were paid after their due date, but within the historical boundaries of late payments between the parties.

127.    At a higher level, the undisputed facts show that the Debtors did not subjectively **experience** any pressure from Artsana's activities and respond by making the Transfers.

128.    At her deposition as a representative of the Debtors pursuant to Fed. R. Civ. P. 30(b)(6), Laura Crossen, testified to the following facts, none of which are rebutted or contested by any other facts in the record or in Plaintiff's Statement of Material Undisputed Facts:

- The Debtors administered their inventory orders through a "merchant" group and their accounts payable through a separate "accounts payable" group.  Crossen Trans. 45:8-18.

- The merchant group, responsible for ordering, knew that Artsana had suggested it would have to stop certain shipments on account of growing arrears. *See* Crossen Trans. at 45:12-46:7

- The possibility of a shipment freeze did not cause the Debtors to make a payment towards existing arrearages. Id. at 42:17;

- When Artsana imposed a shipping hold on select orders, its existence was not communicated to the accounts payable team at the Debtors. Id. at 50:2-13;

30

- Ms. Crossen – and by extension the Debtors – had no knowledge of how the switch to prepayment was negotiated, or how the Debtors reacted internally to this switch. Id. at 57:2-22;

- A requirement to pay arrearages before prepayments would be accepted theoretically **could** put pressure on the Debtors, but Artsana did not make such a condition and such did not put any pressure on the Debtors to pay. Id. at 58:9-59:1;

- The Debtors decided to pay some arrearages to Artsana around the time of the switch to prepayment, but, the Debtors specifically **did not** feel pressured to make the payment. Id. at 61:6-24;

- The Debtors did not believe Artsana would hold prepaid orders if arrears were not paid. Id. at 69:17-70:6; and

- The Debtors intended to pay the arrearage voluntarily if it had sufficient funds, and made such a payment when it had funds to do so. Id. at 73:18-74:6.

129.    In sum, the only alleged pressure from Artsana that Ms. Crossen could identify consisted solely of "required prepayment," "communications" regarding open shipments, and a hold on some shipments. Id. at 71:23-72:1. Under the applicable case law these kinds of routine creditor collection activities are not unusual, or are not relevant to the issue of creditor pressure. Artsana may assert its subjective ordinary course defense; as discussed above this defense defeats the entire preference claim.  Artsana is entitled to summary judgment on Count I.

E.    **Artsana is Entitled to Summary Judgment on Count II**

130.    Count II seeks to avoid the Transfers as constructively fraudulent under 11 U.S.C. § 548(a)(1)(B).  To carry its burden Plaintiff must show that the Transfers were made for "less than a reasonably equivalent value."  11 U.S.C. § 548(a)(1)(B)(i).

131.    "However, payments made to satisfy a prior enforceable debt or obligation are necessarily transfers made for reasonably equivalent value." *In re Fitzpatrick Container Co.*, 670 B.R. 425, 441 (Bankr. E.D. Pa. 2025).

132.    Plaintiff and Artsana are in agreement: the Transfers paid existing antecedent debts. They were made for reasonably equivalent value per se.

31

133.     The undisputed facts show that Plaintiff cannot prevail on his claim for avoidance of a constructively fraudulent transfer.  Artsana is entitled to summary judgment on Count II.

**F.     Artsana is Entitled to Summary Judgment on Counts III and IV**

134.     Artsana is entitled to judgment in its favor on Counts III[14] (seeking Recovery of Avoided Transfers under 11 U.S.C. § 550) and IV (seeking disallowance of all claims under 11 U.S.C. § 502(d) and (j)).

135.     Claims under section 550 require an underlying avoidable transfer.  *See* 11 U.S.C. § 550(a) (allowing recovery "to the extent that a transfer is avoided").

136.     Section 502(d) also requires a valid underlying avoidance claim.  *See* 11 U.S.C. § 502(d) (disallowing claims for any entity "from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title.")

137.     When all avoidance claims in a case lose their viability, claims under sections 502(d) and 550 "are both dependent on the success of the preference and fraudulent transfer claims" and must be dismissed.  *In re CL H Winddown LLC,* No. 21-10527 (JTD), 2023 WL 5740195, at *4 (Bankr. D. Del. Sept. 5, 2023) (dismissing 11 U.S.C. § 502(d) and § 550 claims with prejudice.)

138.     As set forth in the Cross-Motion, Artsana is entitled to summary judgment on Counts I and II, the only avoidance claims in this case.  Without the underlying avoidance claims Plaintiff cannot succeed on Counts III or IV as a matter of law.  The Court must enter judgment in Artsana's favor on Counts III and IV.

---

[14]     The Motion does not request entry of a judgment regarding Court III, under 11 U.S.C. § 550, so Plaintiff cannot obtain such a judgment via the Motion.

## CONCLUSION

For the reasons set forth above, the Court must enter judgment in Artsana's favor and against Plaintiff on all counts in the Complaint.

**SAUL EWING LLP**

*/s/ Turner N. Falk*
Turner N. Falk, Esq.
1735 Market Street, 34th Floor
Philadelphia, PA 19103
Telephone: (215) 972-7777
Email: turner.falk@saul.com

*Counsel for Artsana USA, Inc.*

33