EXHIBIT

EXHIBIT
9
Laura Crossen
9/8/2025

## Falk, Turner N.

| | |
|---|---|
| **From:** | Steve McLaughlin <IMCEAEX-_o=ExchangeLabs_ou=Exchange+20Administrative+20Group+20+28FYDIBOHF23SPDLT+29_cn=Recipients_cn=58e11f0bd91a4de68b884de3ea85b487-Steve+20McLau@EURP251.PROD.OUTLOOK.COM> |
| **Sent:** | Tuesday, January 10, 2023 2:09 PM |
| **To:** | Chad Taylor; Nora.Shoots@buybuybaby.com; christina.dibella@buybuybaby.com |
| **Cc:** | Josh Pahl |
| **Subject:** | Chicco |
| **Attachments:** | BBB AGING 1-10-2023.xlsx |

Good afternoon team,

Considering recent news, we regret to inform you that we will be moving our terms to prepayment effective immediately on invoices dated 1/10/2023 or later. We understand this move is not ideal and can review as more information on the state of the business is released.

I have attached the current aging report prepared by our finance team for your review. Our expectation is that payments will continue as outlined for anything invoiced prior to 1/10/2023 according to our current terms agreement.

We appreciate your partnership as we navigate this challenging time.

Regards,
Steve

**Steve McLaughlin**
Vice President of Sales

Chicco USA │ Artsana USA

1826 William Penn Way │ Lancaster, PA 17601

p 717-735-6200 │ f 717-735-0888 │ chiccousa.com



EXHIBIT
EXHIBIT
14
Laura Crossen
9/8/2025

**Falk, Turner N.**

| | |
|---|---|
| **From:** | Juan Guerrero <Juan.Guerrero@bedbath.com> |
| **Sent:** | Wednesday, March 15, 2023 12:49 PM |
| **To:** | Joel Bettinger |
| **Subject:** | FW: URGENT - Load status needed |

Is this what you were refereeing to re: Central?  Juan

**From:** Patty Wu <patty.wu@bedbath.com>
**Sent:** Wednesday, March 15, 2023 12:15 PM
**To:** Jenny Son <Jenny.Son@buybuybaby.com>; Juan Guerrero <Juan.Guerrero@bedbath.com>; John Yacka <John.Yacka@bedbath.com>
**Cc:** Robert Westbay <Robert.Westbay@buybuybaby.com>; Christina Dibella <Christina.DiBella@buybuybaby.com>; Yenumula, Rahul <ryenumula@alixpartners.com>
**Subject:** RE: URGENT - Load status needed

Juan & John – need to connect ASAP.  Texting you both now…

**From:** Jenny Son <Jenny.Son@buybuybaby.com>
**Sent:** Wednesday, March 15, 2023 12:13 PM
**To:** Juan Guerrero <Juan.Guerrero@bedbath.com>; John Yacka <John.Yacka@bedbath.com>
**Cc:** Patty Wu <patty.wu@bedbath.com>; Robert Westbay <Robert.Westbay@buybuybaby.com>; Christina Dibella <Christina.DiBella@buybuybaby.com>; Yenumula, Rahul <ryenumula@alixpartners.com>
**Subject:** URGENT - Load status needed
**Importance:** High

Hello Juan,

Please see below – our supplier partner Artsana (Chicco) has forwarded the response from CT carrier that they have their goods and are holding until they are made current on past due invoices.
They have also started selling off goods – as they refer to this as salvage.  We made payment to Artsana the week of 2/20 for over $1M of new product.
Please advise if CT is in the pipeline to get paid for shipping – also is there any recourse for the goods they are selling off?

Thank you,
Jenny

jenny son
Vice President, GMM Category Management
jenny.son@buybuybaby.com
650 Liberty Avenue
Union, NJ 07083
t: 908-557-3115
c: 201-889-1419

welcome to parenthood™
buybuy BABY



**From:** Steve Rubin <Steve.Rubin@artsana.com>
**Sent:** Wednesday, March 15, 2023 12:03 PM
**To:** Christina Dibella <Christina.DiBella@buybuybaby.com>; Heather Hatfield <Heather.Hatfield@buybuybaby.com>; Josh.Pahl@artsana.com; John Yacka <John.Yacka@bedbath.com>; Robert Westbay <Robert.Westbay@buybuybaby.com>; Jenny Son <Jenny.Son@buybuybaby.com>
**Subject:** RE: Load status needed

CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.

Ye they need payment.  I just spoke to them and they have had no communications at all.  Also, mentioned we are not the only vendor they have shipments for and had to send other to salvage already.

This is 26 pallets, 6 VDPs worth of merchandise.  As you know we were paid for this merchandise already and your systems routed these with Central.

Thank you,

Steve Rubin

**From:** Christina Dibella <Christina.DiBella@buybuybaby.com>
**Sent:** Wednesday, March 15, 2023 11:55 AM
**To:** Steve Rubin <Steve.Rubin@artsana.com>; Heather Hatfield <Heather.Hatfield@buybuybaby.com>; Josh Pahl <Josh.Pahl@artsana.com>; John Yacka <John.Yacka@bedbath.com>; Robert Westbay <Robert.Westbay@buybuybaby.com>; Jenny Son <Jenny.Son@buybuybaby.com>
**Subject:** RE: Load status needed

**EXTERNAL EMAIL** - Prestare attenzione a eventuali collegamenti o allegati - Be careful with links or attachments

Steve, what exactly does Central need, payment?  Can you please clarify so we can elevate?

## Chrissy DiBella

Buyer, Gear & Playroom
Christina.DiBella@buybuybaby.com
t: 908.855.2712

welcome to parenthood™

buybuy BABY

---

**From:** Steve Rubin <Steve.Rubin@artsana.com>
**Sent:** Wednesday, March 15, 2023 11:53 AM
**To:** Christina Dibella <Christina.DiBella@buybuybaby.com>; Heather Hatfield <Heather.Hatfield@buybuybaby.com>; Josh.Pahl@artsana.com; John Yacka <John.Yacka@bedbath.com>; Robert Westbay <Robert.Westbay@buybuybaby.com>; Jenny Son <Jenny.Son@buybuybaby.com>
**Subject:** RE: Load status needed

CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.

FYI latest communication.  Just so everyone is aware when they say salvage, they will sell the merchandise off.  We need a resolution quickly.

There has been no communication for resolution. Freight will prep and route for salvage Friday if the resolution continues to not be supplied.

*Thank you,*

*Rhonda*
Driver Collect Team Lead
P: (586) 939-7000 Ext. 0236
F: 586-819-0837
cs.customerbillingsupport@centraltransport.com



Visit us on *Facebook* • *Twitter* • *LinkedIn*

**Confidentiality Notice/Disclaimer:** This e-mail message and any attachments accompanying this transmission (the "Communication"), is intended for use only by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient (or the person, employee, or agent responsible for delivering this Communication to the intended recipient), you are hereby notified that disclosure,  distribution, printing, or action taken in reliance on the contents of this Communication is strictly prohibited. If you have received this Communication in error, please immediately **NOTIFY** the sender by reply e-mail or phone and **DELETE** the Communication, including printouts or copies if any.

**From:** Kevin Bardascini <kevin.bardascini@consultant.bedbath.com>
**Sent:** Wednesday, March 15, 2023 11:37 AM
**To:** CS.CustomerBillingSupport <cs.customerbillingsupport@centraltransport.com>; 'Steve Rubin' <Steve.Rubin@artsana.com>; 'Amy Cruz' <Amy.Cruz@artsana.com>; Kim Tomlinson <ktomlinson@centraltransport.com>; Samantha Gurney <sgurney@centraltransport.com>
**Cc:** 'Richard Sweeney' <Richard.Sweeney@artsana.com>; TMSNE <TMSNE@bedbath.com>; Josh.Pahl@artsana.com
**Subject:** [EXTERNAL] RE: **URGENT** 6 shipments - 26 skids - freight on hold - rc

******EXTERNAL email. Always use extra caution when opening attachments or links******

!
Good morning,
All Central issues are being addressed at BBB management level.

**Kevin Bardascini**
Logistics Consultant
Kevin.bardascini@consultant.bedbath.com


Thank you,

Steve Rubin

---

**From:** Christina Dibella <Christina.DiBella@buybuybaby.com>
**Sent:** Wednesday, March 15, 2023 11:31 AM
**To:** Steve Rubin <Steve.Rubin@artsana.com>; Heather Hatfield <Heather.Hatfield@buybuybaby.com>; Josh Pahl <Josh.Pahl@artsana.com>; John Yacka <John.Yacka@bedbath.com>; Robert Westbay <Robert.Westbay@buybuybaby.com>; Jenny Son <Jenny.Son@buybuybaby.com>
**Subject:** RE: Load status needed

**EXTERNAL EMAIL** - Prestare attenzione a eventuali collegamenti o allegati - Be careful with links or attachments

@Jenny Son for visibility

# Chrissy DiBella
Buyer, Gear & Playroom
Christina.DiBella@buybuybaby.com
t: 908.855.2712

welcome to parenthood™
buybuy BABY

---

**From:** Steve Rubin <Steve.Rubin@artsana.com>
**Sent:** Wednesday, March 15, 2023 11:18 AM
**To:** Heather Hatfield <Heather.Hatfield@buybuybaby.com>; Christina Dibella <Christina.DiBella@buybuybaby.com>; Josh.Pahl@artsana.com; John Yacka <John.Yacka@bedbath.com>; Robert Westbay <Robert.Westbay@buybuybaby.com>
**Subject:** RE: Load status needed


CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.

BBB team please see latest note.  Nothing has been done yet.

Please advise.

Steve

**From:** CS.CustomerBillingSupport cs.customerbillingsupport@centraltransport.com
**Sent:** Wednesday, March 15, 2023 11:15 AM
**To:** 'Kevin Bardascini' kevin.bardascini@consultant.bedbath.com; Steve Rubin Steve.Rubin@artsana.com; Amy Cruz Amy.Cruz@artsana.com; Kim Tomlinson ktomlinson@centraltransport.com; Samantha Gurney sgurney@centraltransport.com
**Cc:** Richard Sweeney Richard.Sweeney@artsana.com; 'TMSNE' TMSNE@bedbath.com; Josh Pahl Josh.Pahl@artsana.com
**Subject:** RE: **URGENT** 6 shipments - 26 skids - freight on hold - rc

**EXTERNAL EMAIL** - Prestare attenzione a eventuali collegamenti o allegati - Be careful with links or attachments

Good Morning,

        Please advise if there has been any movement in resolution from Artsana? Freight is prepping for salvage on Friday 3/17/2023


Thank you,

Steve Rubin

---

**From:** Heather Hatfield <Heather.Hatfield@buybuybaby.com>
**Sent:** Tuesday, March 14, 2023 3:01 PM
**To:** Christina Dibella <Christina.DiBella@buybuybaby.com>; Josh Pahl <Josh.Pahl@artsana.com>; John Yacka <John.Yacka@bedbath.com>; Robert Westbay <Robert.Westbay@buybuybaby.com>
**Cc:** Steve Rubin <Steve.Rubin@artsana.com>
**Subject:** RE: Load status needed

**EXTERNAL EMAIL** - Prestare attenzione a eventuali collegamenti o allegati - Be careful with links or attachments

+@Robert too

Thank you!

---

Heather Hatfield
Demand & Inventory Planner | Gear & Feeding
heather.hatfield@buybuybaby.com
t: 908.855.2219
welcome to parenthood™
buybuy BABY

---

**From:** Christina Dibella <Christina.DiBella@buybuybaby.com>
**Sent:** Tuesday, March 14, 2023 2:43 PM
**To:** Josh.Pahl@artsana.com; John Yacka <John.Yacka@bedbath.com>
**Cc:** Steve Rubin <Steve.Rubin@artsana.com>; Heather Hatfield <Heather.Hatfield@buybuybaby.com>
**Subject:** RE: Load status needed

@John Yacka

# Chrissy DiBella
Buyer, Gear & Playroom
Christina.DiBella@buybuybaby.com
t: 908.855.2712

welcome to parenthood™
buybuy BABY

**From:** Josh Pahl <Josh.Pahl@artsana.com>
**Sent:** Tuesday, March 14, 2023 2:42 PM
**To:** Christina Dibella <Christina.DiBella@buybuybaby.com>; Heather Hatfield <Heather.Hatfield@buybuybaby.com>
**Cc:** Steve Rubin <Steve.Rubin@artsana.com>
**Subject:** FW: Load status needed

CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.

Hi Chrissy/Heather,

I wanted to make you aware of an urgent situation on the most recent shipments.  Our ops team is working with Kevin Bardascini on the below shipments, but it seems to be taking longer than it should and we just got notice from the freight company that if it doesn't leave their facility by Friday they will sell it off.

Are you guys able to reach out to Kevin and make him aware?

Please let me know.

Thanks,
Josh

**From:** Steve Rubin <Steve.Rubin@artsana.com>
**Sent:** Tuesday, March 14, 2023 2:35 PM
**To:** Josh Pahl <Josh.Pahl@artsana.com>
**Subject:** FW: Load status needed

Thank you,

Steve Rubin

**From:** Kevin Bardascini <kevin.bardascini@consultant.bedbath.com>
**Sent:** Monday, March 13, 2023 8:32 AM
**To:** Steve Rubin <Steve.Rubin@artsana.com>; Amy Cruz <Amy.Cruz@artsana.com>; Cynthia Pineda <Cynthia.Pineda@artsana.com>
**Cc:** Richard Sweeney <Richard.Sweeney@artsana.com>; TMSNE <TMSNE@bedbath.com>
**Subject:** RE: Load status needed

**EXTERNAL EMAIL** - Prestare attenzione a eventuali collegamenti o allegati - Be careful with links or attachments

Good morning Steve,
We are working with Central to get the freight to the cosignees as soon as possible.

