# EXHIBIT B

# TRANSCRIPT OF LAURA CROSSEN DEPOSITION

Laura Crossen
September 08, 2025

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
CHAPTER 11
CASE NO. 23-13359 (VFP)
(JOINTLY ADMINISTERED)

    -   -   -   -

IN RE: BED BATH & BEYOND, INC.,
et al.,

              Debtors,

- - - - - - - - - - - - - - - - - -

ADV. NO. 24-01336 (VFP)

MICHAEL GOLDBERG, AS PLAN ADMINISTRATOR
FOR 20230930-DK-BUTTERFLY-1, INC.
(f/k/a BED BATH & BEYOND, INC.),

              Plaintiff,

V.

ARTSANA USA, INC.,

              Defendant.
- - - - - - - - - - - - - - - - - - - - -

          Oral sworn Remote Video Conference

deposition of LAURA CROSSEN, taken pursuant to

Notice, commencing at 9:34 a.m., on Monday,

September 8, 2025 before Judith A. Maruca, a

New Jersey Certified Court Reporter and Notary

Public within and for the State of New Jersey.


              -   -   -   -

          U.S. LEGAL SUPPORT
          1818 MARKET STREET
             SUITE 1400
     PHILADELPHIA, PENNSYLVANIA 19103
           (877) 479-2484

R E M O T E   A P P E A R A N C E S:


ASK LLP
BY:  NICHOLAS C. BROWN, ESQUIRE
     2600 Eagan Woods Drive, Suite 400
     St. Paul, MN 55121
     nbrown@askllp.com
Attorneys for the Plaintiff


SAUL EWING LLP
BY:  TURNER N. FALK, ESQUIRE
     1500 Market Street, 38th Floor
     Philadelphia, PA 19102
     215.972.7777
     turner.falk@saul.com
Attorneys for the Defendant,
Artsana USA, Inc.

Laura Crossen
September 08, 2025

- - -

I N D E X

- - -

WITNESS

LAURA CROSSEN

(Witness remotely sworn.)

EXAMINATION                          PAGE

BY MR. FALK.............        6

BY MR. BROWN............        74

Laura Crossen
September 08, 2025

INDEX  TO  EXHIBITS

LAURA CROSSEN

IN RE: BED BATH & BEYOND, INC., ET AL.

MONDAY, SEPTEMBER 8, 2025

JUDITH A. MARUCA, CCR


| MARKED | DESCRIPTION | PAGE |
|--------|-------------|------|
| Exhibit 1 | E-mail chain | 47 |
| Exhibit 2 | E-mail chain | 50 |
| Exhibit 3 | E-mail chain | 65 |
| Exhibit 4 | E-mail chain | 29 |
| Exhibit 5 | E-mail chain | 38 |
| Exhibit 6 | E-mail chain | 46 |
| Exhibit 7 | E-mail chain | 63 |
| Exhibit 8 | E-mail chain | 65 |
| Exhibit 9 | E-mail chain | 54 |
| Exhibit 10 | E-mail chain | 59 |
| Exhibit 14 | E-mail chain | 70 |

(EXHIBITS ANNEXED HERETO)

Laura Crossen
September 08, 2025

                              -   -   -

                    DEPOSITION SUPPORT INDEX

                              -   -   -

Direction to Witness Not to Answer

Page Line          Page Line          Page Line

None


Request for Production of Documents

Page Line          Page Line          Page Line

None


Stipulations

Page Line          Page Line          Page Line

None


Question Marked

Page Line          Page Line          Page Line

None

Laura Crossen
September 08, 2025

- - -

THE COURT REPORTER:  The attorneys participating in this deposition acknowledge that I am not physically present in the deposition room and that I will be reporting this deposition remotely. They further acknowledge that, in lieu of an oath administered in person, the witness will verbally declare his/her testimony in this matter under penalty of perjury.  The parties and their counsel consent to this arrangement and waive any objections to this manner of reporting.

Please indicate your agreement by stating your name and your agreement on the record.

