Laura Crossen
September 08, 2025

like that.  I don't have that level of information
for each one to answer the question broadly like
that.  It would have varied.

Q.       And to your knowledge, when did the
Bed Bath family start to fall behind on bills to
Artsana?

A.       Based on the information I reviewed,
it appeared to be at the end of 2022.

Q.       And can you describe for me what kind
of discussions were happening inside the Bed Bath
family about dealing with arrearages to inventory
vendors?

A.       I mean there was, you know, process of
discussing where payments were at with certain
vendors and, you know, what was due in each upcoming
period, and how to prioritize payments.

Q.       And how did the Bed Bath family of
companies decide which payments to prioritize?

A.       It would be based on the extent of the
past due balance and days past due, as well as in
collaboration with the merchant groups.

Q.       And did the criteria that you just
described are purely mathematical, days past due,
arrearage balance.  Are those the only factors that
were evaluated when deciding how to prioritize

Laura Crossen
September 08, 2025

payments towards arrearages?

A.      I can't answer if those were the only
factors, because the merchants would offer, you
know, their input on, you know, which vendors they
needed to, you know, improve or buy additional
inventory from so they would, you know, provide
information to us around which vendors to pay, you
know, from a priority prospective.  So it wasn't one
dimensional. There were multiple factors in when to
pay and how to prioritize those payments.

Q.      And so the identity of the vendor
mattered in deciding whether to do, what I'll call
catch-up payments?

A.      Yeah.  I can't say that the identity
mattered.  I can say there was a process of
evaluating you know open payments that were past due
and prioritizing them or determining how to allocate
funds to them.

Q.      Let me ask a more specific question.
Did the specific goods that a particular vendor
provided factor into the discussions about how to
prioritize payments of vendor arrearages?

A.      I can't say for sure.  But that
factored in. I can tell you that the merchants were
a part of the process.

Laura Crossen
September 08, 2025

Q.      And were you personally as an individual part of these discussions on prioritizing payments towards arrearages?

MR. BROWN:  Objection to form.  Can you help clarify what timeframe you are referring to?  Is it generally, or is there a specific timeframe?

MR. FALK:  I believe Ms. Crossen indicated that we are talking about say the second half of 2022 maybe the fourth quarter of 2022.

BY MR. FALK:

Q.      So Ms. Crossen, in that timeframe, were you personally part of discussions regarding payment toward arrearages to vendors?

A.      I was.  Yes.

Q.      And so you were on phone calls or e-mail chains with the merchants in these discussions?

A.      In a limited number of individual discussions.  On a more broad basis I would monitor the overall payables, the overall aging of payables and ensure that we were managing, you know, the process.  It wasn't -- I was not involved in every detailed discussion.  I did get involved in a handful.

Laura Crossen
September 08, 2025

Q.       I just want to be clear on this.  You were personally involved in some of these discussions about paying towards vendors with arrearages, correct?

A.       I was.  Yes.

Q.       But you were not able to tell me what criteria the merchants used in deciding which payments to prioritize?

A.       I assume the merchants were reviewing their business, the needs of inventory for their business, and the status of the past due with their vendors and indicating priorities based on those criteria.

Q.       And you said you assume this to be true.  What information --

A.       I want to be clear.  I was involved in the allocation of funds and so the broad management of accounts payable and payments.  I wasn't involved in the details of you know vendor ordering and vendor purchasing status and prioritization.  That was a merchant and business president responsibility.

Q.       We have been talking generally about this billing payment and arrearage process.  I would like to dig in on Artsana specifically.

Laura Crossen
September 08, 2025

A.      Okay.

Q.      Can you tell me when did the Bed Bath family of companies start -- when did they learn that there was an arrearage with Artsana USA?

A.      So the company had system reporting and data that would continuously age its accounts payable.  So that would have been something that would have appeared in a report, you know, with thousands of other vendors.  So I would see that report in aging bucket form, not -- I would not necessarily look at every detail.

Q.      I see.  Can you take a look at the exhibit marked exhibit number four.

A.      Yes.  Give me a moment to pull it up.

(Whereupon, Exhibit No. Exhibit-4 was marked for identification.)

BY MR. FALK:

Q.      Ms. Crossen, do you have the document in front of you?

A.      Yes, I do.  I'm just reviewing it to make sure I know the details for you.

Q.      Thank you.

A.      Yes.  I'm rereading it.  Just give me one moment.  Okay I re-read it.

Q.      Would it be accurate to say this is an

Laura Crossen
September 08, 2025

e-mail chain where the last e-mail, the one that appears at the top of the documents, November 14th, 2022?

A.      Correct.

Q.      And can you describe at a high level what this e-mail reflects?

A.      This is an e-mail just going back and forth on outstanding balances and asking questions about when payments will be forwarded and answering questions about when payments were made.

