Laura Crossen
September 08, 2025

A.      I do.  Uh-hum.

Q.      Do you know whether shipments were actually stopped in response to this request?

MR. BROWN:  Objection to form.

Is there a Bed Bath representative on this e-mail or is this an internal Artsana e-mail?

MR. FALK:  I believe it's internal.

THE WITNESS:  I don't see one.

BY MR. FALK:

Q.      What I really want to get at with this exhibit then, I'll just ask it.

Would it be fair to say that this e-mail appears to show that Artsana made a request to freeze orders on January 7th?

A.      They made a request to freeze certain orders on January 7th, yes.

Q.      Do you have any reason to believe that that that request to freeze these particular orders was made on a different date than January 7th?

A.      This is Artsana's internal e-mail exchange, so I can only observe it.

Q.      I see.  Would you take a look at Exhibit Number 1.

(Whereupon, Exhibit No. Exhibit-1 was marked for identification.)

Laura Crossen
September 08, 2025

A.       (The witness complies.)  Yes.  I reviewed it.

Q.       And at a high level, what does this e-mail chain reflect?

A.       This reflects carrier Schneider trying to schedule a pickup.  And there's information being exchanged about pushing the pickup back.  And then there is information exchanged around cancelling the pickup.

Q.       And so the orders being discussed for pickup in this e-mail chain, were they picked up at the times agreed in this e-mail chain?

A.       Not per the information in the e-mail chain.  They were not.  They were cancelled.

Q.       And according to this e-mail why were they cancelled?

A.       I don't -- this e-mail is being exchanged between the carrier and the logistics.

Q.       Let me ask you more specifically here.

A.       I don't see a reference to exactly why in this e-mail.

Q.       In the Monday, January 9, 2023 e-mail sent at 2:52 p.m. it's the first one in the document.

A.       Yes.

Laura Crossen
September 08, 2025

Q.      Is there someone from Artsana on that e-mail?  Is Steve Rubin from Artsana --

A.      Steve Rubin is Artsana, yes.  Amy Cruz is Artsana, and I think the other one is sort of -- you see that letters, it's a Bed Bath e-mail box related to shipping, yes.

Q.      That's -- that e-mail that's abbreviating to TM SNE.  That is a Bed Bath e-mail address?

A.      Yes.

Q.      I see.  And so, this first -- this most recent e-mail in the chain it reflects a communication between Artsana and someone at Bed Bath, correct?

A.      It does, although that reads like a more of sort of generic logistics handling e-mail box not a merchant or a name of a person.  Just the scheduling of pickups and carrier management wasn't a merchant responsibility, so it looks like that was going into an e-mail box that handled those matters.

Q.      Would you say that that's the right e-mail box for this kind of communication to go to?

A.      Relative to the shipment itself and de-scheduling it, I assume so, based on the fact that the communications were going back and forth to

Laura Crossen
September 08, 2025

that e-mail.

Q.      The Bed Bath team that was responsible for scheduling shipments, what kind of communication would they have with the Bed Bath team dealing with accounts payable?

A.      Not much.  Not to my knowledge.

Q.      So is it possible that this e-mail never reached the Bed Bath accounts payable team?

A.      This is about holding shipments.  And that accounts payable is after something was shipped and been billed.  So I'm making the assumption that this e-mail would not normally go to the accounts payable team.

Q.      I see.  Could you please take a look at Exhibit Number 2 and let me know when you have given it a look over.

                 (Whereupon, Exhibit No. Exhibit-2 was marked for identification.)

A.      (The witness complies.)  I've looked at it.

Q.      And at a high level, what does this e-mail chain reflect?

A.      This e-mail is referring to -- looks like shipments that were being scheduled through use and logistics import POs to Caben as you referred

Laura Crossen
September 08, 2025

to, and that these were being held.

Q.        And to your knowledge, were the orders shipping through Yusen, the same orders that were shipping through Schneider, the entity in the prior exhibit?

A.        No.

Q.        It is different sets of orders?

A.        These are import orders through the Caben Asia Specific company.  And Schneider Logistics would have been a domestic carrier picking up domestic orders.

