| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT** <br> **DISTRICT OF NEW JERSEY** <br> **Caption in Compliance with D.N.J. LBR 9004-1(b)** <br> Marianna Udem <br> Brigette McGrath <br> ASK LLP <br> 60 East 42nd Street, 46th Floor <br> New York, NY 10165 <br> Telephone: (212) 267-7342 <br> Facsimile: (212) 918-3427 <br> mudem@askllp.com <br> bmcgrath@askllp.com <br><br> *Special Counsel to the Plan Administrator* | |
| In re: <br><br> BED BATH & BEYOND, INC., *et al.*,[1] <br><br>            Debtor. | Chapter 11 <br><br> Case No. 23-13359 (VFP) <br><br> (Jointly Administered) |
| Michael Goldberg, as Plan Administrator for 20230930-DK-Butterfly-1, Inc. (f/k/a/ Bed Bath & Beyond Inc.),[2] <br>                Plaintiff, <br><br> v. <br><br> Artsana USA, Inc., <br>                Defendant. | Adv. No. 24-01336-VFP |

**PLAN ADMINISTRATOR'S (I) RESPONSE IN OPPOSITION TO CROSS-MOTION FOR SUMMARY JUDGMENT AND (II) REPLY IN SUPPORT OF PLAN ADMINISTRATOR'S MOTION FOR SUMMARY JUDGMENT WITH RESPECT TO <u>PLAINTIFF'S CLAIMS AGAINST DEFENDANT, ARTSANA USA, INC.</u>**

---

[1] The last four digits of Debtor Bed Bath & Beyond Inc.'s tax identification number are 0488. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/bbby. The location of Debtor Bed Bath & Beyond Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 650 Liberty Avenue, Union, New Jersey 07083.

[2] Pursuant to the *Certificate of Amendment of the Certificate of Incorporation of Bed Bath & Beyond Inc.*, which was filed with the State of New York Department of State on September 21, 2023, the name of the entity formerly known as "Bed Bath & Beyond Inc." was changed to *20230930-DK-Butterfly, Inc.* [Filing ID No. 230921001833 DOS ID 315602].

**TABLE OF CONTENTS**

I.    SUMMARY OF ARGUMENT .................................................................................. 1

II.   RESPONSIVE STATEMENT OF MATERIAL FACTS .................................................. 1

III.  ARGUMENT ....................................................................................................... 15

      A.  Defendant's Industry Analysis is Misleading and Erroneous if Not Inadmissible …..15

      B.  There is No Room for a Subjective Defense Because the Transfers Were Derived
      from Collection Pressure and Were Otherwise Unparalleled Among the Parties' Dealings
      ………………………………………………………………………………………………19

IV.   CONCLUSION ................................................................................................... 22

Pursuant to Federal Rule of Civil Procedure 56(a), made applicable herein pursuant to Federal Rule of Bankruptcy Procedure 7056, Michael Goldberg, in his capacity as Plan Administrator for 20230930-DK-Butterfly-1, Inc. (f/k/a/ Bed Bath & Beyond Inc.) (the "Plan Administrator" or "Plaintiff"), hereby submits this (I) Response in Opposition to the Cross-Motion For Summary Judgment and (II) Reply in support of his *Motion for Summary Judgment with Respect to Plaintiff's Claims Against Defendant, Artsana USA, Inc.* (the "Response").

## I.   SUMMARY OF ARGUMENT

The Transfers were paid outside the ordinary course of business, and a trial is unnecessary because there is no genuine issue of material fact that could lead a trier of fact to find otherwise, because the Debtors were pressured into making the Transfers due to Defendant's freeze on shipments, termination of credit terms, and shift to prepay terms for new orders all as captured by email evidence.  Defendant's conduct in this regard was unprecedented in the parties' course of dealing.  Defendant's reliance on an "industry defense" similarly fails, because in addition to the above-referenced collection pressure, Defendant's own expert report is fatally reliant on false assumptions.

## II.   RESPONSIVE STATEMENT OF MATERIAL FACTS

Pursuant to Federal Rule of Civil Procedure 56(a), made applicable by Federal Bankruptcy Rule 7056, and Local Rule 7056-1, Plaintiff presents the following responses to Defendant's Statement of Additional Undisputed Material Facts:

**Business Background and Prepetition Events**

32. The business relationship between Artsana and the Debtors' Buy Buy Baby business segment ("BBB") lasted for over 20 years.

    Response: does not dispute this statement.

33. Given the ordering, shipping of product and invoicing practices of BBB and Artsana over the course of their business relationship, there usually was a running balance owed

1

to Artsana exceeding several hundred thousand dollars.

Response:  Plaintiff lacks information from which to form a belief regarding the truth

of this statement, as Plaintiff does not have access to, for example, 20 years-worth of

transaction history, nor has Defendant provided evidence to substantiate it.  Plaintiff

notes that, as recently as November 10, 2022 and December 19, 2022, the past due

balance was under $300,000.  Crossen Trans. Ex. 4 p. 1; Ex. 5 p. 4.  Plaintiff agrees to

this statement insofar as it refers to the Debtors' "running balance" increasing as they

approached the preference period to several million dollars.  *See* Crossen Trans. Ex. 1,

pp. 2-3 (January 9, 2023 email stating "There is a total of $5.2m open for direct import

and $2.0m is now past due.")