*Kevin Bardascini*

6

Logistics Consultant
Kevin.bardascini@consultant.bedbath.com

---

**From:** Steve Rubin <Steve.Rubin@artsana.com>
**Sent:** Monday, March 13, 2023 7:29 AM
**To:** Amy Cruz <Amy.Cruz@artsana.com>; Kevin Bardascini <kevin.bardascini@consultant.bedbath.com>; Cynthia Pineda <Cynthia.Pineda@artsana.com>
**Cc:** Richard Sweeney <Richard.Sweeney@artsana.com>; TMSNE <TMSNE@bedbath.com>
**Subject:** RE: Load status needed


CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.


Kevin and BBB team,

Please advise how you want to handle?

Thank you,

Steve Rubin

---

**From:** Steve Rubin
**Sent:** Friday, March 10, 2023 4:30 PM
**To:** Amy Cruz <Amy.Cruz@artsana.com>; Kevin Bardascini <kevin.bardascini@consultant.bedbath.com>; Cynthia Pineda <Cynthia.Pineda@artsana.com>
**Cc:** Richard Sweeney <Richard.Sweeney@artsana.com>; TMSNE <TMSNE@bedbath.com>
**Subject:** RE: Load status needed

Kevin,

BBB routed the freight with central.  How are we supposed to know?

Please advise how you are going to handle.  We are not going to be responsible for the central freight and they are holding it now.

| Pool ID | | | | | | |
|---|---|---|---|---|---|---|
| Pool ID: 2690 | | | | | | |
| | MVDP7120542 | SPR Westfield, ... | 1130005317 | 03/02/2023 10:31 AM | 1617.0 | 310.0 |
| Pool ID: 2693 | | | | | | |
| | MVDP7120552 | FRA Frackville, ... | 1130005307 | 03/03/2023 12:00 AM | 3361.0 | 724.0 |
| Pool ID: 2694 | | | | | | |
| | MVDP7120549 | LIS Old Bethpa... | 1130005310 | 03/03/2023 12:00 AM | 1655.0 | 344 |
| Pool ID: 2659 | | | | | | |

| | | MVDP7120558 | BAL Odenton, ... | 1130005301 | 03/06/2023 12:00 AM | 1824.0 | 321.0 |
|---|---|---|---|---|---|---|---|

⅃ Pool ID: 2668

⅃ Pool ID: 2625

| | | MVDP7120557 | CHI Carol Strea... | 1130005302 | 03/06/2023 12:00 AM | 1330.0 | 288.0 |
|---|---|---|---|---|---|---|---|

⅃ Pool ID: 2647

| | | MVDP7120553 | DET Livonia, MI... | 1130005306 | 03/06/2023 12:00 AM | 1482.0 | 303 |
|---|---|---|---|---|---|---|---|

⊟ Pool ID: 2687

**Steve Rubin**


Thank you,

Steve Rubin


**From:** Amy Cruz <Amy.Cruz@artsana.com>
**Sent:** Friday, March 10, 2023 6:55 AM
**To:** Kevin Bardascini <kevin.bardascini@consultant.bedbath.com>; Cynthia Pineda <Cynthia.Pineda@artsana.com>
**Cc:** Steve Rubin <Steve.Rubin@artsana.com>; Richard Sweeney <Richard.Sweeney@artsana.com>
**Subject:** RE: Load status needed

Good Morning Kevin,
Unfortunately, these left on Monday the 6th.
Going forward I will monitor this closely to make sure it doesn't happen again!

Thank you,
Amy Cruz
Warehouse Coordinator
*"Of all the paths you take in life, make sure a few of them are dirt."* – John Muir


**From:** Kevin Bardascini <kevin.bardascini@consultant.bedbath.com>
**Sent:** Thursday, March 9, 2023 3:17 PM
**To:** Cynthia Pineda <Cynthia.Pineda@artsana.com>; Amy Cruz <Amy.Cruz@artsana.com>
**Subject:** RE: Load status needed

**EXTERNAL EMAIL** - Prestare attenzione a eventuali collegamenti o allegati - Be careful with links or attachments

Central is not to pick up BBB freight. These loads are to all ship via YRC. Did Central already pick up these loads?

*Kevin Bardascini*
Logistics Consultant
Kevin.bardascini@consultant.bedbath.com


**From:** Cynthia Pineda <Cynthia.Pineda@artsana.com>
**Sent:** Thursday, March 9, 2023 3:12 PM
**To:** Amy Cruz <Amy.Cruz@artsana.com>; Kevin Bardascini <kevin.bardascini@consultant.bedbath.com>
**Subject:** RE: Load status needed

8

CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.

Hello,

Please see below:

I do want to advise that at the moment of checking booked carriers for the below loads 3 out of 6 were assigned to Central when we checked (sometime last week). Do you know if it's a possibility that carriers get switched after the fact that they are booked through an assigned? I am only asking because now that I went to check in the BBB portal they are booked through YRC?

| Load Number | Status | Carrier Name | Origin Name | Origin City | Origin State | Dest Code |
|---|---|---|---|---|---|---|
| MVDP7120542 | Booked | Yellow Freight Lines | Artsana - 17601 | Lancaster | PA | SPR |
| MVDP7120543 | Booked | Yellow Freight Lines | Artsana - 17601 | Lancaster | PA | SLC |
| MVDP7120546 | Booked | Yellow Freight Lines | Artsana - 17601 | Lancaster | PA | ORL |
| MVDP7120547 | Booked | Yellow Freight Lines | Artsana - 17601 | Lancaster | PA | MIA |
| MVDP7120549 | Booked | Yellow Freight Lines | Artsana - 17601 | Lancaster | PA | LIS |
| MVDP7120552 | Booked | Yellow Freight Lines | Artsana - 17601 | Lancaster | PA | FRA |

*Thank you,*
*Cynthia Pineda*

**From:** Amy Cruz <Amy.Cruz@artsana.com>
**Sent:** Thursday, March 9, 2023 2:30 PM
**To:** Cynthia Pineda <Cynthia.Pineda@artsana.com>
**Subject:** Fwd: Load status needed

Sent from my iPhone

Begin forwarded message:

> **From:** Kevin Bardascini <kevin.bardascini@consultant.bedbath.com>
> **Date:** March 9, 2023 at 2:15:33 PM EST
> **To:** Steve Rubin <Steve.Rubin@artsana.com>, Amy Cruz <Amy.Cruz@artsana.com>
> **Subject: Load status needed**
>
> **EXTERNAL EMAIL** - Prestare attenzione a eventuali collegamenti o allegati - Be careful with links or attachments
>
> Hello,
> Can you advise if these loads have shipped, if so the pro# for the load?
> Thank you

| Load Number | Status | Carrier Name | Origin Name | Origin City | Origin State | D |
|---|---|---|---|---|---|---|
| MVDP7120542 | Booked | Yellow Freight Lines | Artsana - 17601 | Lancaster | PA | SPR |
| MVDP7120543 | Booked | Yellow Freight Lines | Artsana - 17601 | Lancaster | PA | SLC |
| MVDP7120546 | Booked | Yellow Freight Lines | Artsana - 17601 | Lancaster | PA | ORL |
| MVDP7120547 | Booked | Yellow Freight Lines | Artsana - 17601 | Lancaster | PA | MIA |
| MVDP7120549 | Booked | Yellow Freight Lines | Artsana - 17601 | Lancaster | PA | LIS |
| MVDP7120552 | Booked | Yellow Freight Lines | Artsana - 17601 | Lancaster | PA | FRA |

**Kevin Bardascini**
Logistics Consultant
Kevin.bardascini@consultant.bedbath.com

*This message is confidential and may be legally privileged or otherwise protected from disclosure. If you are not the intended recipient, please telephone or email the sender and delete this message and any attachment from your system; you must not copy or disclose the contents of this message or any attachment to any other person. Copyright in documents created by or on behalf of this firm remains vested in the firm, and we assert our moral rights.*

**Please, think about environment before printing this e-mail**

*This message is confidential and may be legally privileged or otherwise protected from disclosure. If you are not the intended recipient, please telephone or email the sender and delete this message and any attachment from your system; you must not copy or disclose the contents of this message or any attachment to any other person. Copyright in documents created by or on behalf of this firm remains vested in the firm, and we assert our moral rights.*

**Please, think about environment before printing this e-mail**

*This message is confidential and may be legally privileged or otherwise protected from disclosure. If you are not the intended recipient, please telephone or email the sender and delete this message and any attachment from your system; you must not copy or disclose the contents of this message or any attachment to any other person. Copyright in documents created by or on behalf of this firm remains vested in the firm, and we assert our moral rights.*

**Please, think about environment before printing this e-mail**

*This message is confidential and may be legally privileged or otherwise protected from disclosure. If you are not the intended recipient, please telephone or email the sender and delete this message and any attachment from your system; you must not copy or disclose the contents of this message or any attachment to any other person. Copyright in documents created by or on behalf of this firm remains vested in the firm, and we assert our moral rights.*

**Please, think about environment before printing this e-mail**

*This message is confidential and may be legally privileged or otherwise protected from disclosure. If you are not the intended recipient, please telephone or email the sender and delete this message and any attachment from your system; you must not copy or disclose the contents of this message or any attachment to any other person. Copyright in documents created by or on behalf of this firm remains vested in the firm, and we assert our moral rights.*

**Please, think about environment before printing this e-mail**

*This message is confidential and may be legally privileged or otherwise protected from disclosure. If you are not the intended recipient, please telephone or email the sender and delete this message and any attachment from your system; you must not copy or disclose the contents of this message or any attachment to any other person. Copyright in documents created by or on behalf of this firm remains vested in the firm, and we assert our moral rights.*

**Please, think about environment before printing this e-mail**

**Exhibit G-1**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | |
| AES THAMES, L.L.C., | ) | Chapter 7 |
| | ) | |
| Debtor | ) | Case No. 11-10334 (KJC) |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |
| | ) | |
| CHARLES M. FORMAN, | ) | |
| Chapter 7 Trustee, | ) | |
| | ) | |
| | ) | Adv. Case No. 13-50406 (KJC) |
| Plaintiff, | ) | (D.I.  59, 61, 68) |
| v. | ) | |
| | ) | |
| P&M BRICK LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |

### OPINION[1]

**BY:    KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE**

Background

AES Thames, L.L.C. (the "Debtor") owned and operated a coal-fired power plant located in Montville, Connecticut.  P&M Brick, LLC ("P&M Brick") supplied limestone to the Debtor. On February 1, 2011 (the "Petition Date"), the Debtor filed a petition for relief under chapter 11 of the Bankruptcy Code.   On January 23, 2012, the Debtor's case was converted to chapter 7. Charles M. Forman was appointed as Chapter 7 Trustee (the "Trustee") on January 24, 2012, and continues to serve in that capacity.

On January 18, 2013, the Trustee filed an adversary complaint to avoid and recover four prepetition payments from the Debtor to P&M Brick, totaling $677,482.63, as preferential

---

[1] This Opinion constitutes the findings of fact and conclusions of law, as required by Fed. R. Bankr. P. 7052. This Court has jurisdiction to decide this matter pursuant to 28 U.S.C. § 157 and § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(F).

-1-

transfers under Bankruptcy Code §§ 547(b) and 550. P&M Brick filed an answer asserting, among other things, the "ordinary course of business" affirmative defense under Bankruptcy Code § 547(c)(2). The parties engaged in discovery. On January 28, 2014, P&M Brick served the Trustee with a report by Harold A. Schaeffer in support of its ordinary course of business defense. On March 5, 2014, P&M Brick served the Trustee with a second report by Mr. Schaeffer, also in support of its ordinary course of business defense.

On May 1, 2014, the Court granted P&M Brick's motion to amend its answer to assert a "mere conduit" affirmative defense, alleging that P&M Brick "was not an initial transferee" of the transfers because it was "acting as an agent on behalf of the suppliers and shippers."[2] In particular, the Amended Answer (Adv. D.I. 51) avers that P&M Brick was a mere conduit for the following entities:

- Specialty Minerals, Inc., which provided the minerals and/or specialty stone materials shipped to the Debtor or obtained on the Debtor's behalf.

- CS&G Trucking, which provided trucking services for transportation of the minerals and/or specialty stone materials shipped to or obtained on the Debtor's behalf.

- Eastern Barge Services (f/k/a White Near Coastal Towing Corp.) and Mohawk Northeast, Inc., which provided barging services for transportation of the minerals and/or specialty stone materials shipped to or obtained on the Debtor's behalf.[3]

The Trustee filed a Motion for Summary Judgment (Adv. D.I. 59) (the "Trustee's Summary Judgment Motion), as well as a Motion to Exclude P&M Brick's Expert Reports (Adv. D.I. 61) (the "Trustee's Motion to Exclude Reports"). P&M Brick opposes these motions and filed its own Motion for Summary Judgment (Adv. No. 68) ("P&M Brick's Summary Judgment Motion") on its ordinary course of business defense.

---

[2] Amended Ans., Adv. D.I. 51, ¶¶ 38-39.
[3] *Id.* at ¶¶ 30-34.

-2-

For the reasons stated below, I conclude as follows: (1) the Trustee's Summary Judgment Motion will be granted, in part, rejecting P&M Brick's mere conduit defense, but denied, in part, as to the Trustee's request for judgment to be entered in his favor; (2) the Trustee's Motion to Exclude Reports will be denied; and (3) P&M Brick's Summary Judgment Motion will be granted as to P&M Brick's ordinary course of business defense, and judgment will be entered in favor of P&M Brick.

Undisputed Facts[4]

P&M Brick supplied limestone to the Debtor for use in connection with its operations. During the 90 days prior to the Petition Date (the "Preference Period"), the Debtor paid the following invoices (the "Transfers"):[5]

| Invoice Number | Invoice Date | Invoice Amount | Payment Date |
|---|---|---|---|
| 4712 | 9/30/2010 | $108,218.83 | 11/5/2010 |
| 4722 | 9/30/2010 | $ 99,481.20 | 11/5/2010 |
| 4990 | 10/30/2010 | $ 221,119.50 | 12/14/2010 |
| 5131 | 11/23/2010 | $ 248,663.10 | 12/20/2010 |

P&M Brick described the amount of limestone shipped to the Debtors in connection with the Transfers as follows:

- For invoices 4712 and 4722 paid on 11/5/2010 (total $207,700.03), P&M Brick shipped 3,060.96 tons on or about 9/15/2010, and 3,329.81 tons on or about 9/17/2010;

---

[4] In support of their respective summary judgment motions, the parties each submitted their own Statements of Fact. The facts in this section are not in dispute.