MR. FALK:  Turner Falk, counsel for the defendant, Artsana USA.  I'm in agreement.

MR. BROWN:  Nicholas Brown for the plaintiff.  We agree.

- - -

LAURA CROSSEN, after having been first duly sworn, was examined and testified as follows:

- - -

EXAMINATION

- - -

BY MR. FALK:

Q.     All right.  Good morning, Ms. Crossen.

Laura Crossen
September 08, 2025

A.      Good morning.

Q.      So my name is Turner Falk.  I'm counsel for Artsana USA, Incorporated, the defendant in a piece of litigation.  Before we begin, I just want to get some basic background first.

First, are you under the influence of any substances that would prevent you from giving full and accurate answers to my questions?

A.      No.

Q.      And you are here as a 30(b)(6) designee.  In your own words, what does that mean?

A.      I'm here to represent information that I have reviewed on behalf of this case.

Q.      And which entity are you the designee for?

A.      For the wind down debtor DK-Butterfly formerly Bed Bath & Beyond, Inc.

Q.      There may be times where I use the word you, and it may be unclear whether I mean you personally or you, the entity that you are the designee for.  If that is unclear, just ask me and I'll try to clear it up, and hopefully I won't get my wires crossed in the first place.

Tell me everything you did to get ready for this deposition.

Laura Crossen
September 08, 2025

A.      I reviewed information that was provided by both counsel to plaintiff and counsel to the defendant.  I reviewed prior information around history of activities with Artsana USA with respect to records that were retained post bankruptcy.

Q.      And Mr. Brown, your counsel, he provided me with a collection of documents that's about say 120 e-mails and 30 or so spreadsheets. And he represented to me that that was material that you reviewed say last week, at least some time in preparation for this deposition.  Does that seem roughly accurate?

A.      That's correct.

Q.      And in your own words, what is this litigation about?

A.      This is a preference claim with respect to payments made in the 90 days prior to the filing of bankruptcy.

Q.      And have you given testimony in a court of preference claims before?

A.      No.

Q.      Have you given deposition testimony as a designee of the Butterfly wind down entity before?

A.      No.

Q.      Have you ever given 30(b)(6) corporate

Laura Crossen
September 08, 2025

designee testimony in any matter before?

A.     No. For 30 (b)(6).

Q.     And to your knowledge, what is the current amount in dispute in this case?

A.     Approximately 530,000.

Q.     If I said it was $535,358.78 does that sound right?

A.     It does.

Q.     And in your own words, what exactly is a preference?

A.     It's a payment made in the 90 days before the filing of bankruptcy that is designated as having preference.

Q.     And personally, are you familiar with any of the defenses to preferences?

A.     I am.

Q.     Which defenses are you familiar with?

A.     Most relevant is the value.  That's one that I'm familiar with.

Q.     And are you also familiar with a defense called the ordinary course of business defense?

A.     I am.

Q.     I just want to make sure that I minimize my jargon to the right level.

Laura Crossen
September 08, 2025

So let's talk about background.  Were you formerly employed by the debtor, Bed Bath & Beyond family companies.

A.      Yes, I was.

Q.      And what role did you have with Bed Bath & Beyond when it filed bankruptcy?

A.      I was the chief accounting officer at the time it filed bankruptcy.

Q.      And how long had you held that position at the time it filed bankruptcy?

A.      Under one year.

Q.      But more than three months?

A.      Yes.

Q.      So you would have been the chief accounting officer for the entire preference period?

A.      Yes.

Q.      Do you know if you took on that role before or after say November 14th of 2022?

A.      Before.

Q.      And can you tell me what do you do? What did you do in that role?

A.      So for clarification, I was named chief accounting officer in June of 2022.  I assumed the role of interim chief financial officer in September of 2022, and basically wore both hats

Laura Crossen
September 08, 2025

until around the time of February 23, at which time a chief restructuring officer was appointed by the Board, and I continued in my chief accounting officer role.  So I oversaw the accounting and financial functions of the company.