Q.      And you see the oldest e-mail in this chain indicates about $670,000 due to Artsana from Bed Bath & Beyond as of the date it was sent October 28, 2022?

A.      I do.

Q.      And do you have any reason to believe that that number is materially inaccurate?

A.      I don't have an open payable balance history.  That was frozen at that time to answer that question.  I see that it came from Artsana.  I you know I don't have access to information to verify it though at that point in time.

Q.      And do you see on the bottom of the first page, top of the second page of the document, do you see the October 31st, e-mail from Brian

Laura Crossen
September 08, 2025

Cashman?

A.     I do.

Q.     And what does that e-mail indicate --
per that e-mail, what has recently occurred?

A.     He is indicating a payment was issued
that morning.

Q.     And what company is Brian Cashman with
at this point?

A.     He is with a company BRG, Berkeley
Research Group.  They are consultants that were
supporting the company through the back half of '22,
and to help support a number of areas including
assisting with payment flow.

Q.     Do you see any Bed Bath employees
anywhere on this e-mail chain?

A.     No, I don't.  Not on this one.  I see
Brian as the representative.

Q.     Is that unusual at this point in the
year with BRG on board, would that be unusual to be
no Bed Bath employees on a discussion about
payments?

A.     So I can't answer that question.  I,
you know, I don't have every access to every e-mail
communication that may have occurred at that
timeframe to answer that question.  What I can see

Laura Crossen
September 08, 2025

is that Artsana initiated this e-mail string and included only Brian Cashman.

Q.      How did this payment flow information?

A.      Ask that again please?

Q.      I'm sorry.  I'm trying to form a precise question for you.  When a BRG employee would receive information like this, how does that information make it to the Bed Bath family of companies?

A.      Well, this e-mail by example, if Brian Cashman was receiving this e-mail is that your question?

Q.      Right.  What I mean is a vendor says, I'm owed "X" dollars.  They tell BRG.  How does the information get from BRG to somebody at Bed Bath?

A.      Bed Bath would know the vendor outstanding payables at least per its records which may differ from the vendors, credits and other things are being processed, but there would be communication between the BRG employee and Bed Bath employees daily.

Q.      Can you elaborate or the nature of that communication between the BRG and the Bed Bath employees?

A.      It could be e-mails.  It could be

Laura Crossen
September 08, 2025

discussions.  It could be meetings.  It could have been any one of a number of things.

Q.      Did BRG of input on the prioritization of payments towards arrearages?

A.      Did they have authority?  What is your question around input.  Give me a little bit more context, please.

Q.      Earlier we discussed criteria that might have been used to decide the prioritization towards arrearages.  Did BRG also weigh in on prioritization?

A.      I don't believe so.

Q.      And when you say --

A.      I believe they supported processes and helped manage the, you know, the broader communications, but I don't believe they gave input on the prioritization.

Q.      And you earlier testified that BRG had authority to do something, correct?

A.      I didn't say -- I asked you what were you asking.  Was that authority when you asked if BRG gave input on payments.  I was trying to understand -- define the word input.

Q.      I see.

A.      I didn't rendered authority to BRG.

Laura Crossen
September 08, 2025

Q.      I'm about to ask you that about authority.  What I mean by authority is, the ability to legally bind the Bed Bath family of companies to a particular course of action.

Did BRG have authority to place orders with vendors?

A.      No.

Q.      Did it have authority to place orders with Artsana specifically?

A.      Not that I'm aware of, no.

Q.      Did have it --

A.      That is a merchant responsibility.

Q.      Did it have authority to decide which payments for outstanding inventory would be made?

A.      No. It may have assisted with communications with vendors and process management, but no, not unilateral authority to decide the prioritization.

Q.      Once a decision to pay was made, did BRG have authority to accomplish that payment?

A.      BRG didn't work in the accounts payable group to accomplish payments.  They were financial consultants for the company.

Q.      I see.

A.      They didn't work in the accounts

Laura Crossen
September 08, 2025

payable function to execute a payment.

Q.      Going back to Exhibit Number 4.  If you look at the oldest e-mail in the chain.  The one from Amanda Plasterer.  There is a mention of something called Caben there, C-A-B-E-N. What is Caben?

A.      I do not know.

Q.      Why is an Artsana employee discussing arrearages with Caben?  I should say why are Artsana employees discussing arrearages that are allegedly due to Caben?

A.      I don't know the answer to that.

Q.      Would it be fair to say that this Exhibit-4 e-mail chain represents a request from Artsana to catch up on arrearages?

A.      So the first of these e-mails appears to be within the Artsana team.  So I don't know if that initially was informational within the Artsana team.  The next e-mail dated, you know, the same day appears to be a communication to a Brian Cashman referencing those aging payables.  So there is a communication regarding past due payables in this e-mail.