Q.        And according to Artsana, in this e-mail chain, how much -- how much does Bed Bath family of companies owe to Artsana on this date of January 9th?

A.        There is a reference to 5.2 million for direct import in this e-mail.

Q.        And how much of that is past due?

A.        Two million is the amount that is quoted here.

Q.        And does Bed Bath promise to do anything on this e-mail chain?

A.        They -- the communicator, Christina DiBella, indicates that she's heard about a payment that could go out early in the week.  This -- a

Laura Crossen
September 08, 2025

reference to payments that were received already

that week, and then some attempt to clarify that.

Q.      Would you say that Artsana pointing

out the two million that is allegedly past due, puts

pressure on the Bed Bath companies?

A.      I mean to me, it's a statement of past

due amounts.  The shipments are being held as a

result of that amount.  So you know, that again,

whenever shipments are held, it puts pressure on

reviewing the status of the payables.

Q.      Would it be fair to say that this

e-mail chain shows the Bed Bath employees finding

out about the shipping freeze for these orders on

January 9th?

A.      It appears to Jenn Turetsky at Bed

Bath received that information on January 9th.

Q.      Do you have any reason to believe that

Bed Bath employees got the information that there

would be a shipping freeze earlier than January 9th?

A.      I don't have that information.  I

wouldn't be able to answer that question.

Q.      Do you know whether the $1.2 million

payment from Bed Bath, referred in this e-mail

chain, do you know if that was requested before or

after Bed Bath learned of the shipping freeze?

Laura Crossen
September 08, 2025

A.      I do not know.

Q.      I know we have been going through the timeline detail.  I just want to back up for a moment.  So Artsana supplied goods mostly to the Buy Buy Baby concept, right?

A.      Uh-hum.

Q.      And --

A.      Correct.

Q.      You said it was shipping of large dollar value of orders at least in excess of a million dollars a year?

A.      Correct.

Q.      How important were Artsana's goods for the normal business operations of the Buy Buy Baby concept?

A.      I can't answer that question.  I wasn't a merchant responsible for Buy Buy Baby sales.

Q.      So you do not know whether the total cessation of orders from Artsana would have severely harmed the Buy Buy Baby concept?

A.      I think the cessation of orders from a large vendor would create harm to sales.  I don't have -- I personally didn't oversee the vendor and its relationship with the business, so I don't have

Laura Crossen
September 08, 2025

the sort of the nuance context in which you ask that

question.

Q.      I see.  Would you please take a look

at Exhibit Number 9.

(Whereupon, Exhibit No. Exhibit-9 was

marked for identification.)

THE WITNESS:  Yes, I will.  I'm

familiar with it, yes.

BY MR. FALK:

Q.      And at a high level, what does this

e-mail chain reflect?

A.      It is a formal notice that --

notifying the company of Artsana's version of a

current aging report, and that any future orders

would need to be done via pre payment.

Q.      And what discussions occurred inside

Bed Bath & Beyond as a result of Artsana's switching

to pre payment?

A.      I don't know.

Q.      Did any discussions occur internally

about this?

A.      About Artsana specifically?

Q.      Yes.

A.      I don't know.

Q.      Did any discussions occur internally

Laura Crossen
September 08, 2025

in Bed Bath & Beyond about any vendors switching to pre payments around this time?

A.      Specifically with respect to vendors switching to pre payment at this time, I can't answer the question on, you know, who had what discussions about what vendors, but I would assume if any other vendors were switching to pre payment or requesting pre payment, the discussions would have -- communications would have occurred.

Q.      That's an assumption that you do not have direct knowledge of, correct?

A.      I do not have direct knowledge at this point in time of who had which conversations about the status of shipping or pre payment requests from vendors.

Q.      And in the year leading up to the bankruptcy, how many large vendors, million dollar a year plus vendors, switched to pre payments?