34. Payment on account of such running balances ordinarily were made by paying dozens
or hundreds of invoices at once, via ACH transfer exceeding six figures.

Response:  Plaintiff agrees with this statement.

35. Artsana imposed a partial freeze on shipments to BBB on or about January 7, 2023 on
account of a then existing large balance due on account of shipments made to BBB.

Response:  Plaintiff agrees that Defendant imposed a shipping hold on January 7, 2023

on account of a then existing large balance due on account of shipments made to BBB.

Plaintiff disputes that the freeze was "partial".  Plaintiff refers to Crossen Trans. Ex. 6,

p. 2, where Defendant's representative states on January 7, 2023 "Unfortunately we

need to ask you to **halt/stop shipping <u>all</u> the Buy Buy Baby orders**.  **Please do**

**whatever you can to <u>hold the remaining shipments</u>.**" (Emphasis added).

36. At this time, Artsana requested that BBB prepay for orders placed after January 10,
2023.

Response:  Plaintiff generally agrees with this statement.  Defendant did not "request"

the shift to prepay, but unilaterally dictated this shift, which occurred on January 10,

2

2023. Crossen Trans. Ex. 9 (Defendant email stating "we will be moving our terms to prepayment effective immediately.")

37. Artsana did not, at this or any other time, condition future shipments on payment of the then existing amount due.

Response: This statement is incorrect. The email evidence and course of dealing reflects that Defendant's willingness to conduct future business with the Debtors was inextricably linked to the Debtors' willingness to pay past due invoices.

Defendant's decision to ship goods going forward (on an advance payment only basis) was tied to the Debtors' ability to pay outstanding invoices. The Defendant's notice of shift to prepay terms was made in conjunction with its notice of expectation that the Debtors pay outstanding invoices. Plaintiff refers to Crossen Trans. Ex. 9 (email from Defendant to the Debtors entitled "BBB AGING 1-10-2023"), in which Defendant notified Debtors of its decision to shift payment terms from credit to prepay going forward and in addition "our expectation is that payments will continue as outlined for anything invoiced prior to 1/10/2023."

The Debtors did not place any new orders, and Defendant did not fulfill any orders, prior to receiving payment for past due invoices (the Transfers). See Crossen Trans. Ex. 3 (evidencing first new orders since shipping hold), Ex. 7 (February 24, 2023 email entitled "This Week's Order and Payment", making joint reference to payment for new orders and past due invoices).

The Debtors paid for the new goods contemporaneously with their payment of past due invoices, issuing a single ACH payment to pay both sets of obligations. Crossen Trans. Exs. 3, 7; Gwiadowski Trans. Ex. 1.

38. BBB did not place any further orders with Artsana until after February 24, 2023, more

3

than 51 days after the shipping freeze.

Response:  This statement is incorrect as written and misleading.  Defendant's hold on

shipments,  which was communicated to the Debtors no later than January 9, 2023, did

not have an expiration date.  Crossen Trans. Ex. 1 (January 9, 2023 email from

Defendant to Debtors stating "At this time, we have been asked to hold shipments to

BBB.  As we get more information and things change, we will advise.")  Plaintiff agrees

that Debtors did not place any orders with Defendant between the date of

commencement of the shipping hold and approximately February 24, 2023, which was

the date when the Debtors were first able and did in fact make a payment toward past

due invoices.  Crossen Trans. Ex. 3 (email correspondence evidencing placement of

new orders in mid-February 2023);

39. The change in credit terms, from Net-60 to prepayment, was applicable only to go-
forward orders.

Response:  Plaintiff agrees with this statement.

40. Artsana did not condition the fulfillment of any orders placed after January 10, 2023
upon the payment of any amount then due and owing.  Rather, orders were processed
once both the order and prepayment therefor was received by Artsana.

Response:  Plaintiff agrees with the second sentence of this statement, that Defendant

processed the Debtors' lone pay-in-advance order upon receipt of the order and

prepayment, but adds that Defendant's processing of such order was also in addition to

receiving payment of past due invoices (the Transfers).  Crossen Ex. 3 (evidencing

receipt of payment covering both prepay for new goods and payment of past due

invoices); Ex. 7 (February 24, 2023 email entitled "This Week's Order and Payment",

making joint reference to payment for new orders and past due invoices).

The first sentence of this statement is incorrect.  The email evidence demonstrates that

4

Defendant expected the Debtors to make payments on past due invoices as part of Defendant's willingness to supply goods on pay-in-advance terms.   See ¶ 37, *supra.*

41. Artsana was ready, willing and able to ship any prepaid order placed by the Debtors. In fact, Artsana did fulfill prepaid orders placed after February 24, 2023.

Response:   Plaintiff agrees that Artsana was prepared to fufill orders on or after February 24, 2023 upon receipt of advance payment.  Plaintiff adds that during this time period, Defendant made it clear to Debtors that its expectation was Debtors would make payments on their outstanding balance, and that the Debtors accompanied their prepayment with a payment against outstanding invoices.   See ¶ 37, *supra.*

42. The Debtors freely offered to make prepayments, and pay an additional 50% of any prepayment amount, to be applied to existing arrearages.