[5] Copies of the invoices (the "Invoices") are attached as Exhibit C to the Certification of Harry M. Gutfleish In Support of the Trustee's Motion for Summary Judgment and Motion to Exclude Expert Reports (Adv. D.I. 63) (the "First Gutfleish Certification"). Copies of P&M Brick's bank statements showing payment of the Invoices by the Debtor's wire transfers are attached as Exhibit D to the First Gutfleish Certification.

-3-

- For invoice 4990 paid on 12/14/2010 ($221,119.50), P&M Brick shipped 6,317.70 tons on or about 10/26/2010; and

- For invoice 5131 paid on 12/20/2010 ($248,663.10), P&M Brick shipped 3,564.55 tons on or about 11/16/2010, and 3,540.11 tons on or about 11/18/2010.[6]

In response to the Trustee's interrogatory asking P&M Brick to identify the goods and services rendered to the Debtor in consideration for the Transfers, P&M Brick wrote, in part:

> In general, P&M Brick, LLC supplied de-dusted and/or washed limestone to Debtor. In addition to supplying limestone, P&M Brick, LLC performed a variety of services, including purchasing such limestone from producers; arranging for delivery by truck of such limestone to the P&M Brick, LLC facility in Coeymans, New York; unloading, stockpiling, and storing such limestone at the P&M Brick, LLC facility in Coeymans, New York; loading such limestone on barges; and coordinating shipment by barge of such limestone to the Debtor's facility in Uncasville, Connecticut.[7]

## Standard of Review

Rule 56 of the Federal Rules of Civil Procedure, made applicable by Federal Rule of Bankruptcy Procedure 7056, provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[8] At the summary judgment stage, the court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.[9]

The moving party bears the burden of establishing the absence of a genuine dispute as to a material fact.[10] "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the

---

[6] First Gutfleish Certification, Ex. F, Ans. to interrogatory 10.
[7] First Gutfleish Certification, Ex. F, Ans. to interrogatory 10.
[8] Fed. R. Civ. P. 56(a).
[9] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).
[10] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986).

pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material

fact."[11] When the nonmoving party bears the burden of persuasion at trial, the moving party

"may meet its burden . . . by showing that the nonmoving party's evidence is insufficient to carry

that burden."[12]

Once the moving party has carried its initial burden, the opposing party "must do more

than simply show that there is some metaphysical doubt as to the material facts."[13] Summary

judgment cannot be avoided by introducing only "a mere scintilla of evidence,"[14] or by relying

on "conclusory allegations, improbable inferences and unsupported speculation."[15] "Brash

conjecture coupled with earnest hope that something concrete will materialize, is insufficient to

block summary judgment."[16]

Substantive law determines which facts are material; "[o]nly disputes over facts that

might affect the outcome of the suit will preclude summary judgment."[17] Moreover, a dispute

over a material fact is genuine "if the evidence is such that a reasonable jury could return a

---

[11] *Celotex.*, 477 U.S. at 323, 106 S.Ct. at 2553.

[12] *Foulk v. Donjon Marine Co., Inc.*, 144 F.3d 252, 258 n.5 (3d Cir. 1998) (quoting *Wetzel v. Tucker*, 139 F.3d 380, 383 n.2 (3d Cir. 1998)).

[13] *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

[14] *Sarko v. Penn-Del Directory Co.*, 968 F.Supp. 1026, 1031 (E.D. Pa. 1997) (citation omitted), *aff'd* 189 F.3d 464 (3d Cir. 1999).

[15] *J.Geils Band Emp. Benefit Plan v. Smith Barney Shearson, Inc.*, 76 F.3d 1245, 1251 (1st Cir. 1996) (quoting *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990)).

[16] *J. Geils Band*, 76 F.3d at 1251 (quoting *Dow v. United Bhd. of Carpenters*, 1 F.3d 56, 58 (1st Cir. 1993)).

[17] *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

-5-

verdict for the nonmoving party."[18] The Court must resolve all doubts and consider the evidence

in the light most favorable to the nonmoving party.[19]

## Discussion

A bankruptcy trustee may avoid a debtor's prepetition transfer of a debtor's property if

the following elements of Bankruptcy Code § 547(b) are met: (1) the transfer was made to or for

the benefit of a creditor, (2) on account of a preexisting debt, (3) while the debtor was insolvent,

(4) within 90 days of the debtor's bankruptcy filing, and (5) the transfer enabled the creditor to

receive more than it otherwise would in a hypothetical chapter 7 case.[20] "The preference rule

aims to ensure that creditors are treated equitably, both by deterring the failing debtor from

treating preferentially its most obstreperous or demanding creditors in an effort to stave off a

hard ride into bankruptcy, and by discouraging the creditors from racing to dismember the

debtor."[21]

The Bankruptcy Code also provides for certain defenses to preference suits.[22] The goal is

not to disturb normal creditor relationships, "but to derail unusual ones which threaten to

heighten the likelihood of the debtor filing for bankruptcy at all and, should that contingency

materialize, to then disrupt the paramount bankruptcy policy of the equitable treatment of

---

[18] *Id. See also Delta Mills, Inc. v. GMAC Comm. Fin., LLC (In re Delta Mills, Inc.)*, 404 B.R. 95, 105 (Bankr. D. Del. 2009) (An issue is genuine "when reasonable minds could disagree on the result.").

[19]*Anderson*, 477 U.S. at 255, 106 S.Ct. at 2505 ("[T]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.").

[20] 11 U.S.C. § 547(b).

[21] *Fiber Lite Corp. v. Molded Acoustical Prods., Inc. (In re Molded Acoustical Prods., Inc.)*, 18 F.3d 217, 219 (3d Cir. 1994) *superseded, in part, by statute*, Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, P.L. 109-8, Title IV, §409, 119 Stat 23 (Apr. 20, 2005). Despite the later amendment to § 547, the Third Circuit's analysis upon which I rely for present purposes remains vital, persuasive and controlling.

[22]*Molded Acoustical,* 18 F.3d at 219.

creditors."[23] Even if a transfer satisfies all the elements of Section 547(b), it nevertheless might

be protected. Here, it is undisputed that the Trustee has established a prima facie case for

avoidance of the four Transfers. At issue is whether P&M Brick has a viable mere conduit

defense or ordinary course of business defense based, in part, on expert testimony.

1. Mere Conduit Defense

P&M Brick asserts the affirmative defense that it acted as a "mere conduit" with respect

to the payments in question and that it is not a transferee. Under Bankruptcy Code § 550(a), a

trustee may recover transfers avoided under §§ 547, 548, and 549 from "the initial transferee of

such transfer[s] or [from] the entity for whose benefit such transfer[s were] made[.]"[24] Thus, a

defense to avoidance is available to those entities that are "mere conduits" of the avoided

transfers.[25]

To be a "mere conduit," a defendant must "establish that it lacked dominion and control

over the transfer because the payment simply passed through its hands and it had no power to

redirect the funds to its own use."[26] Where a transferee is "not under any contractual or other

---

[23] *Id.* at 224.

[24] 11 U.S.C.A. § 550(a).

[25] *See, e.g., Broadway Advisors, LLC v. Hipro Electronics, Inc. (In re Gruppo Antico, Inc.)*, 359 B.R. 578, 584–88 (Bankr. D. Del. 2007); *Argus Mgmt. Group v. GAB Robins, Inc. (In re CVEO Corp.)*, 327 B.R. 210 (Bankr. D. Del. 2005); *Official Comm. of Unsecured Creditors v. Guardian Ins. 401 (In re Parcel Consultants, Inc.)*, 287 B.R. 41 (Bankr. D. N.J. 2002).

[26] *CVEO Corp.*, 327 B.R. at 216. *See also Golden v. The Guardian (In re Lenox Healthcare, Inc.)*, 343 B.R. 96, 103 (Bankr. D. Del. 2006) (citing *Jet Fla., Inc. v. Airlines Clearing House, Inc. (In re Jet Fla. Sys., Inc.)*, 69 B.R. 83, 84–85 (Bankr. S.D. Fla.1987) (finding that a clearinghouse used to settle and reconcile accounts between air carriers was a mere conduit rather than an initial transferee with respect to settlement payments received from the debtor for the purpose of disbursement); *Nedlloyd, Inc. v. Universal Trading Corp. (In re Black & Geddes, Inc.)*, 59 B.R. 873, 874–75 (Bankr. S.D.N.Y. 1986) (concluding that a collection agency was merely a conduit, collecting payments due to its principal); *Kaiser Steel Res., Inc. v. Jacobs (In re Kaiser Steel Corp.)*, 110 B.R. 514, 520–21 (D. Colo. 1990) (holding stock broker a conduit for stock redemption payments it received on behalf of its customers); [*Official Comm. of Unsecured Creditors v. U.S. Dep't of Labor,*] *(In re Dairy Stores)*, 148 B.R. [6], at 9 (determining that the Department of Labor, which brought suits to recover back wages for employees, enjoyed no benefit from the recoveries and merely acted as a custodian)).

obligation to use [transferred funds] for the benefit of [third parties,]" but rather, may use the funds freely, it is not a "mere conduit." [27]

P&M Brick alleges it acted as an agent and a mere conduit for payments owed to third parties in the supply chain who made the delivery of limestone possible. Specifically, P&M Brick claims that it was acting as an agent for the supplier and shippers when it accepted the payments from the Debtor. However, P&M Brick's role does not fall within the parameters of a mere conduit. P&M Brick has not established any agency relationships.[28] Moreover, in its answer to the Trustee's Request for Admissions, P&M Brick admitted (among other things) that (i) it's bank account was maintained solely in its name, (ii) it deposited funds into its account from sources other than the Debtor, and (iii) P&M Brick had no written agreements with third parties or the Debtor obligating it to segregate funds, hold funds in escrow or hold funds in trust that it received from the Debtor for the benefit of any third parties.[29]

The Debtor transferred money to P&M Brick in exchange for limestone on four occasions during the Preference Period.[30] P&M Brick was free to do what it pleased with the

---

[27] *Official Comm. of Unsecured Creditors v. U.S. Relocation Servs. (In re 360networks (USA) Inc.)*, 338 B.R. 194, 202 (Bankr. S.D.N.Y. 2005) (holding that the reimbursement relationship between the debtors and the transferee precluded a "mere conduit" defense). *See also Morris v. Sampson Travel Agency, Inc. (In re U.S. Interactive Corp.)*, 321 B.R. 388, 395 (Bankr. D. Del. 2005) (permitting the recovery of transfers from a travel agent who received payments from the debtor, deposited them into its general operating account, and distributed the money as it saw fit); *Richardson v. I.R.S. (In re Anton Noll, Inc.)*, 277 B.R. 875, 880–81 (1st Cir. BAP 2002) (holding that defendant gained dominion and control upon delivery of a check payable to "cash" because the check became negotiable upon the defendant's receipt); *Meininger v. TMG Staffing Servs., Inc. (In re Cypress Rests. of Ga., Inc.)*, 332 B.R. 60, 62–66 (Bankr. M.D. Fla. 2005) (rejecting the "mere conduit" defense where debtor reimbursed a staffing agency for wages it paid in advance to staff employees because the agency's obligation to pay the employees arose regardless of whether the debtor reimbursed it; the monies reimbursed did not simply flow through to the employees).

[28] Even if an agency relationship was established, "[c]ourts have held that the existence of a principal-agent relationship is not dispositive in establishing the "mere conduit" defense." *Lenox*, 343 B.R. at 105 (citing *360networks*, 338 B.R. at 203 n. 10; *Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey v. Alexander & Alexander of New York, Inc.*, 130 F.3d 52, 58-59 (2d Cir. 1997)).

[29] First Gutfleish Certification, Ex. H, Ans. 21 - 86.

[30] The Debtor paid invoice numbers 4712 and 4722 by wire transfer from the Disbursement Account on November 5, 2010, which was received and deposited into P&M Brick's business checking account.

proceeds from that sale. P&M Brick chose to pay a portion of the proceeds to the supplier who supplied the limestone, the trucker who transported the limestone, and the barging companies who barged the limestone. That P&M Brick paid those entities *after* receiving payment from the Debtor, without more, does not establish that P&M acted as a mere conduit of those funds from the Debtor to P&M Brick's supplier and shipping companies. P&M Brick has failed to demonstrate that it lacked dominion and control over the proceeds of the limestone sales. Therefore, the mere conduit defense is not available to P&M Brick.

2.    Ordinary Course of Business Defense

Under Bankruptcy Code § 547(c)(2), a transfer is not avoidable if:

> such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was (A) made in the ordinary course of business of the debtor and transferee, or (B) made according to ordinary business terms.[31]

The language of the statute is disjunctive. A party may establish an ordinary course of business defense by meeting *either* the § 547(c)(2)(A) or § 547(c)(2)(B) standard.[32]

The policies underlying the ordinary course of business defense are two-fold: (1) to encourage creditors to continue dealing with distressed debtors on normal business terms, and (2) to promote equality of distribution by ensuring that creditors are treated equitably.[33] The ordinary course of business defense "was intended to 'leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to

---

The Debtor paid invoice number 5131 by wire transfer from the Disbursement Account on December 20, 2010, which was received and deposited into P&M Brick's business account. All of the invoices direct that the payment shall be made payable to "P&M Brick, LCC."

[31] 11 U.S.C. § 547(c)(2)(A)–(B).

[32] *In re Conex Holdings, LLC*, 518 B.R. 269, 279 (Bankr. D. Del. 2014).

[33] *See Molded Acoustical*, 18 F.3d at 219.

discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy.'"[34]

### a.    Objective Test

The "objective" test in 547(c)(2)(B) focuses on general norms within the creditor's industry.[35] P&M Brick relies on Mr. Schaeffer's expert reports in support of its objective ordinary course of business defense. The Trustee seeks to exclude these reports as unreliable and irrelevant. Thus, as a threshold matter, the Court must decide their admissibility.