Q.      And I guess as a chief officer, were you often digging into the nitty-gritty of ordering and billing?

A.      No.

Q.      And who then was handling that sort of on-the-ground-work?

A.      There were staff members in both the business financial groups for the concepts as well as a large accounts payable function.

Q.      Can you explain what you mean by the concepts?

A.      The brands, Bed Bath & Beyond, Buy Buy Baby, Harmon, et cetera.  They have finance representatives.

Q.      I see.  I'm interested in understanding how the different concepts work from like invoicing, ordering, accounting perspective. Can you sort of tell me about the order flow and the payment flow between these different concepts?

A.      So they weren't necessarily between

Laura Crossen
September 08, 2025

them, but each concept would write its own hues

through a procurement company that operated to serve

most of the concepts that I referenced.  And that

procurement company would write the POs and the

payments would flow from the parent company.

        Q.      The parent company.  What is the name

of the parent company?

        A.      Bed Bath & Beyond, Inc.

        Q.      And what was the name of that

procurement company that --

        A.      Liberty Procurement Company.

        Q.      Is that a subsidiary or affiliate in

the Buy Buy Baby group?

        A.      It is a subsidiary of Bed Bath &

Beyond, Inc.

        Q.      I see.  And I believe you said that

that procurement company would do purchase orders

for several different concepts.  Did those concepts

include the Buy Buy Baby concepts?

        A.      Yes.

        Q.      And let's see.  What is your role now

as we sit here today?

        A.      I'm a consultant for the plan

administrator.

        Q.      And how long have you held that role?

Laura Crossen
September 08, 2025

A.      Approximately two years.

Q.      And what are your job responsibilities in that role?

A.      I assist in asset recovery, tax compliance, claims, resolution, and support all of the plan administrators, operating requirements and assist with, you know, any information needs that arise during the course of winding down the debtor.

Q.      Are you familiar with the defendant in this litigation, Artsana USA?

A.      I'm familiar with it to the extent that I recognize the vendor name and have done review necessary for today's deposition.  And I'm familiar with the brands and products.

Q.      And what kind of goods did Artsana supply to the Bed Bath & Beyond family companies?

A.      So I think a primary brand, Chicco was the larger of the vendors.  And they provided baby products in various categories.

Q.      When you say that -- did I hear you right that Artsana was one of the larger vendors supplying?

A.      No. I was referencing the Chicco brand under Artsana as a large brand.

Q.      So you --

Laura Crossen
September 08, 2025

A.      -- within the Artsana family, right.

Q.      So when you say the Chicco brand is a large brand, do you mean that the Chicco brand was supplying a lot of inventory, or do you mean that it is a well-known brand, generally?

A.      So I believe that the Chicco brand was the one that sold the most branded product to Buy Buy Baby.  That was what I was referencing.

Q.      I see.  And to your knowledge, did Artsana sell only to the Buy Buy Baby concept or did it also sell to other concepts?

A.      To my knowledge, the Buy Buy Baby concept.

Q.      And it sounds like you are suggesting that there were various Chicco brands that were not necessarily Artsana USA; is that correct?

A.      No.

Q.      Are you aware of any Chicco affiliates that are not Artsana USA that sold goods to any of the Bed Bath family companies?

A.      No. No.

Q.      Can you describe the course of dealing between Artsana USA and the Bed Bath family of companies during the period -- I'll call it the healthy period -- up to say a year before the

Laura Crossen
September 08, 2025

bankruptcy filing?

A.      Yes.  So I think they would be a normal process of buyers and merchants corroborating with Artsana USA to determine purchase volumes, and purchase items, POs would be written.  They would be written under agreed upon terms that would have been 60-day payment terms in tact during that period.  And then Bed Bath & Beyond slash Liberty Procurement slash Buy Buy Baby, the whole entity would arrange for carrier pickup of goods.  Those goods would be picked up by carrier and shipped to the company.

Q.      I see.  And I'd like to dig in detail into each of those steps in the process.  Let's break down how actual ordering works.

Who -- when an order needs to be placed, who makes the initial outreach to start the process of placing that order?