Q.      I see.  And is -- in this e-mail, is Artsana threatening to take any action if these

amounts are not paid?

A.      I do not see that, no.

MR. BROWN:  Could you repeat the question?

MR. FALK:  I said in these e-mails is Artsana threatening to take any action if these amounts aren't paid?

THE WITNESS:  I don't see action.  But I do see the words that say we will be evaluating shipments this week.

BY MR. FALK:

Q.      And during the timeframe of this e-mail chain from October 28th to November 14th, are you aware of any oral communications from Artsana threatening to take any action if this amount is not paid?

A.      I'm not.

Q.      And would you say that this communication in Exhibit-4 put pressure on the Bed Bath family of companies to pay?

MR. BROWN:  Objection to form.  You can answer.

THE WITNESS:  I'm reading the e-mails as they were written.  And certainly where -- there are references to evaluating shipments, or delaying

Laura Crossen
September 08, 2025

shipping. That could, you know, put pressure.

Q. And where in this e-mail chain do you see a mention of delaying shipping?

A. From Steve McLaughlin where he says they will be evaluating for releasing shipments this week.

Q. And in response -- the arrearage amounts discussed here, do you know if that was eventually paid?

A. I know the payment of 761,000 is referenced in the e-mail was paid.

Q. And --

A. I don't have the specific invoices so I can't answer the question relative to these amounts being quoted back in October. But it does appear a large payment was released from the e-mail.

Q. And at this time, the time frame of this e-mail chain, did Artsana take any collections effort that gave it advantage over other vendors who were in arrears?

MR. BROWN: Objection to form.

THE WITNESS: I can't -- I can't make that comparison at that time. I don't have enough information to make that comparison at that time.

BY MR. FALK:

Laura Crossen
September 08, 2025

Q.      And to be clear, at this time period, let's say November 1st, 2022, was the Bed Bath & Beyond company of families in arrears with other large million dollar a year plus vendors?

A.      I did not review the status of payable balances back at this specific timeframe.  So I can't answer it specifically as to those vendor -- large vendors you're referencing.  I would have to review the data.

Q.      I see.  Would you please take a look at Exhibit Number 5.  And let me know when you have taken a look at the document.

(Whereupon, Exhibit No. Exhibit-5 was marked for identification.)

THE WITNESS:  I looked at it.

BY MR. FALK:

Q.      All right.  And at a high level, what does this e-mail chain represent?

A.      This is an e-mail chain done in late December inquiring about past due balances in both Artsana USA, and now I'm seeing capital Caben which was a name for Artsana -- it looks like Asian Pacific.

Q.      And when you say that you are now coming to understand that Caben was a sister company

Laura Crossen
September 08, 2025

of Artsana, are you saying that based -- just on having read it in this document?

A.      This is the only mention that I have around Caben being a sister company of Artsana USA, yes.

Q.      I see.  And would it be accurate to say that over the course of this e-mail chain the BRG team redirects payment requests to John Dery at Bed Bath?

A.      Yes.

Q.      Do you know why that was done?  Why did BRG pass this off?

A.      BRG ended their engagement around the end of December and a different firm joined in the supporting the company in late December, January of 2023.

Q.      What was the replacement company?

A.      Alix Partners.

Q.      And do you know why that switch from BRG to Alix was made?

A.      That was made at a sort of an executive board level, that decision.

Q.      Does that mean that you do not know?

A.      I do not know the specifics of why it was made.

Laura Crossen
September 08, 2025

Q.      What do you know about the reasons for the decision to switch?

A.      I believe that the company was increasing the resources necessary to continue to support the phase that it was in.

Q.      What phase was it in at the time the switch was made?

A.      Increasing, you know, business pressure and, you know, commercial performance improvements were needed.

Q.      Would it be fair to say that at this time Bed Bath's financial situation became worse than it had been a year prior?

A.      Yes.

Q.      And I guess at an informal level, would it be fair to say at this point, the company is seriously considering bankruptcy?

A.      Yes.

Q.      So in the January 4th e-mail in this chain, the first one or the one at the top of the documents I mean --

A.      Uh-hum.

Q.      Do you see a reference to Artsana's HQ pressuring to stop shipments?

A.      I do.

Laura Crossen
September 08, 2025

Q.        And can you tell me how did the Bed Bath company react to this indication that shipments might be stopped?

A.        What do you mean by the Bed Bath's company reacting?  Could you please ask the question more specifically?

Q.        Okay.  I will break it down into pieces.  After Artsana mentioned that it might need to stop shipments, were there any discussion of that fact among the Bed Bath -- I'm going to calling it payment team -- by which I mean the merchants and accounts receivable folks that we were discussing earlier about prioritization?