A.      In the year leading up to bankruptcy, so the timeframe literally, the one year?  Is that the question?

Q.      I believe the bankruptcy was what, April 2023?

A.      April '23.

Q.      April '22 to April '23, how many

Laura Crossen
September 08, 2025

million dollar plus vendors switched to pre payment?

A.       I do not have a specific number.  In terms of assessing the exact count of vendors, but I can say that they were very limited pre payments in the year leading up.  There was only one timeframe when the company offered a pre payment process for new goods in December of '22, that stands as having you know a significant amount of pre payments, but that was not vendor-requested, it was company-offered in order to replenish stock after the holiday season.

Q.       And which vendor companies was this special pre payment process offered to?

A.       When you say which companies, do you mean which vendors?

Q.       Which vendors, yes.

A.       Yes.  There was a list of vendors. There were several.

Q.       Was Artsana one of those vendors?

A.       No.

Q.       Was Caben?

A.       I did not see Caben, no.  I did not see Caben.

Q.       Artsana switched to pre payment that's discussed in this Exhibit 9.

Laura Crossen
September 08, 2025

A.      Uh-hum.

Q.      Did the Bed Bath team negotiate that with Artsana before it was formally put in place?

A.      I do not know.  If it was negotiated, it would have been by the merchants, so I don't have any record of that.

Q.      And to be clear again, the merchants are employees of a Bed Bath & Beyond affiliated company, correct?

A.      Correct.

Q.      The entity the merchants work for, do you know if that was one of the debtors in this bankruptcy?

A.      Yes.

Q.      It was?

A.      Yes.

Q.      And after this switch to pre payment was communicated to the Bed Bath & Beyond team, how did Bed Bath react?

A.      I do not know.  I don't know how individuals -- when you say the entity reacted, I don't know.

Q.      Did the switch to pre payment put pressure on the company?

A.      The switch to pre payment obviously

Laura Crossen
September 08, 2025

not being able to access goods affects the company's performance.

Q.      Did the switch to pre payment put pressure on the company to pay existing outstanding invoices?

MR. BROWN:  Sir, can you repeat that question?

BY MR. FALK:

Q.      Yes.  Did the switch to prepayment put pressure on Bed Bath to pay existing outstanding invoices?

A.      I think that any pressure to not ship, if it was in fact a requirement that outstanding invoices be paid before any prepayment would be allowed, if that was the structure, then that would put pressure.

Q.      Do you see that structure reflected in this e-mail?

A.      I see this e-mail indicating prepayment will be effective as of 1/10/23, and the expectation is payments that are open would be paid in accordance with terms.

Q.      And so that portion discussing payment to the existing invoices, would it be fair to say that Artsana is just asking those be paid normally?

Laura Crossen
September 08, 2025

A.      That's what it reads, yes.

Q.      Would you please take a look at Exhibit Number 10 and let me know when you have skimmed that.

(Whereupon, Exhibit No. Exhibit-10 was marked for identification.)

A.      I will.

Q.      Oh, before we leave Exhibit 9.  I just want to get us oriented on the timeline.  Exhibit 9 is the switch to prepayment.  That's being communicated to Bed Bath on January 10th, correct?

A.      Yes.  Correct.

Q.      Now we can go to Exhibit 10.

MR. BROWN:  Would you mind maybe after this next exhibit, if that would be a good time to take a break?

MR. FALK:  You know, it would actually be a good time to take a break right now.  Because the next few exhibits go together.

MR. BROWN:  Great.

MR. FALK:  What do you need, five minutes, 10 minutes?  What do you need?

MR. BROWN:  Maybe five or ten just to be safe.

THE WITNESS:  Ten would be good.

Laura Crossen
September 08, 2025

MR. FALK:  All right.  11:05 I'll see you again.

THE WITNESS:  Thank you.

MR. BROWN:  Thank you.

(Recess taken 10:56.)

(Back on the record 11:07.)

BY MR. FALK:

Q.    All right.  Ms. Crossen, we are just coming back after a short break.  You understand that you are still under oath and must give true and accurate answers to these questions.  Correct?

A.    I do.

Q.    Wonderful.

To refresh us, is it right we were just looking at a January 10th, 2023, e-mail exchange where Artsana switched to going forward orders to prepayment?