Response:   This statement is incorrect.   Defendant pressured the Debtors to pay outstanding invoices in tandem with their shift to and acceptance of prepayments, including as follows:

- January 10, 2023 (in chronological order):

  o Mr. Pahl, Defendant's employee, emails Ms. DiBella, the Debtors' employee, stating "Can you please provide an update on the outstanding $2m payment?  There is another $1m that comes due at the end of next week bumping the total to $3m.  Possible to let me know by EOD?"  Crossen Trans. Ex. 2.

  o Ms. DiBella (Debtors' employee) responds, "We have heard $1.2M is to be paid early this week.  We'll keep following up on that until it happens." Crossen Trans. Ex. 2.

  o Mr. McLaughlin, Defendant's employee, emails Ms. Dibella, copying Mr. Pahl, "Considering recent news, we regret to inform you that we will be

5

moving our terms to prepayment effective immediately on invoices dated 1/10/2023 or later. . . . I have attached the current aging report prepared by our finance team for your review.  Our expectation is that payments will continue as outlined for anything invoiced prior to 1/10/2023 according to our current terms agreement." Crossen Trans. Ex. 9.

- January 18, 2023 (in chronological order):

  o Mr. McLaughlin (Defendant employee) emails the Debtors, copying Ms. DiBella and Mr. Pahl (among others), "We are currently close to $3M in past due invoices.  I know last week this was brought up on your end.  Can you please provide an update on payment?" Crossen Trans. Ex. 10.

  o Mr. Taylor, Debtor's employee, responds to Mr. McLaughlin, copying Ms. DiBella and Mr. Pahl (among others),  "We (merchant team), have given the greenlight and prioritized weekly payments for you in both the domestic and DI sides, but can confirm I don't see any payments going out after last Monday to you.  I'm reaching out to our AP team on this and am hoping for a payment date confirmation." Crossen Trans. Ex. 10.

- In January and February 2023, the Debtors negotiated with their lenders to free up additional liquidity in order to afford payments to vendors such as Defendant. Crossen Trans. 62:5 – 63:6; 73:9 – 74:6.

- February 24, 2023:  Ms. DiBella emails Mr. Pahl, confirming the Debtors' incoming payment of approximately $1.6 million, split between advances for new orders and partial satisfaction of outstanding debt - the Transfers.  Crossen Trans. Ex. 7.

6

43. Artsana understood that the Debtors sought to catch up their existing arrears over time, as they had done in the past.

Response:   This statement is incorrect as written.   During the December 2022 to February 2023 timeframe specifically, Defendant was consistently pressing the Debtors to pay down their growing arrearage.   Plaintiff refers to the aforementioned emails communicating Defendant's inquiries and expectations regarding the payment of past due invoices.  Plaintiff further refers to Exhibit 2, pp. 1 - 4 of the Goldberg Declaration, reflecting additional emails from Defendant to the Debtors, between December 19, 2022 and January 4, 2023, requesting payment and threatening to stop shipments.

44. Artsana did not take any action to pressure or force the Debtors to pay existing arrearages.

Response:  This statement is incorrect.  Plaintiff refers to ¶¶ 35, 37, 42, *supra*.

Plaintiff further refers to Ms. Crossen's testimony confirming pressure employed by Defendant upon the Debtors, as follows:

- Crossen Trans. 43:10-18:

Q: And did the Bed Bath companies feel pressured by Artsana's suggestion that it would need to stop shipping?

A: I would say generally that the act of not shipping creates pressure.  The act of indicating that shipments will be delayed or cease would create pressure.

- Crossen Trans. 52:3-10:

Q: Would you say that Artsana pointing out the two million that is allegedly past due, puts pressure on the Bed Bath companies?

A: I mean to me, it's a statement of past due amounts.  The shipments are being held as a result of that amount.  So you know, that again, whenever shipments are

7

held, it puts pressure on reviewing the status of the payables.

- Crossen Trans. 71:19 – 72:1:

 Q:  So to sort of sum up this series of exhibits that we've looked at, can you tell me what kind of pressure Artsana put on Bed Bath to make payment of its past due invoices?

A:   So Artsana required prepayment following January 10th.   Artsana communicated regarding open payables, and with respect to certain shipments, indicated that they would be held.

- Crossen Trans. 72:20 – 73:1:

Q: And I believe you said that the switch to prepayment put on pressure to pay prior invoices  How so?

A: I think what I said was, that the holding or stopping shipments, leading up to the prepayment, is what would have put pressure on the company to pay.

45. Artsana received a payment in the amount of $1,603,440.00 on February 24, 2023.  In the remittance instructions to Artsana, the Debtors directed Artsana to apply $538,400.30 of such payment amount to existing invoices.  The balance of such payment amount was to be applied to go-forward orders and shipments, and was applied in this manner.

Response: Plaintiff agrees with this statement.

46. On September 8, 2025, Artsana conducted the deposition Laura Crossen, who was designated by Plaintiff as the Debtors' representative, pursuant to Federal Rule 30(b)(6).  A copy of Ms. Crossen's deposition transcript is attached as Exhibit B.

Response:  Plaintiff agrees with this statement.

47. On or about September 29, 2025, Plaintiff conducted the deposition of Artsana's representative, Thomas Gwiazdowski, pursuant to Bankruptcy Rule 30(b)(6).  A copy of Mr. Gwiazdowski's deposition transcript with exhibits is attached as Exhibit C.

Response:  Plaintiff agrees with this statement.