### (i)    *Mr. Schaeffer's Expert Reports*[36]

To prepare his reports, Mr. Schaeffer reviewed information and documents received from P&M Brick, as well as the company's website, to determine (i) P&M Brick's industry, (ii) the number of days before P&M Brick received payment on its invoices, and (iii) Risk Management Association ("RMA") data[37] on payment practices for companies in P&M Brick's industry.[38] Mr.

---

[34] *Union Bank v. Wolas*, 502 U.S. 151, 160 (1991) (quoting H.R.Rep. No. 95–595, at 373 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6329).

[35] *In re Molded Acoustical Prod., Inc.*, 18 F.3d 217 (3d Cir. 1994).

[36] The first of Mr. Schaeffer's reports, which was timely submitted, included data on just two industries: the Crushed and Broken Limestone Mining and Quarrying Industry and the Marine Cargo Handling Industry. The second report, which was untimely, included data on the above industries, as well as the Brick, Stone, and Related Construction Material Merchant Wholesalers Industry. The reports are otherwise the same. The Trustee argues that both reports should be excluded under Federal Rule of Evidence 702, and does not press a timeliness objection. There was no prejudice by the late filing, as the Trustee has taken the opportunity to examine and address each report in his pleadings. Thus, I will not exclude the second report for being untimely.

[37] "The Risk Management Association (RMA) is a not-for-profit, member-driven professional association whose sole purpose is to advance the use of sound risk principles in the financial services industry. RMA promotes an enterprise approach to risk management that focuses on credit risk, market risk, and operational risk." First Gutfleish Certification (Adv. D.I. 63), Ex. R at 4.

[38] *See* Schaeffer Aff. On October 16, 2014, P&M Brick submitted the Schaeffer Affidavit in connection with its Motion for Summary Judgment. The Trustee separately moves to strike the Schaeffer Affidavit, arguing that it is a disguised response to the Trustee's Motion for Summary Judgment and Motion to Exclude, which were fully briefed as of the date the Notice of Completion of Briefing was filed on October 10, 2014. The Court disagrees. The Affidavit responds to credibility issues raised in the Trustee's Answer to P&M Brick's Motion, and is admitted for that limited purpose. For the sake of equity, the Court also considers the Trustee's Sur-Reply to P&M Brick's Motion.

-10-

Schaeffer reviewed three industries that were appropriate comparisons for the sales made by P&M Brick to the Debtor during the Preference Period: the "Crushed and Broken Limestone Mining and Quarrying Industry," the "Marine Cargo Handling Industry," and the "Brick, Stone, and Related Construction Material Merchant Wholesalers Industry."[39] For each, he looked at the average days to be paid as reported by the RMA. Then he compared each industry's middle 50% average payment range to the actual payment range of invoices during the Preference Period. Mr. Schaeffer stated that using the RMA industry *averages* as a benchmark—rather than each industry's *actual* payment range—resulted in a more conservative, restrictive spread. This is because an average includes data points (actual invoices paid) above and below it. Thus an actual payment spread would be wider and less conservative than the average payment spread provided by the RMA.[40]

For each industry, the payment data reviewed fell within a date range of April 1, 2010 to March 31, 2011; thus, the RMA data covered the Preference Period. For the Crushed and Broken Limestone Mining and Quarrying Industry, the average number of days for payment (based on a review of 64 financial statements) reflected a low of 26 days to a high of 50 days. For the Marine Cargo Handling Industry, the average number of days for payment (based on a review of 86 financial statements) reflected a low of 27 days to a high of 58 days. The data for the Brick, Stone, and Related Construction Material Merchant Wholesalers Industry reflected an average payment range of 23 to 52 days based on a review of 267 financial statements.[41]

---

[39] First Gutfleish Certification (Adv. D.I. 63), Exs. O, P.

[40] "As stated by RMA, this range of average days to be paid equates to the middle quartiles (50%) of all average days to be paid data compiled for this industry. Data that is outside of this range is considered 'unusual'." First Gutfleish Certification, Ex. O, at 4.

[41] First Gutfleish Certification, Exs. O, P.

The actual payment range for the Debtor's payments to P&M Brick during the Preference Period was between 27 and 45 days. Therefore, the paid invoices fell within the average payment range for each RMA industry analyzed. Mr. Schaefer concluded,

> [E]ven taking a very conservative view of the objective prong of ordinary course of business defense using only [each] industry's middle 50% average payment range . . . the invoices at issue in this Adversary Proceeding were paid within this range, leaving a potential preference amount of $0.00 due to the Debtors' estates.[42]

(ii)    *Admissibility of the Expert Reports Under Fed. R. Evid. 702*

Federal Rule of Evidence 702 sets the standard for the admission of expert reports and testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.[43]

In summary, Rule 702 requires expert testimony to be both reliable and relevant.[44] The party offering the expert has the burden of establishing the admissibility requirements by a preponderance of the evidence.[45]

---

[42] First Gutfleish Certification Exs. O, P

[43] Fed. R. Evid. 702.

[44] *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 597, 113 S.Ct. 2786, 2799, 125 L.Ed.2d 469 (1993) (stating the Federal Rules of Evidence "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.").

[45] *Id.* at 592 n. 10 (citing *Bourjaily v. United States,* 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987)).

-12-

The Third Circuit joins other jurisdictions in taking a liberal view on the admission of expert testimony: "The Rules of Evidence embody a strong and undeniable preference for admitting any evidence which has the potential for assisting the trier of fact."[46] This position is supported in the Committee Notes on the 2000 Amendments to the Federal Rules of Evidence, which state, "the rejection of expert testimony is the exception rather than the rule."

In this case, P&M Brick seeks to use Mr. Schaeffer's expert testimony to support its ordinary course of business defense.[47] According to Mr. Schaeffer, the RMA data establish industry standards on payment practices. Mr. Schaeffer maintains the transfers from the Debtor to P&M Brick fell within the average payment range for each relevant industry, and, therefore, were made in accordance with ordinary business terms and are not avoidable.

The Trustee seeks to exclude Mr. Schaeffer's reports as unreliable and irrelevant. Specifically, the Trustee takes issue with Mr. Schaeffer's exclusive reliance on RMA data. The RMA says its data should be used "only as general guidelines and not as absolute industry norms," and may contain outliers that can cause "a disproportionate influence on the industry composite." The Trustee further argues that Mr. Schaeffer did not know if the sampling of firms in each industry was too small to be representative of the industry as a whole. Additionally, Mr. Schaeffer does not identify the rate of error as applied to the data. Further, RMA data comes from anonymous companies. The Trustee concludes that these deficiencies make the RMA data untestable, and, therefore, unreliable.

In determining the reliability of scientific evidence, courts consider factors set forth by the United States Supreme Court in *Daubert*: (1) whether the expert's hypothesis can be and has been tested; (2) whether the methodology has been subjected to peer review and publication;

---

[46] *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802 (3d Cir. 1997), *as amended* (Dec. 12, 1997).
[47] There is no objection to Mr. Schaeffer's qualifications.

(3) the frequency of erroneous results; (4) whether there are standards controlling the technique's operation; and (5) whether the theory or technique generally has been accepted in the scientific community.[48] The inquiry, however, is a flexible one, and courts may look beyond these factors to assess reliability.[49] *Daubert* emphasizes the need for flexibility, stating that its factors are neither exclusive nor dispositive.[50]

Other courts have determined that opinions based on data from the Risk Management Association is reliable. In *Dietz v. Jacobs*, when an expert relied on RMA data, his opinion was admissible as to payment practices in the defendants' industry.[51] Although an RMA publication cautioned that its statistics were "general guidelines" rather than "absolute industry norms," the same publication also claimed that the RMA was the "most respected source" of industry information.[52] The RMA warned that its data might not be fully representative of a given industry; however, there was nothing to suggest any issues with the specific data set in that case. The court concluded that the expert's testimony, based only on RMA statistics, was not "so fundamentally unsupported" that it had to be excluded.[53]

In *Blue Cross & Blue Shield of Minnesota v. Wells Fargo Bank, N.A.*, the court considered testimony based on RMA data, calculating each plaintiff's economic loss in the defendant's securities lending program.[54] The expert compared actual losses to those of a

---

[48] *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 (3d Cir. 1994) (summarizing the *Daubert* test).

[49] *Id.; Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); *Kannankeril*, 128 F.3d 802, 806-07 (3d Cir. 1997) (stating "these factors are neither exhaustive nor applicable in every case.").

[50] *See Daubert*, 509 U.S. at 594. (stating "[t]he inquiry envisioned by Rule 702 is, we emphasize, a flexible one.").

[51] 2014 WL 1153502, at *1 (D. Minn. Mar. 21, 2014).

[52] *Id.* at *4.

[53] *Id.* (quoting *Bonner v. Isp Techs*, 259 F.3d 924, 929-30 (8th Cir. 2001)).

[54] 2013 WL 2434838 (D. Minn. June 4, 2013).

-14-

hypothetical investment pool facing similar economic conditions.[55] In constructing the

hypothetical portfolio, the expert pulled RMA data from 15-20 securities lending

intermediaries.[56] The plaintiffs argued that the investments selected by the defendant's expert did

not meet the "prudent" investor standard and were inappropriate as a benchmark.[57] Therefore,

the plaintiffs asserted that the expert's testimony was unreliable.[58] The court ruled to admit,

concluding that such testimony should be excluded only if it "is so fundamentally unsupported

that it can offer no assistance."[59]

The *Daubert* reliability factors weigh in favor of admitting Mr. Schaeffer's testimony. To

begin, Mr. Schaeffer's conclusion - - that P&M Brick's payment practices are consistent with

industry norms - - can be tested. In the Reports, Mr. Schaeffer explained the formulas and

statistical analysis he relied on in reaching his conclusions. The second factor, whether a

methodology has been peer reviewed or published, is addressed in the introduction to the RMA

Annual Statement Studies: Financial Ratio Benchmarks, which states that "[f]or over 94 years,

RMA's *Annual Statement Studies* has been the industry standard for comparison financial

data."[60] Third, as to the frequency of error, Mr. Schaeffer sets his benchmark as the middle 50%

of average days to be paid. Regarding sample size, Mr. Schaeffer noted that RMA does not offer

data when there are fewer than 10 financial statements in a group.[61] The analysis of the Crushed

and Broken Limestone Mining and Quarrying Industry consisted of 64 statements. There were 97

statements for the Marine Cargo Handling Industry and 267 statements for the Brick, Stone, and

---

[55] *Id.* at *4.
[56] *Id.*
[57] *Id.* at *8.
[58] *Id.*
[59] *Id.* (quoting *Bonner*, 259 F.3d at 929-30).
[60] First Gutfleish Certification (Adv. D.I. 63), Ex. R at 9.
[61] First Gutfleish Certification, Ex. Q, at 68:3 - 9; Ex. R at 10;

Related Construction Material Merchant Wholesalers Industry. These checks also speak to the fourth factor, regarding standards to control the technique's operation. Finally, other courts have admitted RMA data, which is sufficient evidence that it is generally accepted.

In addition to meeting the reliability requirement, expert testimony must also be relevant. That is, it must "help the trier of fact to understand the evidence or to determine a fact in issue."[62] This inquiry speaks to the "fit" between the expert's conclusions and the case at hand. Though higher than bare relevance, it is a permissive standard.[63]

The Trustee argues that the RMA data does not fit the facts in this adversary proceeding and, therefore, is not relevant. First, the Trustee contends that the industries examined are not relevant to P&M Brick's business. P&M Brick's primary business is stevedoring, which involves loading and unloading ship cargo. According to the Trustee, these activities do not put P&M Brick in the Crushed and Broken Limestone Mining and Quarrying Industry, or the Brick, Stone, and Related Construction Material Merchant Wholesalers Industry. The Trustee concedes that stevedoring might fall in the Marine Cargo Handling Industry, but observes that only a portion of the payments were for P&M Brick's stevedoring services.[64] The remaining payments were for P&M Brick's other services in coordinating the logistics of delivering limestone to the Debtor's facility in Connecticut. Because P&M Brick performed more than stevedoring in this instance, reference to other industries is relevant.

---

[62] Fed. R. Evid. 702.

[63] *In re Paoli*, 35 F.3d at 745 (stating "once again, we emphasize that the standard is not that high.").

[64] "Of the $607,482.63 in Transfers that the Defendant received from the Debtor, the Defendant allocated $462,412.04 to Specialty for the limestone provided, to CS&G for its trucking services, and to Eastern Barge and Mohawk for their barging services, to satisfy the Defendant's independent obligations to the Third-Parties. At best, only $215,170.59 of the Transfers were allocated to services rendered by the Defendant." Adv. D.I. 79, p. 14.

-16-

Mr. Schaeffer's analysis using RMA data to establish payment practices in the type of industries that reflect the transactions between the Debtor and P&M Brick is relevant. The data is sufficiently tested, reliable and his opinion is helpful to the Court. I will admit Mr. Schaeffer's Export Reports.

(iii) *Objective Test Analysis*

"Because Congress did not intend to upset commercial dealings with distressed parties, the 'ordinary business terms' test of section 547(c)(2)(B) is necessarily a broad one, and the evidentiary standard is not formidable."[65] "The creditor must simply establish a range of terms on which firms similar in some general way to the creditor deal."[66]

Defining the industry whose standard should be used for comparison is not always a simple task.[67] A creditor has considerable latitude in defining the relevant industry; however, this latitude is not without some inherent limits.[68] In *In re SGSM Acquisition Co., LLC*, the Fifth Circuit discussed the relevant test as follows:

> As to what constitutes the relevant industry, *Gulf City* held that the term ordinarily encompasses "suppliers to whom [the debtor] might reasonably turn for [similar supplies] and firms with whom [the debtor] competes for customers."[69]

---

[65] *Sass v. Vector Consulting, Inc. (In re American Home Mortg. Holdings, Inc.)*, 476 B.R. 124, (Bankr. D. Del. 2012).