A.      That is a merchant responsibility.

Q.      And who exactly would that be, which entity first?

A.      Buy Buy Baby merchants would be the ones reaching out.

Q.      And let's see, who -- I guess I will get to that later -- so this merchant would reach out to Artsana USA, correct?

Laura Crossen
September 08, 2025

A.      Correct.  The merchants were employees of Liberty Procurement Company, so that's who would reach out.

Q.      And what information did they give to Artsana USA to start the process of placing an order?

A.      Personally, I wouldn't know exactly what the dialogue or process is, but there was a, you know, and automated PO form, and I would assume it would involve a skew number, quantity cases, and distribution list of where to ship it to.

Q.      And talking about shipping, where did the goods provided by Artsana ship from?

A.      I don't know.

Q.      And where did the goods provided by Artsana ship to?

A.      It would have shipped to either warehouses or stores.

Q.      In --

A.      The company.

Q.      Would all of those have been within the United States or other countries as well?

A.      Within the United States.

Q.      And do you know if there were any third-party shipping companies involved in this

Laura Crosseen
September 08, 2025

chain of distributing inventory?

A.          Can you clarify what you mean by a third-party shipping company in the context of the question?

Q.          So are you familiar with a company called Yusen?

A.          Yusen was an import provider.  Yusen was a logistics company that assisted with scheduling import containers.

Q.          And was Yusen involved in the shipping of orders from Artsana to the Bed Bath family companies?

A.          So they would not have been involved in domestic orders.  So I would -- they would have been involved if there were import containers that were shipping from Artsana to the Bed Bath family of companies.

Q.          And do you know if import containers were shipping to the Bed Bath family of companies?

A.          So I did see some reference and e-mails that were shared with me related to import containers, so I think the answer is yes.  But I do not have access to records around import containers. Those were in a third-party system that we no longer have access to.

Laura Crossen
September 08, 2025

Q.      And when something is shipping -- let's do the import containers first.  When something is coming via an import container, what information can the Bed Bath family of companies see about that order before it's delivered?

MR. BROWN:  Objection to form.

BY MR. FALK:

Q.      What I mean is, can the Bed Bath family of companies see that it's left the port, track it in the ocean, see that it's been dropped off at a destination in the U.S., things like that?

A.      That's a question I did not prepare for.  I do not have the details of the system or records from it available to answer exactly what was visible to people.  I don't have that information.

Q.      I see.

A.      To answer specifically.

Q.      Then let's dig into specific of how delivery to the Bed Bath of families works.

Can you tell me when product gets dropped off somewhere and is made available to Bed Bath, how does that work?

A.      So once a PO is agreed upon, a ship date would be established.  In almost all cases, the Bed Bath & Beyond family of companies would use a

Laura Crossen
September 08, 2025

designated carrier of its choice that it had

contracts with to go and schedule an appointment to

go pick up the goods and to bring them to a

warehouse or a store of the company.

Q.      And to your knowledge and

understanding, did Bed Bath -- at what point in this

process did Bed Bath come to own the goods?

A.      At the point it picked them up.  At

the point the carrier picked them up.

Q.      And which party is paying for the

carrier at that pickup time that you are discussing?

A.      As I said, in most cases, I don't have

the specifics here, but in most cases, Bed Bath and

Beyond of families paid the carrier, the purchaser.

Q.      Under what circumstances would some

other party have paid the carrier?

A.      There could have been a vendor

arrangement where it was flex rate, and that meant

that the vendor paid the freight and charged the

company for the freight.

Q.      And in that sort of hypothetical the

vendor would have been Artsana USA, correct?

A.      Correct.  If in fact that was the way

it was done.

Q.      That's I'm just about to get at.  Are

Laura Crossen
September 08, 2025

you aware of any times where Artsana shipped and paid for those fees itself?

A.      I'm not.  I am not aware.  But I did not have any information to review the answer to that question, so I do not know the answer to that question.