A.        So, I don't have knowledge of oral discussions that would have taken place.  I have reviewed the e-mails that you provided indicating that you know there was some communication back and forth with the merchant team around the fact that you know, payment needed to be received otherwise shipment may -- shipments may be delayed or cease.

Q.        And do you know of any e-mail or other written correspondence internal to Bed Bath about Artsana's suggestion that they may stop shipments?

A.        The ones I reviewed that are provided, yes.

Laura Crossen
September 08, 2025

Q.      And to your knowledge, those communications that you reviewed are the whole universe of written communications about that issue?

A.      I don't have the whole universe to positively confirm that for you.  But I have what's been provided by house counsel and you.

Q.      And how -- at this point, January 4th, 2023, how did the Bed Bath companies respond to this suggestion that shipments may be stopped?

A.      Again, can you clarify what you mean by respond?  Do you mean verbal conversations that may have been taking place about that or what is your specific question?

Q.      Did the Bed Bath family of companies make a payment in response to this January 4th suggestion?

A.      I do not believe they did.

Q.      Did the Bed Bath family of companies change the manner in which they ordered inventory from Artsana?

A.      I can't answer that question.

Q.      Why?

A.      I don't --

Q.      Why can't you answer it?

A.      Because that would have been a

Laura Crossen
September 08, 2025

merchant activity that I don't have an imprint or a

record of -- whether or not --

Q.      I just want to be clear that the

reason you can't answer that question is because you

don't know?

A.      I don't have the records to answer

that question right now.  I don't have the

merchant's side of the communications that may have

taken place internally, right.

Q.      And did the Bed Bath companies feel

pressured by Artsana's suggestion that it would need

to stop shipping?

MR. BROWN:  Objection to form.  You

can answer it.

THE WITNESS:  I would say generally

that the act of not shipping creates pressure.  The

act of indicating that shipments will be delayed or

cease would create pressure.

BY MR. FALK:

Q.      Who from the Bed Bath family of

companies is on this e-mail chain?

A.      Are you still referring to Exhibit-4?

Q.      Exhibit-5 I mean.

A.      Five.  Okay.  Bear with me.  I want to

reopen it and make sure I have only Exhibit-5 open.

Laura Crossen
September 08, 2025

I see John Dery from the Bed Bath family of
companies.

Q.      Anyone else?

A.      I only see John Dery after Brian
Cashman.

Q.      At this point, when this e-mail chain
is going on, what is John Dery's job title?

A.      He was director of accounts payable.
Senior director of accounts payable.

Q.      And what were his job
responsibilities?

A.      He oversaw the accounts payable
function, processing, reconciliation, payment
making.

Q.      Is it fair to say that Artsana
communicated to John Dery a suggestion that they may
have to stop shipping if their arrearage was not
handled?

A.      So -- so in looking at this particular
e-mail, I do not see them communicating that to John
Dery.  I do see in the very final top e-mail that
that was communicated to Chad Taylor who was the
merchant or one of the merchants involved in the
account.

Q.      So he would be another person employed

Laura Crossen
September 08, 2025

in the Bed Bath family of companies?

A.      I see that at the top, yes.  Yep.  It doesn't have his suffix, but it is him.

Q.      You said Chad Taylor worked with the merchants?

A.      He was in the merchant group, yes. That's where it says HQ is pressuring stop ship.

Q.      Do I have it right that the merchant group was mainly involved in the order placement side and not the accounts payable side?

A.      Correct.  Correct.

Q.      Would it have been unusual then for the merchant to be involved in an e-mail chain about arrearages like this?

A.      No. No. That is not unusual.  Vendor teams often communicate with merchant teams about their accounts, both purchases and the status of their accounts.

Q.      And this suggestion that shipments may need to be stopped, do you have any knowledge of whether it was communicated to anyone at Bed Bath Beyond John Dery and Bed Bath?

A.      Personally, no.

Q.      And in your role as the designee, the 30(b)(6) witness, do you have any knowledge either?

Laura Crossen
September 08, 2025

A.      I do not, no. I do not see the e-mail being forwarded.  I don't -- I don't have physical confirmation of it being shared with anyone else.

Q.      And do you have any knowledge of this suggestion being communicated orally to anyone else in the Bed Bath family of companies?

A.      I do not.

Q.      Would you take a look at Exhibit-6 and let me know when you have given that a quick look over?

(Whereupon, Exhibit No. Exhibit-6 was marked for identification.)

THE WITNESS: (The witness complies.) I looked at it.

BY MR. FALK:

Q.      Will you take a look at the second page, at the January 7th, 2023 e-mail from Steve Rubin.

A.      Uh-hum.

Q.      What is Steve Rubin asking be done in this e-mail?

A.      He is asking that shipments are halted or stopped.

Q.      Do you see that it refers to Caben team as well?