A.    Correct.

Q.    All right.  Let's take a look at Exhibit Number 10.

A.    I have it open.

Q.    And have you given that a look?

A.    I have.

Q.    At a high level, what does this e-mail exchange reflect?

Laura Crossen
September 08, 2025

A.    Artsana communicating to I believe three Bed Bath individuals, an aging report indicating there's three million in past due invoices and a response indicating that there will be prioritized weekly payments going forward.

Q.    Would it be fair to say that this indicates Bed Bath was going to be paying towards existing past due invoices?

A.    So this indicates from the merchant, Chad Taylor, that the merchant team, had given the greenlight and prioritized weekly payments for Artsana.  I don't believe that that necessarily can guarantee that those payments would occur.  But that the merchant team put that priority level in place.

Q.    Is there any indication in this e-mail of Artsana put any pressure on the company to pay?

A.    Well, at this point Artsana had already indicated in January 10th's e-mail that any future orders would be on a pre-paid basis.  This e-mail is more of an inquiry.

Q.    So you don't see this e-mail as putting pressure on the company?

A.    I think that this is a request for update and status on payment.

Q.    Okay.  And for the go-forward order by

Laura Crossen
September 08, 2025

which I mean orders placed after January 10th that would have been occurring under the prepayment structure, were orders placed by Bed Bath under that new structure?

A.      I believe yes.  Although there was a delay between the timing of that January 10th conversion to pre-pay, and an actual pre-pay going out, which was at the end of February.

Q.      And what was responsible for that delay?

A.      Cash flow availability.

Q.      By that do you mean Bed Bath & Beyond was -- did not have sufficient cash flow to make all the prepayments it wanted to?

A.      Yes.  They were lender waivers and other things going on in the timeframe of January and February and cash rasing activities.  So --

Q.      And those lender waivers -- actually, to your knowledge, what are the other things.  You mentioned lender waivers.  What are the other things that were necessary to address, before the prepayments could be made?

A.      Well, the accessibility to cash was what had to be addressed.

Q.      Can you elaborate on what exactly that

Laura Crossen
September 08, 2025

means?

A.      It means resolving any status issues with lenders that were required to continue to access the facility, as well as, you know, generating cash flow from the business in order to release payments.

Q.      And those issues, those were issues did not need to be addressed with Artsana, correct?

A.      They are not specific to Artsana, no.

Q.      And those particular issues did not involve negotiations with Artsana, did they?

A.      No.

Q.      Would you take a look at Exhibit Number 7?

(Whereupon, Exhibit No. Exhibit-7, was marked for identification.)

A.      The witness complies.  Yes, I'm familiar.

Q.      At a high level, what does this e-mail chain represent?

A.      This is a Bed Bath merchant, Buy Buy Baby, a merchant, communicating a new order and a paydown of payables in the form of a total payment in late February.

Q.      And what is the total amount of that

Laura Crossen
September 08, 2025

payment roughly?

A.      1.6 million, roughly.

Q.      And how is that divided up between new orders versus payment to existing invoices?

A.      A million 65 new orders.  532,000, paydown payment.

Q.      And that 532, that's for a paydown of existing invoices.  Do you know if that is the amount that is being challenged as a preference here in this case.  Or do you know if that is a portion of the amount that is being challenged as a preference in this case?

A.      Yes.

Q.      This is Bed Bath committing to pay the alleged preference?

A.      This is a communication about that payment, yes.

Q.      I see.  And this also includes a placement, a prepayment for new going-forward orders, correct?

A.      Correct.

Q.      And the orders pre-paid by payment discussed here, were they placed by Bed Bath & Beyond?

A.      Based on subsequent communications

Laura Crossen
September 08, 2025

about the related shipments, I would say yes.

Q.      And were the goods ordered by those orders delivered to Bed Bath?

A.      I don't have a direct answer to that question.  But I do see some information in e-mails that were shared indicating that some of the goods on those orders may have been held and potentially utilized by a carrier, but I would assume the vast majority of that was in fact resolved, but there seemed to be some back and forth on it in the e-mail communications.