**Objective Ordinary Course Analysis**

Plaintiff generally objects to and disputes Defendant's inclusion of paragraphs 48 – 55 in its Statement of Undisputed Material Facts, as these paragraphs cite to Defendant's expert's report on the objective ordinary course of business and do not represent undisputed facts. Notwithstanding the foregoing, Plaintiff will respond to each statement in turn:

48. The industry that is applicable to both Artsana and BBB is the "Toy and Hobby Goods and Supplies Merchant Wholesalers Industry" (the "Applicable Industry"). It is this industry with respect to which industry data complied by the Risk Management Association ("RMA") on billing, payment and collection practices was obtained.

    Response: Plaintiff agrees with this statement.

49. Mr. Schaefer has prepared a report summarizing his analysis and opinions (the "Report") which is attached hereto as Exhibit A.

    Response: Plaintiff agrees with this statement.

50. In February 2023, the Transfers, a single payment on many invoices was made to Artsana, which payment Plaintiff seeks to avoid in this adversary proceeding. As set forth in greater detail in the Report, to determine whether the Transfers were made according to ordinary business terms, Mr. Schaeffer first assessed the "industry standard" with respect to the days after issuance of an invoice until payment of the invoice (i.e., "days to pay") using RMA data for a period including the challenged Transfers.

    Response: Plaintiff agrees with this statement except that the payment Plaintiff seeks to avoid is limited to the portion of the single payment that was applied to past due invoices.

51. According to the RMA data, the most common credit terms in the applicable industry are Net-30, meaning payment is due 30 days after issuance of an invoice.

    Response: Plaintiff disagrees with this statement. See Rebuttal Report p. 14 ("Schaeffer cites to no source supporting that 30 days is the prevalent credit term in the industry, and he admits that other credit terms exist."); p. 22 ("The typical sales terms in the Defendant's industry . . . are sales on credit with payment required between 30

and 60 days.")

52. According to the RMA data, the "middle quartiles" (50%) of average days to pay in the Applicable Industry is 2 to 68 days.  Based on Net-30 terms, this means that in the Applicable Industry payments are generally made up to 38 days late.

Response:  Regarding the first sentence, Plaintiff agrees that the RMA data for the February 2023 timeframe in the Applicable Industry reflects 68 days as the high-end of the middle-quartile average days to pay range, but believes the low-end of such range is 4 days rather than 2.  Regarding the second sentence, Plaintiff agrees that defense expert gives this opinion in his report, but disagrees with the defense expert's methods for arriving at this opinion as well as the opinion itself.  Plaintiff refers to his discussion of the objective ordinary course defense in Part III.A, *infra*.

53. Thus, payments made on invoices issued by Artsana within 38 days of their applicable due date are within the "industry standard."

Response: Plaintiff agrees that defense expert gives this opinion in his report, but disagrees with the defense expert's methods for arriving at this opinion as well as the opinion itself.  Plaintiff refers to his discussion of the objective ordinary course defense in Part III.A, *infra*.

54. Mr. Schaeffer calculated the number of days after issuance of each Artsana invoice until it was paid.  Invoices paid within 98 days of issuance were paid on or before 38 days late – within the industry standard.

Response: Plaintiff agrees that defense expert gives this opinion in his report, but disagrees with the defense expert's methods for arriving at this opinion as well as the opinion itself.  Plaintiff refers to his discussion of the objective ordinary course defense in Part III.A, *infra*.

55. Only 80 of the invoices paid by the Transfers – totaling $42,966.04 – were paid outside of this days-to-pay range, and potentially outside the industry standard terms.  All other invoices paid by the Transfers were made according to ordinary business terms as contemplated by 11 U.S.C. § 547(c)(2)(B).

Response:   Plaintiff agrees that defense expert gives this opinion in his report, but disagrees with the defense expert's methods for arriving at this opinion as well as the opinion itself.  Plaintiff refers to his discussion of the objective ordinary course defense in Part III.A, *infra*.

**Subjective Ordinary Course of Business Analysis**

As with the fact section devoted to Defendant's objective ordinary course analysis, Plaintiff generally objects to and disputes Defendant's inclusion of paragraphs 56 – 67 in its Statement of Undisputed Material Facts, as these paragraphs cite to Defendant's expert's report and Defendant's counsel's own arguments regarding the application of the subjective ordinary course of business and do not represent undisputed facts.  See Local Rule 7056-1(b) ("Each statement of material facts . . . may not contain legal arguments or conclusions of law.")

With regard to the factual components of paragraphs 56 – 67, for purposes of this summary judgment proceeding Plaintiff stipulates to the accuracy of the historical and preference period invoice and payment detail (for example, invoice dates and amounts and corresponding payment dates and amounts) and does not disagree with the mathematical calculations of average and standard deviation cited therein.

However, Plaintiff disagrees with defense expert's methods, interpretation, and application of such data, and his opinions derived from such data, regarding the subjective ordinary course defense, specifically regarding defense expert's opinion that the historical dataset used to compare with the Transfers should be limited to payments occurring in the month of February for years 2019 and 2022.  See Rebuttal Report pp. 15 – 17.

**Lack of Creditor Collection Pressure**

68.  The Debtors administered their inventory orders with Artsana through a "merchant" group and their accounts payable through a separate "accounts payable" group.