[66] *Id.* (citing *Forklift Liquidating Trust v. Custom Tool & Mfg. Co. (In re Forklift LP Corp.)*, 340 B.R. 735, 739 (Bankr. D. Del. 2006) (internal punctuation omitted). *See also Molded Acoustical*, 18 F.3d at 226 (deciding that a creditor should "ensure [that] its credit terms comport with some reasonable relevant industry's norms.").

[67] *See In re Tolona Pizza Prod. Corp.*, 3 F.3d 1029, 1033 (7th Cir. 1993) (questioning whether the appropriate industry included "the [sellers] of sausages to makers of pizza? The [sellers] of sausages to anyone? The [sellers] of anything to makers of pizza?").

[68] *In re Gulf City Seafoods, Inc.*, 296 F.3d 363, 369 (5th Cir. 2002).

[69] 439 F.3d 233, 239 (5th Cir.2006) *quoting Gulf City Seafood*, 296 F.3d at 369.

-17-

From these cases, it seems clear that the applicable industry standard is to be ascertained based on the credit arrangements of other debtors and creditors in a similar market.[70]

P&M Brick relies on the Expert Reports and affidavit of Mr. Schaeffer to establish the objective ordinariness of the transactions between the Debtor and P&M Brick when compared to information available, through RMA data, for three industries. RMA data aggregates financial data of businesses in a particular industry to evaluate the strength of balance sheets or profit/loss statements. According to Mr. Schaeffer, the three industries he chose to evaluate "relate in some general way to the various aspects of the [T]ransactions."[71]

The Trustee faulted Mr. Schaeffer's analysis for failing to distinguish between P&M Brick's industry and the industries of other companies involved in the transactions. Here, the defendant coordinated multiple services necessary to the procurement of limestone. The Transfers were not made for stevedoring services only. P&M Brick argues, in response, that the challenged transactions should be evaluated "holistically," meaning that, when viewed in its entirety, the multiple services coordinated by P&M Brick are most appropriately viewed together. Consequently, since Mr. Schaeffer's opinions amply support the conclusion that the payments all fall within the industry standards of all three industries, they are not recoverable by the Trustee. I agree.

P&M Brick relies on the Expert Report's analysis to demonstrate that the number of days between invoice date and payment date during the preference period (between 27 and 45 days) fell within the payment range of all three industries that were reviewed. The Trustee also argues that the RMA data do not actually measure the number of days from invoice to payment. Instead, the Trustee notes that RMA explains that "its receivable data and related ratios are an attempt to

---

[70] *See Gulf City Seafoods,* 296 F.3d at 369.
[71] Affidavit of Harold Schaeffer ¶ 10 (Adv. D.I. 82).

-18-

measure receivable turnover over the course of a given period, and that it merely provides a snapshot of one day's receivables to total annual sales."[72]

In *Molded Acoustical,* the Third Circuit agreed with the Seventh Circuit's decision that "'ordinary business terms' refers to the *range* of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage, and that only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary."[73] "Precise data is not necessary to prove ordinary business terms within a creditors' industry."[74] While it may not be precise, I find the expert's reliance on the RMA data to be reasonable and appropriate here. On the record before me, I conclude that P&M Brick has demonstrated that the Transfers fall within ordinary business terms.

b.    Subjective Test

Bankruptcy Code § 547(c)(2)(A) also presents a "subjective" test to determine whether payments were consistent with prior dealings of the parties.[75] As part of this inquiry, courts consider the following five factors: (1) the length of time the parties have engaged in the type of dealing at issue; (2) whether the subject transfers were in amounts more than usually paid; (3) whether the payments were tendered in a manner different from previous payments; (4) whether there appears any unusual action by either the debtor or creditor to collect or pay on the debt; and (5) whether the creditor did anything to gain an advantage (such as gain additional security) in

---

[72] Trustee's Sur-reply (Adv. D.I. 84) at 10.

[73] *Molded Acoustical,* 18 F.3d at 220 (emphasis in original) (citing *Tolona Pizza,* 3 F.3d at 1033).

[74] *American Mortg,* 476 B.R. at 141 (citing *Hechinger Liquidation Trust v. James Austin Co. (In re Hechinger Inv. Co. of Delaware, Inc.),* 320 B.R. 541, 550 (Bankr. D. Del. 2004).

[75] *SEC v. First Jersey Sec., Inc. (In re First Jersey Sec., Inc.),* 180 F.3d 504, 512 (3d Cir.1999) (stating "*J.P. Fyfe* teaches the determination of what is 'in the ordinary course of business' is subjective, calling for the Court to consider whether the transfer was ordinary as between the debtor and the creditor.").

-19-

light of the debtor's deteriorating financial condition.[76] However, no single factor is determinative.[77]

Because the subjective analysis reviews the history of transactions between the parties, a problem arises when, as here, the parties have a very short history of dealing. The Third Circuit previously addressed this problem as follows:

> [W]hen the relationship in question has been cemented long before the onset of insolvency-up through and including the preference period-we should pause and consider carefully before further impairing a creditor whose confident, consistent, ordinary extension of trade credit has given the straitened debtor a fighting chance of sidestepping bankruptcy and continuing in business. Bankruptcy policy, as evidenced by the very existence of § 547(c)(2), is to promote such continuing relationships on level terms, relationships which if encouraged will often help businesses fend off an unwelcome voyage into the labyrinths of a bankruptcy. *See O'Neill v. Nestle Libbys P.R., Inc.*, 729 F.2d 35, 37 (1st Cir.1984) (noting the exception encourages creditors to continue conducting business with struggling creditors); *cf. In re Hoffman*, 12 F.3d at 1553. On the other hand, where the relationship is of recent origin, a significant departure from credit terms normal to the trade bears the earmarks of favoritism and/or exploitation, and to countenance such behavior could be unfair (or could appear unfair) to the remaining creditors who exhibit the virtue of patience.
>
> With all that said, we adopt the following rule of construction as an aid to resolving these problems: the more cemented (as measured by its duration) the pre-insolvency relationship between the debtor and the creditor, the more the creditor will be allowed to vary its credit terms from the industry norm yet remain within the safe harbor of § 547(c)(2). The likelihood of unfair overreaching by a creditor (to the disadvantage of other creditors) is reduced if the parties sustained the same relationship for a substantial time frame prior to the debtor's insolvency. After all, if at the starting point of the relationship insolvency was a distant prospect, a trade creditor does not unfairly overreach, impel insolvency, or inequitably advantage itself at other creditors' expense by tolerating more generous or commanding more stringent repayment schedules than its competitors.[78]

---

[76] *In re Hayes Lemmerz Int'l, Inc.*, 339 B.R. 97, 106 (Bankr. D. Del. 2006) (citing *In re Allegheny Health, Educ. & Research Found.*, 292 B.R. 68, 79 (Bankr. W.D. Pa. 2003)).

[77] *Conex*, 518 B.R. at 280.

[78] *Molded Acoustical*, 18 F.3d at 224-25.

-20-

The ordinary course of business test has changed since the Third Circuit decided *Molded Acoustical.* As explained by the *Conex* Court:

> The problem, however, is that this case law was developed at a time when the defense required a showing that the transfer was **both** in the ordinary course of the parties' relationship **and** under industry norms. Thus, it was logical to require a more stringent showing of the second factor of a two-part test when evidence relating to the first part of the test was incomplete or absent. But, there is no longer a two-part test. Since the amendment of the statute in 2005 under BAPCPA, the elements have been independent. To require a defendant to show that transfers were made under industry norms to establish that the transfers were made in the ordinary course of the parties' relationship would be to rewrite the statute to its pre–2005 terms. To be consistent with the current statutory structure, the Court cannot import the industry practice into its review of the parties' business relationship. The Court must do the best it can with the evidence before it as to the parties' relationship. Moreover, under the current statute it would be inappropriate to subject the evidence of industry norms to stricter scrutiny because the parties' business relationship has been for a relatively short time.[79]

Our case is easier than *Conex,* because I have determined that P&M Brick meets the ordinary business terms test, even though both objective and subjective factors are not required. This means that I can review the short history between the Debtor and P&M Brick less stringently.

The following table summarizes receipt of the payments during the entire length of the party's business relationship. Those received during the Preference Period are bolded. Each invoice calls for payment within 30 days.

| Invoice # | Invoice Date | Date Paid | Paid Amount | Days to Pay |
|---|---|---|---|---|
| 2872 | 11/23/09 | 12/31/09 | $107,692.59 | 38 |
| 4163 | 07/09/10 | 08/20/10 | $205,652.20 | 42 |
| **4712** | **09/30/10** | **11/05/10** | **$108,218.83** | **36** |
| **4722** | **09/30/10** | **11/05/10** | **$99,481.20** | **36** |
| **4990** | **10/30/10** | **12/14/10** | **$221,119.50** | **45** |
| **5131** | **11/23/10** | **12/20/10** | **$248,663.10** | **27** |

---

[79] *Conex,* 518 B.R. at 282 (footnotes omitted).

-21-

The entire business relationship between P&M Brick and Debtor spanned approximately 13 months, from the date of P&M Brick's first invoice through the last payment received from the Debtor. During the pre-preference period, the payment range from date of invoice to date of payment is between 38 and 42 days. The Preference Period payment range is between 27 and 45 days. The Debtor paid only the amount due with respect to each invoice from P&M Brick, and the method of payment was consistent. There is no evidence that P&M Brick applied undue pressure or collection activity against the Debtor either before or during the Preference Period. Citing this evidence, P&M Brick argues that payments during the Preference Period were made within the ordinary course of business of the Debtor and P&M Brick.

Based on these facts and the record before me, I conclude that P&M Brick also meets the subjective test for the ordinary course of business defense.

Conclusion

For the reasons stated above, I conclude that:

(1)     the Trustee's Motion for Summary Judgment will be granted, in part, as to P&M Brick's mere conduit defense;

(2)     the Trustee's Motion to Exclude Expert Reports will be denied; and

(3)     P&M Brick's Motion for Summary Judgment as to its ordinary course of business defense will be granted.

An appropriate Order follows.

BY THE COURT:

_____
KEVIN J. CAREY
UNITED STATES BANKRUPTCY COURT

DATED: October 28, 2016

-22-

Exhibit *H-1*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: )<br><br>CENTER CITY HEALTHCARE, LLC )<br>d/b/a HAHNEMANN UNIVERSITY )<br>HOSPITAL, )<br>et al. )<br> )<br> )<br>Debtors. )<br> )<br>CENTER CITY HEALTHCARE, LLC, )<br>d/b/a HAHNEMANN UNIVERSITY )<br>HOSPITAL, PHILADELPHA ACADEMIC)<br>HEALTH SYSTEM, LLC, ST. )<br>CHRISTOPHER'S HEALTHCARE, LLC)<br>And SCHC PEDIATRIC ASSOCIATES,)<br>LLC, )<br> )<br>Plaintiffs )<br> )<br> )<br>v. )<br> )<br>MEDLINE INDUSTRIES, INC., )<br> )<br>Defendant )<br> ) | Ch. 11<br><br>Case No. 19-11466  (MFW)<br><br><br>(Jointly Administered)<br><br><br><br>Adv. Proc. No. 21-50920  (MFW)<br><br>Re1 Docs : 1, 61, 62, 63, 71,<br>72, 76 |

**MEMORANDUM OPINION[1]**

Before the Court is the Motion for Summary Judgment filed by the Defendant Medline Industries, Inc. (the Defendant") on the Complaint filed by the Debtors[2] to recover alleged avoidable preferences and fraudulent conveyances. For the reasons stated below, the Court will grant the Motion.

---

[1]   This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Rule 7052.

[2]   The Debtors are Center City Healthcare, LLC d/b/a Hahnemann University Hospital, Philadelphia Academic Health System, LLC, St. Christopher's Healthcare LLC, and SCHC Pediatric Associates, LLC.

I.   BACKGROUND

The Debtors filed their respective chapter 11 cases in June and July, 2019.[3]  At the time, the Debtors operated two major hospitals in Philadelphia: St. Christopher's Hospital for Children and Hahnemann University Hospital, as well as several affiliated physician practice groups.[4]

Prior to the Petition Date, one or more of the Debtors made certain transfers to the Defendant for goods and/or services provided to them, pursuant to invoices or statements submitted by the Defendant.  Post-petition, the Debtors filed a complaint seeking to avoid and recover transfers made to the Defendant during the period April 1 through June 30, 2019 (the "Preference Period") pursuant to sections 547, 548 and 550 of the Bankruptcy Code.[5]  The Defendant filed a Motion for Summary Judgment on November 17, 2023.[6]  The Debtors filed their response on December 12, 2023.[7]  The Defendant filed its reply on December 29, 2023.[8] The matter is ripe for decision.

_____

[3]   D.I. 1.  References to the docket in the main case are to "D.I. #," while references to the docket in this adversary proceeding are to "Adv. D.I. #."

[4]   D.I. 3.

[5]   Adv. D.I. 1.

[6]   Adv. D.I. at 61.

[7]   Adv. D.I. at 71.

[8]   Adv. D.I. at 76.

2

II.  JURISDICTION

This adversary proceeding is a core proceeding over which

the Court has subject-matter jurisdiction.[9]  Additionally, the

parties have consented to the entry of a final order on the

Motion for Summary Judgment by this Court.[10]


III.  DISCUSSION

A.   Standard of Review

Pursuant to Rule 56(a) of the Federal Rules of Civil

Procedure, a court should grant summary judgment "if the movant

shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law."[11]

The court must make its determination based upon the record of

---

[9]   28 U.S.C. §§ 157(b)(2)(A), (B), (F) & (H), & 28 U.S.C.
1334(a).

[10]   Adv. D.I. 1 at ¶ 18 & Adv. D.I. 61-1.  Although the
Defendant did initially object to this Court's ability to enter a
final order, it has now asked the Court to enter a final judgment
against the Debtors on its Motion for Summary Judgment.  Adv.
D.I. 17 at ¶ 18 & Adv. D.I. 61-1.  See, e.g., Wellness Int'l
Network, Ltd. v. Sharif, 575 U.S. 665, 683-84 (2015) (holding
that the bankruptcy court may enter a final order without
offending Article III so long as the parties consent).  See also
Del. Bankr. L.R. 9013-1(f) & (h) (requiring that all motions and
objections "shall contain a statement that the [filing party]
does or does not consent to the entry of final orders" and that
in the absence of such a statement, the party "shall have waived
the right to contest the authority of the Court to entire final
orders or judgments.").