Q.      And just to be clear, is the reason you did not have that information has been -- become inaccessible?

A.      So information regarding the freight component of each shipment, to my knowledge was not retained.

Q.      I see.  Would it be fair to say that Artsana shipped millions of dollars of inventory each year to the Bed Bath family?

A.      Yes.

Q.      And how many other vendors shipped million of dollars worth of inventory a year to the Bed Bath family?  Let's -- for time period, I mean say like a year before the bankruptcy filing?

MR. BROWN:  Objection to form.  Could you clarify when you say millions of dollars, do you mean anything over a million?

MR. FALK:  I will get more specific on that in a moment, I guess.

Laura Crossen
September 08, 2025

BY MR. FALK:

Q.      But yeah, a year before the bankruptcy filing, how many vendors shipped one million dollars or more worth of goods to the Bed Bath family?

A.      I don't know the answer to that question.

Q.      Would it be fair to say that Artsana shipped tens of million, 10 million or more dollars worth of goods per year?

A.      Yes.

Q.      And do you know how many vendors shipped tens of millions of dollars per year to the Bed Bath family again at that one year prior to the bankruptcy date?

A.      No, not off the top of my head, no.

Q.      I see.  To your knowledge, are there any major differences between the ordering and shipping processes that Artsana and the Bed Bath family used, and the ordering and shipping processes that other large vendors -- other million dollar plus vendors used?

A.      Can you clarify within that question. That's such a broad process.

Q.      I'll break it down.  When I say large vendors, at least for this part of the deposition, I

Laura Crossen
September 08, 2025

mean those million dollar a year plus vendors.

You described a process for placing purchase orders that would work with Artsana.  Was that -- would that be the same process that was used for other large vendors?

A.      I would generally say yes, but there were different types of arrangements depending on the vendor and whether they shipped to warehouses or stores, whether they were drop shipped or vendor direct to consumer.  So there were a number of purchasing processes, but would Artsana's process fit into a structure like other vendors to the extent it was the same process for purchases?  Yes.

Q.      I see.  And I believe you mentioned that Artsana was supplying inventory on 60-day terms, is that right?

A.      Correct.

Q.      So the Bed Bath family was effectively buying inventory on credit, correct?

A.      Correct.

Q.      And were -- one year prior to the bankruptcy, were these other large vendors also providing inventory to the Bed Bath family on credit?

A.      Yes.

Laura Crossen
September 08, 2025

MR. BROWN:  Objection to form.

BY MR. FALK:

Q.      And one year prior to the bankruptcy, were any of the large vendors providing inventory on a pre-payment basis?

MR. BROWN:  Objection to form.  I think it is a little bit unclear what you are referring to when you say other large vendors.

MR. FALK:  Again, I'm using the concept of other large vendors to mean vendors that are not Artsana that supply a million plus dollars worth of goods per year.

THE WITNESS:  I don't know of the specifics of all vendor orders one year prior to the bankruptcy, but generally, the company purchased on terms.

BY MR. FALK:

Q.      And are you aware of any of the large vendors providing goods in that one year -- at that one year benchmark on a cash and delivery basis?

A.      I believe there were some.

Q.      So --

A.      Limited.  Very limited.  It was not standard.

Q.      I see.  Let's dig into billing,

Laura Crossen
September 08, 2025

invoice and payments.

Can you describe at a high level, how billing, invoicing and payment works.

A.      So billing and invoicing I would call those synonymous.  The purchase order is placed. Once the goods are, you know, shipped by the vendor, they would EDI an invoice to the company's systems. And the company would schedule that pickup of the goods.  Once goods were received, the company systems would attempt a three-way match between the PO, the invoice, and the receiver.  And once that process was complete and all differences, discrepancies were resolved, that three-way matched set of documents, electronic documents would be available to pay.

Q.      And let's see, would it be fair to say that at some point leading up to the bankruptcy, Bed Bath & Beyond began to fall behind on payments to its inventory vendors?

A.      There were definitely some payments that fell behind.

Q.      And when did the Bed Bath family of companies start to fall beyond on payments to large vendors in general?

A.      I can't answer specifically as a group