Q.      I see.  Would you please take a look at Exhibit-3?

(Whereupon, Exhibit No. Exhibit-3 was marked for identification.)

THE WITNESS:  Exhibit-3?

BY MR. FALK:

Q.      Yes.

A.      Yes.  I looked at it.

Q.      And on the third page of the document, do you see an image that starts with the word Oracle and payments and a number?

A.      I do.

Q.      So that image albeit cut off, extends to the right side of the screen.  Would you take

Laura Crossen
September 08, 2025

look at also Exhibit 8.  We are going to look at these in conjunction.

(Whereupon, Exhibit No. Exhibit-8 was marked for identification.)

THE WITNESS:  I have that opened as well.

Q.      Does Exhibit-8 accurately reflect the entire contents of the picture that is cut off in Exhibit-3?

A.      It does.

Q.      I see.  So taken together, these exhibits, do they reflect a payment made to Artsana from the Bed Bath companies?

A.      They do.

Q.      And what is the amount of that payment?

A.      1,603,440.30.

Q.      When a payment is made from Bed Bath to Artsana, which company decides how that payment will be applied?

A.      So normally when a payment is made, Bed Bath systems will apply the payment to the oldest invoices.

Q.      That's the general rule.  Do you have any reason to believe that general rule was changed

Laura Crossen
September 08, 2025

for this payment?

A.      It's possible it was changed.  But not changed intentionally, but when a prepayment goes out, obviously there are no invoices yet.  So then a manual intervention has to occur to clear a payment against invoices.  But I would assume that the portion of this payment that was paying down invoices applied in the system as I described.

Q.      You headed off the question I was about to ask next.  Would it be fair to say that this e-mail chain in Exhibit-3 reflects the fact that orders were being placed before this payment was made?

A.      Well orders were being -- it looked to me like discussed and arranged and chosen and arrived at before the payment was made.

Q.      Did Bed Bath have any reason to believe that if it did not make the portion of this payment towards existing invoices, that Artsana wouldn't fill pre-paid future orders?

A.      I can't determine that from this e-mail exchange.

Q.      Do you have any other knowledge that indicates that those two concepts were linked?  The prepayment idea and the payment of the existing

Laura Crossen
September 08, 2025

invoices?

MR. BROWN:  Objection to form.  You can answer it, if you can.

THE WITNESS:  I do believe that Artsana received an arrangement where 50 cents of each dollar of prepayment was paid to Artsana on open payables.  That's how this amount was arrived at.

Q.      Have you seen written communications to that effect?

A.      I'm aware of it.  I'm aware of that arrangement.

Q.      Are you aware of it from oral discussions with other people or from written communications?

A.      I'm aware of it from being in the environment at the time.

Q.      I see.  And when you say you at this point, you mean yourself personally?

A.      Personally, correct.

Q.      Which person did you speak with that told you about this arrangement?

A.      I think that the chief restructuring officer mentioned this arrangement -- these arrangements, yes.

Laura Crossen
September 08, 2025

Q.      Who was that chief restructuring officer?

A.      She was from Alix Partners.  Her name is Holly Etlin.

Q.      And so this arrangement that we are talking about, that was kind of -- that was the deal, an amount pre-paid, half that amount towards old invoices, and that would allow pre-paid inventory to be shipped out?

A.      Yes.  That's how I understood it.

Q.      And Bed Bath -- on the Bed Bath side, did Bed Bath understand this arrangement to be a way to ensure continued fulfillment to orders?

A.      I can't answer that.  I don't know.  I don't know what it -- what this arrangement did for future orders.

Q.      If this arrangement was not in place, did Bed Bath believe that go-forward pre-paid orders would not be filed?

MR. BROWN:  Objection to form.

THE WITNESS:  I can't answer whether it believed.  I don't know outright whether the Bed Bath believed that in each vendor's case.  I think that it would be reasonable to assume that pre-paid orders, you know, may not occur with some vendors if