Response:  Plaintiff generally agrees with this statement.

69. The merchant group, responsible for ordering, knew that Artsana had suggested it would have to stop certain shipments on account of growing arrears.

Response:  Plaintiff agrees with this statement.

70.  The possibility of a shipment freeze did not cause the Debtors to make a payment towards existing arrearages.

Response:  This statement is incorrect.  Plaintiff refers to ¶¶ 37, 42, 44, *supra*.  Plaintiff further notes that Defendant's sole piece of evidence on which it relies for this statement is taken out of context.  During Ms. Crossen's deposition, defense counsel's question regarding how Bed Bath companies responded to Defendant's suggestion that shipments may be stopped was limited to "at this point, January 4th, 2023," whereas this qualification is removed from Defendant's #70 statement.  See Crossen Trans. 42:7-17.

71.  The limited shipping hold and switch to prepayment was aimed, from Artsana's perspective, at mitigating losses, not pressuring the Debtors for payment of antecedent debts.

Response:  This statement is incorrect.  Motivating the Debtors to catch up past due payments was a significant aim behind Defendant's conduct in holding shipments and terminating credit as evidenced by the above-referenced emails.

72. Artsana's shipping hold on select orders was not communicated by Debtors' merchant group to the Debtors' accounts payable team.

Response:  This statement is incorrect.  Plaintiff refers to Crossen Trans. Ex. 2 (Ms. Dibella's January 10, 2023 email to Mr. Pahl, entitled "RE: BBB-PO on hold – Artsana USA Inc c/o Caben Asia Pacific Ltd.", stating "We have heard $1.2M is to be paid early this week.  We'll keep following up on that until it happens."); Ex. 5 (Mr. McLaughlin's January 4, 2023 email to Mr. Taylor, entitled "FW: Buy Buy Aging", stating "Can you please assist in pushing the finance team on communication.  Our team has seemed to have

12

lost contact with BRG team and our HQ is pressuring stop ship."); Ex. 10 (Mr. Taylor's January 18, 2023 email to Defendant and Mr. Dery (a member of Debtors' accounts payable group), entitled "Re: Buy Buy Aging", stating "We (merchant team), have given the greenlight and prioritized weekly payments for you in both the domestic and DI sides, but can confirm I don't see any payments going out after last Monday to you.  I'm reaching out to our AP team on this and am hoping for a payment date confirmation.")

73. Ms. Crossen, as Rule 30(b)(6) representative of the Debtors, testified that the Debtors (and thus Plaintiff as successor to the Debtors) has no evidence of how the switch to prepayment was negotiated, or how the Debtors reacted internally to this switch.

Response:  This statement is incorrect and represents a misstatement of Ms. Crossen's testimony.   Ms. Crossen's unfamiliarity with "how the switch to prepayment was negotiated" is due to the fact that the switch to prepayment was unilaterally imposed by Defendant.  The Debtors' internal reaction to this switch is borne out in the email evidence and Ms. Crossen's own testimony, namely, that the Debtors had to negotiate with their lenders in order to secure additional cash flow to afford payments to Defendant, and that the Debtors made such a payment, consisting of approximately $1.1 million in advance payments and $538,400 toward past due invoices.  See also Crossen Trans. 57:2 – 59:1.

74:  Artsana did not make payment of arrears a condition to shipping product to the Debtors on a pre-pay basis.

Response:   Plaintiff disagrees with this statement.   The above-cited email evidence demonstrates that Defendant's expectation with the shipping hold, termination of credit terms and switch to prepayment was that the Debtors would make payments toward their past due invoices.

75:  The agreement to continue providing goods to the Debtors through a pre-pay invoicing arrangement was not conditioned on Debtors making the Transfers and such also did not put any pressure on the Debtors to make the Transfers.

13

Response: Plaintiff disagrees with this statement. As previously stated, Defendant's expectation in imposing the shipping hold, terminating credit terms, and switching to prepayment, was that the Debtors would make payments on open invoices as part of continuing their business relationship.

76. The Debtors decided to pay arrearages to Artsana around the time of the switch to prepayment, but did not feel pressured to make the Transfers.

Response: This statement is incorrect. As set forth in ¶¶ 37, 42, 44, *supra*, the time of the switch to prepayment, which coincided with the time of the shipping hold, brought heightened pressure upon Debtors to pay outstanding invoices. The Transfers represent the first and only significant payment by the Debtors to Defendant following imposition of the shipping hold and prepayment shift, and followed negotiations between the Debtors and their lenders to access additional cash to make such payment (among other payments to their vendors).

77. The Debtors did not believe Artsana would hold prepaid orders if the Transfers were not made.

Response: This statement is incorrect and constitutes a mischaracterization of Ms. Crossen's testimony. The portion of the transcript relied on by Defendant in making this statement actually states, in pertinent part, "I think that it would be reasonable to assume that pre-paid orders, you know, may not occur with some vendors if paid out of open payables, you know, didn't happen, but I can't tell you for sure." Crossen Trans. 69:17 – 70:2.

78. The Debtors intended to make the Transfers to pay the arrearage voluntarily if they had sufficient funds to do so, and Debtors made the Transfers when they did.