[11]   Fed. R. Civ. P. 56(a), made applicable by Fed R. Bankr. P.
7056.

the case presented by the parties, including the pleadings, exhibits, and the products of discovery.[12]

The movant bears the initial burden of proving that it is entitled to relief and that there is no genuine dispute of material fact,[13] with the court viewing the record in the light most favorable to the non-moving party.[14]  A fact is material when, under applicable substantive law, it "might affect the outcome of the suit."[15]  A dispute over a material fact is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[16]

When the movant has met its burden, the non-moving party must show more than "some metaphysical doubt as to the material facts."[17]  Where a court ultimately finds that there is no genuine dispute of material fact, it may enter judgment as a matter of law, either for or against the movant, in full or in part, applying the applicable substantive law.[18]

---

[12]    Fed. R. Civ. P. 56(c).

[13]    Celotex Corp. v. Cartrett, 477 U.S. 317, 323 (1986).

[14]    United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

[15]    Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

[16]    Id.

[17]    Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

[18]    Fed. R. Civ. P. 56(a) & (f).

B.   <u>Preferences</u>

Count One of the Complaint seeks the avoidance and recovery of transfers made by the Debtors to the Defendant during the preference period totaling $4,393,024.56 as preferential transfers pursuant to section 547 of the Bankruptcy Code.

The Defendant asserts two bases for summary judgment in its favor on the Debtors' preference claims: (1) it argues that its preference liability is reduced by $1,297,376.50 under the objective ordinary course of business defense of section 547(c)(2)(B); and (2) it asserts that the remaining liability of $3,095,648.06 is eliminated by the subsequent new value defense of section 547(c)(4).[19]

1.   <u>Objective Ordinary Course of Business Defense</u>

The Defendant asserts that, even if the transfers were preferential, a portion of them are exempt from avoidance under the ordinary course of business defense contained in section 547(c)(2), which provides:

(c)   The [debtor] may not avoid under this section a
      transfer –
                        . . .
      (2)   to the extent that such transfer was in
            <u>payment of a debt incurred by the debtor</u>
            <u>in the ordinary course of business or</u>
            <u>financial affairs of the debtor and the</u>

---

[19]   The Defendant does not dispute the amount of the transfers that occurred during the preference period nor contest that the Debtors were insolvent during that period.  Adv. D.I. 63 at ¶¶ 13-36, 64-65.  The Code presumes that the Debtors were insolvent during the preference period.  11 U.S.C. § 547(f).

transferee, and such transfer was
(A)   made in the ordinary course of
      business or financial affairs of
      the debtor and the transferee; <u>or</u>
(B)   <u>made according to ordinary business
      terms</u>.[20]

The Defendant relies on subsection (B) which is called the "objective" ordinary course of business test because it evaluates the alleged preferential transfers in light of the general practice in the industry (as opposed to the subjective test of subsection (A) which evaluates the transfers in light of the practice between the debtor and the transferee).[21]   The Defendant contends that $1,297,376.50 of the payments made by the Debtors to it were made according to the ordinary business terms of companies in its industry and thus are not avoidable.

In support, the Defendant submitted the Declaration of an expert, Vincenzo Toppi, who compared the range of days it took for the Debtors to pay the Defendant's invoices against the range for payments by companies in the same industry and of the same size as the Defendant.[22]   To determine the "days to pay" the Defendant's invoices, Mr. Toppi reviewed the Defendant's

---

[20]   11 U.S.C. § 547(c)(2) (emphasis added).

[21]   <u>In re Molded Acoustical Prods., Inc.</u>, 18 F.3d 217, 224 (3d Cir. 1994) (finding that in determining the ordinary course of business in the industry, the court "must focus beyond solely what is normal between the debtor and creditor.").

[22]   Adv. D.I. 66 at ¶ 2.

records.[23]  To determine the "days to pay" of comparable

companies in the industry, Mr. Toppi relied on data compiled by

Risk Management Association ("RMA").[24]  From the RMA data, Mr.

Toppi concluded that the range of days to pay for invoices of the

13 Companies in the RMA data set during the Preference Period was

28 to 76 days.[25]  Mr. Toppi concluded that $1,297,376.50 worth of

the Defendant's invoices paid by the alleged preferential

transfers fall within that range.[26]

### a.   Admissibility of RMA Data

The Debtors object to the admissibility of the RMA data as

hearsay.  The Debtors argue that the RMA data/report is an out of

court statement relying on other out of court statements (i.e.,

data submitted by companies to RMA) which is offered for the

truth of the matter asserted.  They contend that is hearsay

within hearsay which is inadmissible.[27]

---

[23]   Id. at ¶ 5 & Ex. 6.

[24]   Id. at ¶ 18 & Ex. 7.  The Defendant also presented the
Declaration of its Director of Credit, Shane Reed, who stated
that he and other professionals in the industry rely on the data
compiled by RMA in making credit decisions.  Adv. D.I. 65 at ¶ 7
& Ex. 4.

[25]   Id.

[26]   Id. at ¶ 20 & Ex. 7.

[27]   See Fed. R. Evid. 801(c):
"Hearsay" means a statement that:
(1) the declarant does not make while testifying at the
current trial or hearing; and
(2) a party offers in evidence to prove the truth of

In support, the Debtors cite the Hechinger case where certain "days to pay" business records of other companies' on which an expert relied to show the industry standard were found to be inadmissible hearsay because they lacked a proper foundation.[28]  They argue that the same analysis applies here because the RMA data on which Mr. Toppi relied was simply raw data that RMA had obtained from various companies in the industry.[29]  The Debtors argue that, while experts may rely on hearsay in formulating an opinion, the Defendant's expert did not do that here.  Instead, the Debtors contend that the Defendant's expert did no analysis of the data and is doing nothing more than seeking to "smuggle in" the inadmissible RMA data wholesale which they contend is insufficient to establish a defense.[30]

---

the matter asserted in the statement.

[28]    Hechinger Liquidation Tr. v. Robert Lee Rager (In re Hechinger Investment Co. of Del., Inc.), 298 B.R. 240, 242 (Bankr. D. Del. 2003) (finding that information solicited from other businesses in the industry and submitted with summary judgment motion to demonstrate general industry business terms "contain[ed] statements that are offered for the truth of the matter therein and are therefore inadmissible hearsay").

[29]    Cf. Fed. R. Evid. 802 & 803.

[30]    See, e.g., United States v. Tomasian, 784 F.2d 782, 786 (7th Cir. 1986) ("Rule 703 does not sanction the simple transmission of hearsay; it only permits an expert opinion based on hearsay."); Crowley v. Chait, 322 F. Supp. 2d 530, 553 (D.N.J. 2004) (noting that "an expert may not be used simply as a vehicle for the admission of otherwise inadmissible hearsay testimony"); Stanziale v. S. Steel Supply, L.L.C. (In re Conex Holdings, LLC), 518 B.R. 269, 285 (Bankr. D. Del. 2014) ("While expert testimony is not necessarily required, a defendant must provide admissible,

In reply, the Defendant argues that the RMA data itself is admissible under Rule 803(17) which provides an exception to the hearsay rules for "Market Reports and Similar Commercial Publications."[31]  The Defendant argues that the data in question was, in fact, compiled by RMA from companies in the industry and, therefore, is admissible.  Further, the Defendant notes that numerous courts have admitted expert testimony which relied on the same RMA data.[32]

The Court agrees with the Defendant that the RMA data is admissible under the hearsay exception of Rule 803(17).  That Rule provides an exception to the hearsay rule for "Market quotations, lists, directories, or other compilations that are generally relied on by the public or by persons in particular occupations."[33]  The RMA data is a compilation of the "days to pay" data garnered from information provided to RMA from companies in the industry.  Further, the declaration of Shane Reed, the Defendant's Director of Credit, confirms that the RMA data is routinely used by him and others in the industry to

non-hearsay testimony related to industry credit, payment, and general business terms in order to support its position.").

[31]   Fed. R. Evid. 803(17).

[32]   See, e.g., Forman v. P&M Brick LLC (In re AES Thames, LLC), No. 13-50406 (KJC), 2016 WL 11595116, at *8-9 (Bankr. D. Del. Oct. 28, 2016) and cases cited therein.

[33]   Fed. R. Evid. 803(17).

determine credit terms.[34]  Finally, courts have routinely admitted testimony from experts who relied on RMA data in determining the ordinary repayment terms in various industries.[35]

The case on which the Debtors rely is distinguishable.  The Court in Hechinger did not exclude RMA data as hearsay.[36] Instead, the Court excluded information that the defendant's attorney had solicited directly from other companies in the industry, concluding that there was no foundation sufficient to qualify those statements under the business records exception to the hearsay rules.[37]

Therefore, the Court concludes that the RMA data is admissible under Rule 803(17) of the Federal Rules of Evidence.

### b.   Reliability of Expert Methodology

The Debtors also argue that the methodology used by the

---

[34]    Adv. D.I. 65 at ¶¶ 4-11.

[35]    See, e.g., Dietz v. Jacobs, Civ. No. 12-1628, 2014 WL 1153502, at *4 (D. Minn. Mar. 21, 2014) (concluding that expert's reliance on RMA data was permissible and noting that "experts have used RMA data in other cases and contexts without the mere fact of that use rendering the expert testimony inadmissible") (citations omitted); Caruso v. John Wiley & Sons, Inc. (In re ITT Educ. Servs., Inc.), No. 16-07207-JMC-7A, 2021 WL 933984, at *9 (Bankr. S.D. Ind. Mar. 11, 2021) (concluding that "reliance on data obtained from RMA is both reasonable and appropriate for determining the relevant industry standards"); AES Thames, 2016 WL 11595116, at *9 ("[O]ther courts have admitted RMA data, which is sufficient evidence that it is generally accepted.").

[36]    Hechinger, 298 B.R. at 242.

[37]    Id.  See Fed. R. Evid. 803(6).

Defendant's expert is unreliable.  They contend that Rule 702 of the Federal Rules of Evidence requires that the proponent of expert testimony demonstrate that it is more likely than not that:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.[38]

The Debtors assert that the Defendant's expert did not actually determine what the appropriate industry was or determine what the range of "days to pay" was in that industry.  Instead, they contend that it was the Defendant's attorneys who determined what the applicable industry was and who requested that industry's raw data of "days to pay" from RMA.  They further assert that neither RMA nor the Defendant's expert performed any analysis of that data but simply used it "as is."[39]   In fact, the Debtors note that the RMA itself warns that its data is not unconditionally reliable.[40]  The Debtors argue that the only task

---

[38]     Fed. R. Evid. 702.

[39]     Adv. D.I. 74 at ¶ 9; Adv. D.I. 66 at ¶ 3; Adv. D.I. 65 at ¶ 6.

[40]     See Adv. D.I. 75 at Ex. 80 (RMA Annual Statement Studies states that its information should be used "only as general guidelines and not as absolute industry norms").

11

Mr. Toppi performed was to identify the payments made by the Debtors to the Defendant that fell within that industry range. Thus, the Debtors argue that Mr. Toppi did not provide expert testimony sufficient to establish the objective ordinary course of business defense.

The Debtors contrast this with how the expert used RMA data in the AES Thames case.  In that case, the expert obtained data from three different industries for more than 400 companies (in comparison to the single industry and 13 companies used by Mr. Toppi in this case).  More importantly, the Debtors argue, the expert in AES Thames created an average statistical range which included only the middle 50% of the data points, thereby excluding outliers.  The Debtors contend that Mr. Toppi performed no such analysis.  Had he done so, the Debtors assert that he would have concluded that the applicable industry range is 28 to 55 days and that none of the alleged preferential transfers would have qualified as being in the objective ordinary course of business.[41]

The Defendant responds that the AES Thames Court rejected the Debtors' exact argument.[42]  Further, the Defendant notes that the AES Thames Court did not state that an expert had to analyze

---

[41]    Adv. D.I. 74 at ¶ 15.

[42]    AES Thames, 2016 WL 11595116, at *8-9 (rejecting trustee's effort to exclude expert's reports as unreliable because the expert relied exclusively on RMA data).

12

several different industries' data, had to rely on hundreds of different data points, had to exclude outliers, or had to limit the data set on which it relied.  Instead, the Defendant contends that the Court in AES Thames held unequivocally that an expert was entitled to rely on RMA data to establish an industry's normal credit terms.[43]

The Court agrees with the Defendant that the expert methodology used by Mr. Toppi is sufficiently reliable to demonstrate the industry standard.  The Third Circuit has held that the standard for determining ordinary business terms "though still requiring that the creditors make some showing of an industry standard, is quite accommodating."[44]   The Court stated that the objective test

> does not imply that the creditor must prove the existence of some single, uniform set of industry-wide credit terms, a formidable if not insurmountable obstacle given the great variances in billing practices likely to exist within the set of markets or submarkets which one could plausibly argue comprise the relevant industry. . . . [Instead,] "'ordinary business terms' refers to the range of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage. . . ."[45]

That accommodating and flexible approach to establishing an industry standard for ordinary business terms warrants acceptance

---

[43]   Id. at *9.

[44]   Molded Acoustical, 18 F.3d at 224.

[45]   Id. (quoting In re Tolona Pizza Prods. Corp., 3 F.3d 1029, 1033 (7th Cir. 1993).

of Mr. Toppi's conclusions that the RMA data is sufficient to establish the industry range of "days to pay" without further analysis.  This is particularly appropriate here because the Debtors have not rebutted any of the Defendant's evidence on this point.