Response: Plaintiff does not understand this statement and otherwise disagrees with it. The email evidence and Ms. Crossen's testimony reflect that the Debtors had built a large

14

outstanding past due balance by early January 2023 which was the root cause of Defendant imposing a shipping hold, cancelling credit terms and shifting to prepay only. The Transfers were made in response to Defendant's conduct, following the Debtors' efforts to secure additional cash, and were paid together with a larger advance payment for new orders.

### III.    ARGUMENT

**A. Defendant's Industry Analysis is Misleading and Erroneous if Not Inadmissible**

1. Timing of Payments is Outside the RMA Industry Range

Defendant's expert performs a sleight of hand in pushing the notion that the Transfers were consistent with industry terms. The defense expert is generally correct that the RMA industry data supports an ordinary or "middle quartiles" range for invoice payments of 2 to 68 days. Cross-Motion at ¶ 52. The problem for Defendant is that the Transfers were made between 78 and 136 days after invoice date. In an exercise equivalent to cramming a square peg in a circular hole, defense expert adopts two assumptions (without any support): (i) that the RMA range is based on net-30 payment terms, and (ii) using the parties' 60-day payment terms, the applicable range would grow by 30 days, to between 32 and 98 days. These unsubstantiated assumptions are critical to defense expert's conclusion that the majority of the Transfers, while paid outside of the 2 to 68 day RMA range, are nevertheless objectively ordinary.

Plaintiff's expert rebuttal report, the *Expert Report of Edward T. Gavin, CTP, NCPM*, attached hereto as **Exhibit E** (the "Rebuttal Report"), expounds on the errors with Defendant's analysis. The Rebuttal Report refutes Defendant's industry defense including as follows:

- o   The RMA interquartile range of days sales outstanding (or days receivables) is a common measure of industry activity and what constitutes "normal" invoice payment practices in a given industry, and its use is ubiquitous in the analysis of objective ordinary course of business defenses. Rebuttal Report p. 13.

o   The Schaeffer Report repeatedly refers to "average days past due range as provided by RMA." This is not correct – RMA does not provide average days past due information. Schaeffer has calculated this himself using RMA data and his own pronouncement as to normal credit terms in the underlying RMA population. To imply that this average days past due behavior is somehow independent information provided by RMA, on which he, as an expert, is simply relying, is misleading.  Rebuttal Report p. 14.

o   I disagree strongly with the methodology Schaeffer has selected here, which is to use his asserted prevalent credit terms in the industry of 30 days, subtracting that from the uppermost bound of the RMA interquartile days receivables range of 68 days, and thereby deriving an "average past due payment range" of 1-38 days. First, Schaeffer cites to no source supporting that 30 days is the prevalent credit term in the industry, and he admits that other credit terms exist – as he must, since Artsana's own credit terms with the Debtor were sixty days, not thirty.   Rebuttal Report p. 14.

o   What is also unknown are the credit terms that exist between a company submitting data to RMA (a "reporting company") and its customers. . . Because we cannot know what the credit terms are between the reporting companies and their customers, we cannot determine how the payment ranges reported exist relative to those underlying credit terms. Without that information, trying to derive past-due payment activity from RMA days sales outstanding data is a pointless exercise.  We are left with no objective means by which to determine if 68- day payments are on 30-day terms, 45-day terms, 60-day terms, or 90-day terms. In all likelihood, the RMA population is inclusive of all of these terms. Without being able to determine the weight of each, using metrics bound to late payment practices as a measure of what defines industry practice is nonsensical, as it does not tell us anything about the underlying behavior the Schaeffer Report claims to represent. Schaeffer claims that the prevalent credit terms are payments within 30 days but also states that other terms exist. He then applies 30-day credit terms to the entire industry captured in the RMA data, apparently deciding, without any discussion, that the other terms simply don't matter for his purposes.  Rebuttal Report pp. 14-15.

In addition to rebutting Defendant's expert report, the Rebuttal Report contains an independent analysis and application of the objective ordinary course defense.  Rebuttal Report pp. 18-20, Ex. B.  Based on RMA industry data, Mr. Gavin determines that the relevant average days sales outstanding comprising the 50% interquartile range was between 10 days and 68 days (more or less consistent with the initial findings of defense expert), that this RMA data is not subject to manipulation due to payment terms or due dates, and that none of the Transfers fit within this range because every invoice paid by the Transfers was outstanding for greater than 68 days. Rebuttal Report p. 19.  Had defense expert removed his unsupported assumptions regarding

16

payment terms and due dates, he would have arrived at the same conclusion.

    2.  Collection Pressure is Relevant to the Industry Defense

While the timing of payments alone dissolves the industry defense, Defendant's shipment and credit holds and shift to prepayment provide additional fuel for rejecting this defense. Defendant's interpretation of caselaw concerning the relevance of collection pressure to the industry defense analysis is misguided.  Contrary to Defendant's understanding, the holding of the District of Delaware Court in *In re Center City Healthcare LLC* was not that collection pressure is irrelevant to the objective defense, but that any assertion of collection pressure must be supported with evidence that the creditor's conduct is extraordinary.  Thus, *In re Center City Healthcare LLC* stands for the proposition that collection pressure <u>is relevant</u> to the objective analysis assuming the debtor offers evidence of its extraordinary nature.  *Center City Healthcare, LLC, et al. v. Medline Industries, Inc. (In re Center City Healthcare LLC),* 2025 WL 3205002, at *8 (D. Del.  Nov. 17, 2025) ("Assuming that extraordinary collection activity may defeat an ordinary course defense, the Debtors did not present any evidence that Medline's conduct was, in fact, extraordinary.")