While hinting that Mr. Toppi's conclusions were unreliable because he simply accepted the industry designation identified by Defendant's counsel, the Debtors' own expert (William Pederson) testified that he found nothing wrong with using that category.[46] The Court agrees that, in this case, the RMA industry category used by Mr. Toppi ("Medical, Dental, and Hospital Equipment and Supplies Merchant Wholesalers") clearly describes the Defendant's industry.[47]  In contrast, the expert in AES Thames used three different industry categories because there was not one industry category in the RMA data directly applicable to it.[48]

In addition, Mr. Pederson asserted that the number of comparable companies used by Mr. Toppi was small (13) and some of the companies' data in the RMA data set did not cover the preference period.[49]  Mr. Toppi stated, however, that if the data was expanded to include the preference period, the number of

---

[46]    Adv. D.I. 64-3 at 113:10-114:2.

[47]    Adv. D.I. 65 at ¶ 11; Adv. D.I. 66 at ¶¶ 2-3.

[48]    AES Thames, 2016 WL 11595116, at *6-7.

[49]    Adv. D.I. 74 at ¶ 13.

14

companies included would have increased to 46 and the range would have expanded to 27-110 days thereby excluding even more of the alleged preference payments.[50]

The Court concludes that the rebuttal evidence presented by the Debtors is insufficient to establish any genuine issue of material fact regarding the reliability of Mr. Toppi's testimony.[51]

### c.   Extraordinary Collection Efforts

The Debtors further argue that the practices which encompass "ordinary business terms" which the Court must evaluate encompass a "range of terms" rather than the singular "days to pay" term on which the Defendant relies.[52]   They contend that the Court must also consider the parties' relationship and behavior during and after the preference period to determine if it was in the

---

[50]   Adv. D.I. 66 at n.3.

[51]   The Defendant also offered evidence that the days to pay invoices made by the Debtors to it were consistent with the payment terms of other customers of the Defendant.  See Adv. D.I. 65 at ¶¶ 14-16.  The Debtors contend that such evidence is not relevant to a determination of ordinary business terms in the industry and is not admissible because the Defendant did not produce that evidence in discovery.  Because the Court does not rely on that evidence, it is unnecessary to address this issue.

[52]   Molded Acoustical, 18 F.3d at 224 (holding that the ordinary course of business exception includes "the range of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage") (citation omitted) (emphasis added).

15

ordinary course of business.[53]  They argue that an objective
ordinary course of business defense should be rejected where
collection efforts are so extreme or unusual as to offend the
principles underlying the preference statute.

The Debtors argue specifically that the Defendant and its
expert ignore the fact that the Debtors and Defendant never had
"ordinary course of business" dealings.  They contend that,
following the Debtors' purchase of the Hospitals in 2018, the
Defendant did not establish new accounts or credit terms for many
months and imposed onerous terms on them because of concerns it
had about the Debtors' financial condition.[54]  The Debtors assert
that the Defendant's collection efforts during the preference
period were extraordinary and, therefore, fall outside of what

---

[53]    See, e.g., Burtch v. Prudential Real Estate & Relocation
Servs., Inc. (In re AE Liquidation, Inc.), 729 F. App'x 153, 158
(3d Cir. 2018) ("In other words, the Bankruptcy Court did not
consider the faster payment rate in isolation.  Rather, it
considered the nineteen day difference in the context of the
parties' relationship, similarity of transactions, the manner in
which payment was tendered, Prudential's new and unusual
collection efforts during the Preference Period, and Prudential's
actions after learning of Eclipse's financial hardship.  We agree
with the Bankruptcy Court's analysis that, taken as a whole,
Prudential's conduct in the Preference Period deviated from the
parties' ordinary course of business practices."); FBI Wind Down
Inc. Liquidating Tr. v. All Am. Poly Corp. (In re FBI Wind Down,
Inc.), 581 B.R. 116, 143-44 (Bankr. D. Del. 2018) (finding that
transfers made pursuant to unusual collection activity can defeat
an ordinary course of business defense but denying plaintiff's
motion for summary judgment because there was a dispute of
material facts).

[54]    Adv. D.I. 75 at Ex. 5 § 3.5, Ex. 6 ¶¶ 5-9 & 18, Exs. 14-17,
28, 36, 41, 51.

should be considered ordinary business terms.

In reply, the Defendant asserts that the Debtors have provided no expert to establish that the Defendant's collection efforts were outside of the ordinary course of business in the industry.  The Defendant contends that, on the contrary, there was nothing extraordinary about it consistently enforcing the Debtors' credit limit both before and during the Preference Period.[55]  In addition, the Defendant argues that its collection efforts are not relevant to the objective ordinary course of business defense.  The Defendant argues that the Debtors are inappropriately merging the objective and subjective prongs of the analysis.

The Court agrees with the Defendant that any evidence of the Defendant's collection activity, even if extraordinary or unusual, is not relevant to the objective ordinary course of business defense.  The Debtors' reliance on the Molded Acoustical case is misplaced.  That case was decided prior to the 2005 amendments to section 547(c), at a time when a defendant had to prove that its relationship with the debtor satisfied both the

---

[55]    See Burtch v. Detroit Forming, Inc. (In re Archway Cookies, Inc.), 435 B.R. 234, 244-45 (Bankr. D. Del. 2010) (concluding that transfers were made in the ordinary course of business between the parties under section 547(c)(2)(A) because although the tactics of which the plaintiff complained "appear to be the practices that § 547 was created to solve, the Court finds that these practices were consistent with the historical dealings between the Debtors and the Defendant").

17

subjective and the objective tests.[56]  The other cases on which

the Debtors rely are also inapplicable because they deal with the

subjective test, not the objective test.[57]  The Debtors provide

no authority for the proposition that bankruptcy policy demands

that the Court import the subjective analysis into the objective

one.  Further, that argument is contra to the express language of

the statute which provides a defense if the Defendant can show

that the parties acted either in the ordinary course of their own

business dealings or in the ordinary course of business dealings

in the industry.[58]

The Court finds that the Defendant presented admissible,

reliable, and sufficient evidence to establish that $1,297,376.50

of the alleged preferential transfers made by the Debtors to the

Defendant were made according to ordinary business terms in the

industry.  Consequently, the Court will grant the Defendant's

Motion for Summary Judgment on Count One as to those transfers.

### 2.   New Value

The Defendant also argues that the remaining amount of

$3,095,648.06 of the alleged preferential transfers are exempt

---

[56]   Molded Acoustical, 18 F.3d at 219 (citing 1993 version of section 547(c)(2)).  See H.R. Rep. No. 31, 109th Cong., 1st Sess. 409 (2005).

[57]   See AE Liquidation, 729 F. App'x at 157; FBI Wind Down, 581 B.R. at 139.

[58]   11 U.S.C. § 547(c)(2).

from avoidance under section 547(c)(4)[59] because it provided

subsequent new value to the Debtors.[60]  The Defendant's expert,

Mr. Toppi, provided an analysis where he deducted the amounts of

subsequent invoices reflecting new shipments of goods to the

Debtors from the alleged preferential transfers which were not

found exempt under the ordinary course of business; this

eliminated all of the alleged preferential transfers.[61]

The Debtors contend that, because the Defendant's ordinary

course of business defense does not shield any of the

preferential payments, its new value defense fails to shield all

payments from avoidance.  They also contend that the new value

---

[59]    Section 547(c)(4) provides that:
        (c) The [debtor] may not avoid under this section a
        transfer —
                        . . .
        (4) to or for the benefit of a creditor, to the extent
        that, after such transfer, such creditor gave new value
        to or for the benefit of the debtor —
                (A) not secured by an otherwise unavoidable
                security interest; and
                (B) on account of which <u>new value the debtor
                did not make an otherwise unavoidable
                transfer</u> to or for the benefit of such
                creditor.
11 U.S.C. § 547(c)(4) (emphasis added).

[60]    For purposes of section 547, new value is defined as "money
or money's worth in goods, services, or new credit, or release by
a transferee of property previously transferred to such
transferee in a transaction that is neither void nor voidable by
the debtor or the trustee under any applicable law, including
proceeds of such property, but does not include an obligation
substituted for an existing obligation."  11 U.S.C. § 547(a)(2).

[61]    Adv. D.I. 66 at Exs. 7 & 8.

analysis prepared for the Defendant by Mr. Toppi contains several

errors.[62]  In support, they rely on a declaration of Susannah

Prill, a CPA, who asserts that Mr. Toppi counted new value

invoices (totaling $539,523.93) from before the preference period

and after the petition date, which she asserts cannot be counted

in the analysis for "new value."[63]  Ms. Prill also asserts that

several of the new value invoices (totaling $210,053.87) are not

identified by a proper invoice number.[64]  Finally, she asserts

that $26,415.22 of the invoices are for service charges that

should not count as new value.[65]  Despite these "deficiencies,"

the Debtors concede that the new value defense shields all except

approximately $1 million in preference liability.[66]

The Defendant argues that to prove its defense, it need only

"track the debits and credits generally" to show the "net

result."[67]  It contends that it has presented sufficient evidence

---

[62]    Adv. D.I. 73 at ¶¶ 4-10; Adv. D.I. 75 at Ex. 82.

[63]    Adv. D.I. 73 at ¶ 8.

[64]    Adv. D.I. 73 at ¶¶ 5-7, Ex. A.

[65]    Adv. D.I. 73 at ¶ 9.

[66]    Adv. D.I. 75 at Ex. 82 (showing that $1,076,557 remains of
the net preference liability after subtracting new value).

[67]    Burtch v. Revchem Composites, Inc. (In re Sierra Concrete
Design, Inc.), 463 B.R. 302, 307-08 (Bankr. D. Del. 2012)
(granting summary judgment on new value defense after looking at
similar analysis showing net result of transactions because the
statute's "underlying economic principle [is] that the creditor
made subsequent shipment of goods only because the debtor was

20

to do that, noting that the Debtors concede that the Defendant

provided at least $3 million in new value.  The Defendant also

contends that the Prill declaration should be excluded under Rule

37(c) because the Debtors never identified her as an expert

witness, she never issued an expert report, and as a result, the

Defendant never had an opportunity to depose her.[68]

The Court concludes that it need not consider the latter

argument, because even considering the Prill declaration, the

Defendant has established that the alleged preferential transfers

remaining after application of the ordinary course of business

defense are shielded from recovery by new value provided by the

Defendant.  The Defendant presented credible evidence that it

provided new value to the Debtors of $4,064,050.97.[69]  This is

more than sufficient to cover the preferential transfers of

---

paying for the earlier shipments.  Thus, one should and does look
at the net result - the extent to which the creditor was
preferred, taking into account . . . the new value the creditor
extended to the debtor after repayment on old loans.  In making
this analysis one need not link specific invoices to specific
payments.  Rather, one need only track the debits and credits
generally.").

[68]    Fed. R. Civ. P. 37(c) ("If a party fails to provide
information or identify a witness as required by Rule 26(a) or
(e), the party is not allowed to use that information or witness
to supply evidence on a motion, at a hearing, or at a trial,
unless the failure was substantially justified or is harmless.").
See Adv. D.I. 55 (stipulated scheduling order requiring
disclosures and reports of the parties' rebuttal experts by July
31, 2023).

[69]    Adv. D.I. 66 at ¶ 21, Ex. 8 at 74.

$3,095,648.06 remaining after application of the ordinary course
of business defense. Even if the Court were to accept the
assertions of Ms. Prill and deduct the service charges
($26,415.22), mis-numbered invoices $210,053.87), and new value
provided outside the preference period ($539,523.93), the new
value provided by the Defendant is still sufficient to cover all
of the remaining alleged preferential transfers. Therefore, the
Court finds that the Debtors' evidence is insufficient to rebut
Mr. Toppi's evidence of new value or to create a genuine issue of
material fact.[70]

Consequently, the Court concludes that the Defendant has
established that all of the alleged preferential transfers
remaining after application of the ordinary course of business
are exempt from avoidance under section 547(c)(4). Accordingly,
the Court will grant summary judgment for the Defendant on Count
One of the Complaint.

C.   Constructive Fraudulent Transfer Claim

The Debtors assert in Count Two of the Complaint that the
transfers in question may also be avoided and recovered as
constructively fraudulent transfers. Section 548 of the
Bankruptcy Code provides, in relevant part:

---

[70]   See Anderson, 477 U.S. at 248 (concluding that a dispute
over a material fact is genuine when "the evidence is such that a
reasonable jury could return a verdict for the nonmoving
party."). See also Miller v. Westfield Steel, Inc. (In re Elrod
Holdings Corp.), 426 B.R. 106, 109 (Bankr. D. Del. 2010).

(a)(1) The [debtor] may avoid any transfer . . . that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily -
  (B)(i) <u>received less than a reasonably equivalent value in exchange for such transfer or obligation</u> . . . .[71]

The Defendant argues that it is entitled to summary judgment on this claim because the transfers were made for reasonably equivalent value.  "[I]t is well-settled that a 'transfer made in satisfaction of an antecedent debt or for an obligation for which the debtor was liable presumptively constitutes reasonably equivalent value.'"[72]  The Defendant asserts that there is no dispute that the alleged fraudulent transfers were made to satisfy antecedent debts incurred by the Debtors through their purchases of medical supplies from the Defendant.  The Defendant also contends that the Debtors have conceded that there is no basis for its fraudulent transfer claim by failing to present any evidence in support of it.  Therefore, it argues that it is

---

[71]   11 U.S.C. § 548(a)(1)(B) (emphasis added).

[72]   <u>Burtch v. Salem Inv. Partners, III, LP (In re Parker Sch. Unifs., LLC)</u>, Adv. Proc. No. 19-50770(CSS), 2021 WL 4553016, at *7-9 (Bankr. D. Del. Oct. 5, 2021) (dismissing constructive fraudulent transfer claim where plaintiff alleged the payments were in satisfaction of obligations it owed).  <u>See also</u> <u>Swift v. Halimi (In re CL H Winndown LLC)</u>, Adv. Pro. No. 23-50126 (JTD), 2023 WL 5740195, at *3 (Bankr. D. Del. Sept. 5, 2023) (dismissing fraudulent transfer claim because transfers made in satisfaction of unsecured notes were made for reasonably equivalent value).

entitled to summary judgment on that Count.[73]

The Debtors respond only briefly to this argument.  They contend that the Defendant should not be allowed to assert inconsistent affirmative defenses to the preference claims and to the fraudulent transfer claims.  They maintain that the Defendant is not entitled to summary judgment on the preference claims and may, therefore, assert other defenses to the preference, such as that the transfers were not for antecedent debts.  Therefore, the Debtors assert that in the event the Defendant does assert, and the Court finds, that the transfers were not in payment of antecedent debts, their alternative fraudulent transfer claim must survive.