The Delaware District Court's approach is in line with the overarching theory behind the objective ordinary course defense as enforced within the Third Circuit.  The Third Circuit has advised that "ordinary terms are those which prevail in healthy, not moribund, creditor-debtor relationships."  *Id.* at *5 (quoting *In re Molded Acoustical*, 18 F.3d 217, 223-24 (3d Cir. 1994)).  "In other words, a creditor cannot establish the industry norm by arguing that its terms match how the industry treats other financially challenged debtors."  *Id.*  Thus, in *In re Fred's Inc.*, 2025 WL 208536, the Delaware bankruptcy court rejected evidence offered by the creditor that it was common in the transportation industry for a supplier to tighten credit terms once it becomes clear that the customer is facing financial difficulty.  *Fl Liquidating Trust v. C.H. Robinson Company,*

17

*Inc. (In re Fred's Inc.)*, 2025 WL 208536, at *7 (Bankr. D. Del. Jan. 15, 2025).  The presence of extraordinary efforts to collect unpaid debt goes toward the moribund nature of the debtor-creditor relationship.  It therefore appears likely that both the Third Circuit and the Delaware District Court would consider evidence of extraordinary collection pressure when weighing the objective ordinary course of business defense.

Plaintiff has produced sufficient evidence of the extraordinary nature of Defendant's conduct.  In addition to the arguments and cited evidence set forth in Part F of his Opening Brief, his discussion of collection pressure in rebuttal to the subjective defense found in Part B, *infra*, Plaintiff refers to Mr. Gavin's analysis of Artsana's collection practices.  Rebuttal Report pp. 20-23.  In particular, Mr. Gavin determines the new payment terms derived from Artsana's collection pressure (shift to payment in advance coupled with payment of open invoices before future sales are fulfilled) are not consistent with the credit terms typical in the industry, or with the conduct of companies engaged in a healthy debtor-creditor business relationship.  Rebuttal Report pp. 22-23.  Mr. Gavin goes on to state,

> Artsana undertook a scheme to unilaterally change the business terms in place between the [debtors] and Defendant immediately prior to the start of the preference period after learning of [debtors'] potential distress.  I believe that these acts were extraordinary, and the pressure applied was extraordinary, in the context of the business and credit relationship between the [debtors] and Defendant.  Finally, I also conclude that these changes put into place sales terms that would not ordinarily apply between the Defendant and a healthy debtor.

Rebuttal Report p. 23.

Even absent Mr. Gavin's expert opinion, it is axiomatic that a freeze on shipments, termination of credit, and shift to exclusively advance payment terms is emblematic of extraordinary conduct reserved for the financially deteriorating debtor.  The Court should not ignore these facts when assessing whether the Transfers were made under circumstances that are consistent with healthy debtor-creditor relationships.

18

**B. There is No Room for a Subjective Defense Because the Transfers Were Derived from Collection Pressure and Were Otherwise Unparalleled Among the Parties' Dealings**

    i.  Collection Pressure Alone Rebuts the Ordinary Course Defense

The Plan Administrator discussed the significance of collection pressure to the ordinary course analysis and highlights examples of collection pressure in this case in Part F of his Opening Brief, which is incorporated by reference herein, and in his Responsive Statement of Material Facts, ¶¶ 37, 42, 44, 72, *supra*. Defendant's position that there was no collection pressure associated with the Transfers is unsupported by the record.

Defendant attempts to blunt the impact of its shipment hold (which it concedes occurred) by arguing only some of the Debtors' employees were aware of the hold. Essentially, Defendant posits that because it only communicated the shipment hold to the Debtor team responsible for placing orders, the hold could not have played a role in the Debtors' decision-making concerning which invoices to pay. Even if a legal distinction could be made between the Debtors' merchant and payables teams when assessing a corporation's knowledge and response to collection pressure, which Plaintiff disputes, Defendant's position is debunked by the evidence.

It was standard business practice for the Debtors' accounts payable and merchant divisions to communicate about shared accounts. Crossen Trans. at 45:12-18 ("Vendor teams often communicate with merchant teams about their accounts, both purchases and the status of their accounts.")

The email evidence corroborates this point. For example, a member of the Debtors' merchant team, Ms. Dibella, upon learning that Defendant was "holding PO's due to payment issues" and receiving demand for an update on payment of $2 million in past due payables, assured Defendant on January 10, 2023 she was in touch with the persons responsible for paying invoices in an effort to address the hold, stating "We have heard $1.2M is to be paid early this week. We'll