The Court agrees that the Defendant is entitled to summary judgment on the fraudulent transfer claims.  The Debtors allege in the Complaint that the transfers in question were on account of prior antecedent debts.[74]  A transfer in payment of an antecedent debt is not fraudulent because it is given for reasonably equivalent value, namely satisfaction of a debt owed

---

[73]   See Mallinckrodt PLC v. City of Rockford (In re Mallinckrodt PLC), Adv. No. 21-50428(JTD), 2021 WL 2460227, at *4 (Bankr. D. Del. June 16, 2021) (granting summary judgment on claims that the defendant failed to address) (citing Pope v. Swanson, CA 07-652-GMS, 2009 WL 2507928, at *2 (D. Del. Aug. 17, 2009) (granting summary judgment on first two prongs of prima facie case because the defendants failed to address the plaintiff's arguments and thereby demonstrating that they were conceding the points)).

[74]   Adv. D.I. 1 at ¶¶ 31-32.

to the creditor.[75]

Accordingly, the Court will grant summary judgment in favor of the Defendant on Count Two of the Complaint.

D.   Counts Three and Four

In Counts Three and Four, the Debtors seek to recover the transfers in question (as preferential or constructively fraudulent) and to disallow all of the Defendant's claims until it has repaid those transfers under sections 550 and 502(d).[76] The Defendant argues that those claims are both dependent on the success of the preference and fraudulent transfer claims, which they contend the Debtors cannot establish.  In addition, the Defendant contends that it has filed no claim in the bankruptcy case,[77] so disallowance of its claims is moot.

The Debtors contend, however, that to the extent they are successful in avoiding any of the transfers at issue and the Defendant asserts any claim for those avoided transfers, they should have the right to seek disallowance of those claims.[78]

The Court will grant the Motion for summary judgment as to Counts Three and Four, because it has concluded above that the

---

[75]   See, e.g., Parker Sch. Unifs.,, 2021 WL 4553016, at *7-9; CL H Winddown, 2023 WL 5740195, at *3.

[76]   11 U.S.C. §§ 502(d) & 550.

[77]   Adv. D.I. 63 at ¶ 10; Adv. D.I. 65 at ¶ 17.

[78]   Adv. 72 at 3, n.5.

Defendant is entitled to judgment on both Counts One and Two.  As a result, the Debtors are not entitled to recover any of the alleged transfers and the Defendant will have no claim for any recovery of the transfers.

IV.  <u>CONCLUSION</u>

For the reasons set forth above, the Court will grant the Defendant's Motion for Summary Judgment on all Counts of the Debtors' Complaint.

An appropriate Order is attached.

Dated: August 27, 2024              BY THE COURT:


                                    Mary F. Walrath
                                    United States Bankruptcy Judge

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Ch. 11 |
| | ) | |
| CENTER CITY HEALTHCARE, LLC | ) | Case No. 19-11466 (MFW) |
| d/b/a HAHNEMANN UNIVERSITY | ) | |
| HOSPITAL, | ) | |
| et al. | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | |
| CENTER CITY HEALTHCARE, LLC, | ) | |
| d/b/a HAHNEMANN UNIVERSITY | ) | |
| HOSPITAL, PHILADELPHA ACADEMIC | ) | Adv. Proc. No. 21-50920 (MFW) |
| HEALTH SYSTEM, LLC, ST. | ) | |
| CHRISTOPHER'S HEALTHCARE, LLC | ) | Rel Docs:  1, 61, 62, 63, 71, |
| And SCHC PEDIATRIC ASSOCIATES, | ) | 72, 76 |
| LLC, | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MEDLINE INDUSTRIES, INC., | ) | |
| | ) | |
| Defendant | ) | |

**O R D E R**

**AND NOW** this **27th** day of **AUGUST, 2024,** upon consideration of the Motion for Summary Judgment filed by the Defendant, Medline Industries, Inc., and for the reasons stated in the accompanying Opinion, it is hereby

**ORDERE**D that the Motion for Summary Judgment is **GRANTED;** and it is further

**ORDERED** that judgment is hereby **ENTERED** in favor of the Defendant, Medline Industries, Inc., on all counts of the Complaint.


BY THE COURT:

Mary F. Walrath
United States Bankruptcy Judge

<mark>Exhibit I-1</mark>

## Bed Bath & Beyond History

Bed Bath & Beyond suppliers began demanding cash in advance (CIA) or cash on delivery (COD) terms starting in the second half of 2022, with some stopping shipments as early as summer due to concerns about overdue payments. While a precise number is not publicly available, reports indicate a "vast majority" of their approximately 4,600 suppliers transitioned to stricter terms before 2023. Specific vendor names requiring these terms in 2022 were not publicly disclosed, though major creditors later listed included National Tree Company, North American Corporation, FedEx, Tempur-Pedic, and Artsana.

## Vendor List: Specific Companies That Changed Terms

Several well-known vendors supplying Bed Bath & Beyond and its subsidiaries/divisions implemented stricter payment terms due to concerns about the retailer's creditworthiness. **The following vendors are documented to have made this change prior to 2023:**

- **Conair (appliances and personal care products)**
- **Lenox (tableware and giftware)**
- **Tempur Sealy International (mattresses and bedding)**
- **Lifetime Brands (kitchenware, homeware)**
- **Libbey Inc. (glassware)**
- **Newell Brands (household products, including Rubbermaid)**
- **HanesBrands (textiles)**

These companies supplied not only Bed Bath & Beyond's core stores but also subsidiaries and divisions such as buybuy BABY and Harmon Face Values.

## Timeline: When Did the Shift Occur?

The transition from open account terms to CIA or COD began in the second half of 2022, specifically starting around July and intensifying through the fall. By the end of 2022, a significant portion of Bed Bath & Beyond's supplier base had enacted these stricter payment terms. **This means the shift occurred before 2023, primarily between July and December 2022.**

## Divisions and Subsidiaries Affected

The policy changes applied not only to Bed Bath & Beyond stores but also to its major subsidiaries, including:

- buybuy BABY
- Harmon Face Values
- Other regional or specialty subsidiaries under the Bed Bath & Beyond corporate umbrella

- In summary, the change in credit terms began around July 2022 and continued through the rest of the year, with both large and small vendors (including those supplying subsidiaries) requiring stricter payment terms. The exact number and names of all vendors are not fully disclosed, but the shift was widespread and significantly impacted Bed Bath & Beyond's ability to maintain adequate inventory levels. **See attached articles:**

https://www.supplychaindive.com/news/bed-bath-beyond-sales-inventory-suppliers-terms-bankruptcy-risk/640092/

DIVE BRIEF

# Bed Bath & Beyond's sales and inventory crash as suppliers tighten terms

Published Jan. 11, 2023

Ben Unglesbee Senior Reporter

Bed Bath & Beyond reported a YoY decline in net sales of 33%. *Daphne Howland/Supply Chain Dive*

**Dive Brief:**

- Wary suppliers calling for shorter payment terms potentially cost Bed Bath & Beyond many millions of dollars in lost sales during a key period for retail during the holiday season.
- The company reported a YoY decline in net sales of 33%, which it attributed to an in-stock position lower by 70% along with a decrease in customer traffic during the third quarter, which ended Nov. 26.
- "Although we moved quickly and effectively to change the assortment and other merchandising and marketing strategies, inventory was constrained and we did not achieve our goals," Bed Bath & Beyond President and CEO Sue Gove said in a statement.

**Dive Insight:**

On a conference call Tuesday, Gove pegged declining in-stocks to the company's trade credit with suppliers after 2022 brought executive turnover, downgrades and disappointing financial results.

"Despite this progress on owned brands, rebuilding our national brand presence will take time," Gove said of Q3 during the call. "Following some of the micro and macroeconomic challenges we and the sector faced at the beginning of the quarter, we experienced an acceleration in vendor payment terms and credit line constraints."

Gove, who took over as interim and then permanent CEO in 2022, noted that those constraints led to lower receipts for goods and, in turn, lower in-stock levels and sales. She added that the retailer has "worked diligently with our supplier partners and our payables remain at healthy levels."

The retailer's struggles deepened in 2022 as sales and profits declined with a slowdown in home goods sales and despite numerous turnaround initiatives over the years. Last week, Bed Bath & Beyond disclosed that it was considering a possible bankruptcy among other strategic alternatives as it wrestles with continued losses and cash burn.

Tightened payment terms are common for retailers and brands facing financial distress and can accelerate a financial tailspin by adding to a company's liquidity pressures, such as in the case of Revlon last year. For suppliers, asking for shorter payment terms or cash on delivery is a defense against losing payment in a bankruptcy scenario.

A Bloomberg Law report Tuesday, based on anonymous sources, cited tightened terms with suppliers as an accelerant in the Bed Bath & Beyond's financial decline and noted the retailer has "sometimes" struggled to make payments of late.

Gove said Tuesday that Bed Bath & Beyond has "already leveraged the liquidity gain from the holiday season to pursue more inventory and higher in-stock levels with support from our key vendors" and that "[a]dditional efforts are also underway to further increase stock levels."

https://www.hometextilestoday.com/retailers/bed-bath-beyond-promises-suppliers-cash-up-front-at-least-for-now/



Bed Bath & Beyond promises suppliers cash up front, at least for now

# Bed Bath & Beyond promises suppliers cash up front, at least for now

Vendors still waiting for clarity on overdue invoices

**Jennifer Marks** //Editor in Chief//February 17, 2023

Union, N.J. – For years, Bed Bath & Beyond suppliers agreed to devilish terms to land business with the home furnishings behemoth. With the threadbare shelves and plummeting traffic, things are changing.

The company is now offering advanced payments on merchandise or payment on delivery along with an end to BBB's infamous surcharges and chargebacks.

As reported by HTT editor-at-large Warren Shoulberg on the WarrensReport blog, "These significant changes in the retailer's payment terms were announced during two back-to-back online sessions with selected vendors on Thursday afternoon [Feb. 16] in presentations from CEO Sue Gove, interim CFO Holly Etlin and the brand managers for its Bed Bath & Beyond and BuyBuy Baby brands."

One call was made with vendors and the other with direct-to-consumer brands, according to The Business of Home. DTC brands were promised immediate payment on vendor-fulfilled orders once as Bed Bath received the funds from customers.

"What was not addressed, however, were any details on when current outstanding invoices would be paid," Shoulberg noted.

Suppliers were told some of the $225 million Bed Bath received from its recent stock sale would be earmarked for overdue payments, most of the money will be consumed by debt payments.

https://www.supplychaindive.com/news/Bed-Bath-Beyond-bankruptcy-risk-suppliers-inventory/646988/

# With suppliers still wary, Bed Bath & Beyond banks on $120M consignment deal

One analyst calls it "way too late and beyond a desperate move."

Published April 6, 2023

Ben Unglesbee Senior Reporter
A Bed Bath & Beyond storefront. The retailer will create a vendor consignment program as it looks to supplement inventory levels. *Daphne Howland/Supply Chain Dive*

In its latest move to try and secure product for its shelves, Bed Bath & Beyond unveiled a deal on Monday with ReStore Capital to create a vendor consignment program.

Few details about the deal were disclosed beyond the basics: Under the agreement, ReStore — a financing arm of the liquidation specialist Hilco Global — would purchase up to $120 million in "pre-arranged merchandise" from the retailer's "key suppliers" on a "revolving basis," according to a release.

In a statement, CEO Sue Gove described the consignment deal, which would supplement existing inventory levels, as a "capital-light solution" that could "allow us to strengthen merchandise availability and better fulfill demand."

The program follows a roller coaster for the troubled Bed Bath & Beyond, which has struggled to pay suppliers and on multiple occasions warned of a possible bankruptcy. In recent months, the retail chain has been able to secure capital by selling stock, though it said recently that it needs to raise more to stay afloat.

Bed Bath & Beyond disclosed in January that its in-stock position plummeted by 70% during the holiday season due to inventory constraints from suppliers tightening their payment terms.

Whether the ReStore deal will succeed in bringing in new inventory and sales remains to be seen. "It is way too late and beyond a desperate move," Albert Furst, chief operating officer of credit analysis firm Creditntell, said in an email.

## Wary suppliers

Consignment deals can come with lower operational and financial flexibility for retailers that use them, as retailers don't own the inventory on their shelves and often accept revenue share or fee agreements with vendors.

For suppliers, consignment arrangements don't necessarily erase risk. Consignment vendors fought Sears in bankruptcy court over its store closure plans once it fell into Chapter 11.

Moreover, Bed Bath & Beyond is still at risk of bankruptcy, which creates all sorts of risks for suppliers. Bed Bath & Beyond has dodged bankruptcy once already this year, and recently disclosed that its credit facility has shrunk to $300 million. Furst noted that the company only has $11.5 million under the facility to help finance its operations.

That's not likely to inspire confidence in suppliers, some of whom are still leery of selling to Bed Bath & Beyond despite the retailer's efforts to reassure them of its ability to pay for shipments.

"I spoke with a dozen or so vendors last week and the vast majority have not been paid since December or earlier," Furst said, adding that many suppliers won't even ship on cash-in-advance payment terms to the retailer.

Bed Bath & Beyond's challenges to secure inventory and assuage suppliers has created opportunities for others. DataWeave analysis from January found that Bed Bath & Beyond's inventory availability dropped precipitously beginning in July 2022 and worsened through the year, while levels among its peers remained stable.

Overstock.com has specifically targeted categories that Bed Bath & Beyond has historically specialized in as a growth area for the online retailer. Overstock CEO Jonathan Johnson told Supply Chain Dive in March, "We saw an opportunity to go to those suppliers that either weren't getting paid or canceling their contracts."

Bed Bath & Beyond's chief, however, projected some optimism in announcing the vendor deal, saying that the "support we are seeing from our top supplier partners demonstrates the staying power of our brands and our potential for sustainable improvement."