19

keep following up on that until it happens." Crossen Trans. Ex. 2 (email chain entitled "Re: BBB – PO on hold – Artsana USA Inc c/o Caben Asia Pacific Ltd."). Indeed, the first (and only) payment following Ms. Dibella's assurance on January 10, 2023 that the Debtors would address the hold due and payment issues was the payment which included the Transfers. *See* Crossen Trans. Ex. 2 (parties confirm the promised payment is "in addition to the payments [Defendant] received yesterday" [January 9, 2023]); Decl. of Turner Falk pp. 464-65 (confirming the lone payment after January 9, 2023 was the Transfers payment); Crossen Trans. Ex. 6 (Ms. Dibella sends an email to the same Defendant representative, Mr. Pahl, confirming forthcoming payment of the Transfers). In fact, the email evidence confirms that Ms. Dibella was a primary point of contact on behalf of the Debtors for matters involving Defendant specifically concerning the shipping hold and the payment of invoices during this time. *See* Crossen Trans. Ex. 2 (discussing the shipping hold and past due payments); Ex. 9 (Defendant's email notice to Debtors (including Ms. Dibella) terminating credit terms and shifting to prepayment terms); Ex. 10 (both Ms. Dibella and members of payable team on January 18 email chain discussing past due balance approaching $3 million and Debtors intent to "prioritize(d) weekly payments"); Ex. 6 (Ms. Dibella informs Defendant of February 27 payment for new orders and past due amounts). It follows that the Debtors' employees responsible for and directly involved in facilitating the payment of invoices, and specifically the Transfers, were well aware of Defendant's shipping hold and its direct correlation to the outstanding past due balance.

To summarize, Defendant imposed the shipment hold because the Debtors were falling behind on payment obligations. Defendant did not lift the shipping hold until it received the Transfers. The same Debtor employee was instrumental in arranging payment of the Transfers and placing of new orders. The amount of the debt payment was tied directly to the amount of the

20

advance payment (50% of payment for new orders).  And the Transfers were paid as part of a single payment which included funds for new orders.  Based on the foregoing, Defendant's effort to disentangle the shipment hold and prepayment terms from the Transfers is a futile exercise.

Defendant argues that the "required prepayment, communications regarding open shipments, and a hold on some shipments" represent "routine creditor collection activities" that cannot overcome an ordinary course defense.  Defendant Brief p. 31.  Yet Defendant has failed to introduce any evidence that its above-described conduct was in fact "routine" in the parties' course of dealing.  The lack of historical precedent for Defendant's conduct highlights its extraordinary nature and renders the subjective ordinary course defense unworkable.

ii.  <u>Defendant Improperly Manipulates the Historical Data by Limiting the Lookback Analysis to February of 2019 and 2022</u>

Even absent the collection pressure and unique nature of the Transfers, Defendant has failed to demonstrate grounds for a subjective ordinary course of business defense.  Defendant argues the timing of the Transfers was similar to its historical course of dealing.  However, Defendant relies on selective incorporation of historical data to arrive at this misleading conclusion.

Defendant selective reliance on transactions only taking place in the month of February for years 2019 and 2022 is arbitrary and erroneous.  The fact that COVID-19 was underway in 2020 and 2021 does not by itself justify exclusion of those years from the subjective ordinary course analysis, and Defendant fails to explain why its business with the Debtors was so atypical during that period as to render their transactions incomparable to those in February 2023.  *See* Rebuttal Report p. 16.  Indeed, under Defendant's rationale that transactions during the COVID pandemic are unique, the Transfers (which took place in February 2023) have more in common with the February 2020 and 2021 timeframe than 2019 and prior years, considering that the COVID-19

pandemic was ongoing during the Preference Period.[3]

Defendant's narrow focus on the month of February is similarly unsubstantiated. The defense expert makes a vague reference to "seasonality patterns" without any explanation or supporting information showing why payment behavior during the other 11 months of each year are irrelevant to determining the parties' historical course of dealing. See Rebuttal Report p. 17 ("[Defense expert] offers no indication as to why seasonality impacts payment practices, and we are left with nothing on which to go other than the Schaeffer Report's unsupported assertion.")

## IV.      CONCLUSION

Defendant's Cross-Motion and opposition regarding summary judgment fails to establish an ordinary course defense or even offer a genuine issue of material fact as to such defense. The Transfers were not consistent with industry norms based on different timing of payments alone, in addition to the presence of collection pressure. The Transfers were not ordinary as between the parties, as the circumstances leading up to the Transfers were unparalleled in the parties' course of dealing including significant collection pressure in the form of shipping holds, credit termination, and shift to payments in advance. Because Defendant has conceded Plaintiff's *prima facie* case and cannot establish an ordinary course of business defense, summary judgment in favor of Plaintiff is warranted.

---

[3] *See https://archive.cdc.gov/www_cdc_gov/coronavirus/2019-ncov/your-health/end-of-phe.html* (last visited May 6, 2026) (CDC declared the end of the federal COVID-19 public health emergency on May 11, 2023); https://news.un.org/en/story/2023/05/1136367 (last visited May 6, 2026) (reporting the World Health Organization's declaration on May 5, 2023 that the COVID-19 global health emergency was over).

Dated: May 8, 2026

**ASK LLP**

By: /s/ *Brigette McGrath*
Brigette McGrath Esq., NJ SBN 01000-2011
Nicholas C. Brown, Esq., VA SBN 99898,
NC SBN 38054 (admitted *pro hac vice*)
ASK LLP
2600 Eagan Woods Drive, Suite 400
St. Paul, MN  55121
Telephone: (651) 289-3867
Fax: (651) 406-9676
Email: bmcgrath@askllp.com
       nbrown@askllp.com

*-and-*

Marianna Udem, Esq., NJ SBN 03659-2006
60 East 42nd Street, 46th Fl.
New York, NY  10165
Telephone: (212) 267-7342
Fax: (212) 918-3427

*Attorneys for Movant*

23