| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT**<br>**DISTRICT OF NEW JERSEY**<br>*Caption in Compliance with D.N.J. LBR 9004-1(b)*<br>SAUL EWING LLP<br>Turner N. Falk, Esq.<br>1735 Market Street, 34th Floor<br>Philadelphia, PA 19103<br>Telephone: (215) 972-7777<br>Email: turner.falk@saul.com<br>*Counsel for Artsana USA, Inc.* | |
| In re:<br><br>BED BATH & BEYOND, INC., *et al.*,[1]<br><br>　　　　　　　　　　Debtors. | Chapter 11<br><br>Case No. 23-13359 (VFP)<br><br>(Jointly Administered) |
| Michael Goldberg, as Plan Administrator for 20230930-DK-Butterfly-1, Inc. (f/k/a Bed Bath & Beyond Inc.),[2]<br><br>　　　　　　　　　　Plaintiff,<br>　　　v.<br><br>Artsana USA, Inc.,<br><br>　　　　　　　　　　Defendant. | Adv. No. 24-01336 (VFP) |

**ARTSANA USA, INC.'s REPLY IN SUPPORT OF**
**CROSS-MOTION FOR SUMMARY JUDGMENT**

---

[1]　　The last four digits of Debtor Bed Bath & Beyond Inc.'s tax identification number are 0488. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/bbby. The location of Debtor Bed Bath & Beyond Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 650 Liberty Avenue, Union, New Jersey 07083.

[2]　　Pursuant to the Certificate of Amendment of the Certificate of Incorporation of Bed Bath & Beyond Inc., which was filed with the State of New York Department of State on September 21, 2023, the name of the entity formerly known as "Bed Bath & Beyond Inc." was changed to 20230930-DK-Butterfly, Inc. [Filing ID No. 230921001833 DOS ID 315602].

**TABLE OF CONTENTS**

**Page**

SUMMARY OF ARGUMENT ................................................................................................. 1

ARGUMENT ........................................................................................................................... 2

    A.   The Industry Standard Analysis is Flexible, Not Strictly Formalistic ................................ 2

    B.   Creditor Collections Efforts Remain Irrelevant to the Objective Ordinary Course
Defense .................................................................................................................................. 5

    C.   The Transfers Were Made in the Ordinary Course of Business Between the Debtors and
Artsana ................................................................................................................................... 7

CONCLUSION ...................................................................................................................... 10

i

## TABLE OF AUTHORITIES

CASES

*Forman v. Moran Towing Cop. (In re AES Thames, LLC)*, 547 B.R. 99 (Bankr. D. Del. 2016) ..10

*In re Am. Home Mortg. Holdings, Inc.*, 476 B.R. 124 (Bankr. D. Del. 2012)................................4

*In re Ctr. City Healthcare, LLC*, 664 B.R. 208 (Bankr. D. Del. 2024), aff'd, No. AP 21-50920
(MFW), 2025 WL 3205002 (D. Del. Nov. 17, 2025).........................................................4, 5

*In re Ctr. City Healthcare*, LLC, No. AP 21-50920 (MFW), 2025 WL 3205002 (D. Del. Nov. 17,
2025) ................................................................................................................................5, 6

*In re Fred's Inc.*, No. 19-11984 (CTG), 2025 WL 208536 (Bankr. D. Del. Jan. 15, 2025)............6

*In re Powerwave Techs., Inc.*, No. 13-10134 (MFW), 2017 WL 1373252 (Bankr. D. Del. Apr.
13, 2017) .......................................................................................................................3, 4

STATUTES AND RULES

F.R.E. 702 .................................................................................................................................2

Fed. R. Bankr. P. 7056.............................................................................................................2

Fed. R. Civ. P. 56(c)(1)(A) ......................................................................................................2

Fed. R. Civ. P. 56(c)(4)............................................................................................................2

05/29/2026

Cross-Movant, Artsana USA, Inc. ("Artsana"), hereby files its reply in support (the "Reply") of its *Cross-Motion for Summary Judgment* (the "Cross-Motion"),[1] and states as follows:

**SUMMARY OF ARGUMENT**

Artsana's Cross-Motion includes an expert report and other supporting analyses demonstrating that the challenged Transfers were made in both the ordinary course of business between the parties and in a manner consistent with the industry standard.

Plaintiff's response in opposition to the Cross-Motion ("Plaintiff's Response") merely repeats the legal proposition that unwarranted creditor pressure can defeat an objective or industry-standard based ordinary course of business defense. This argument is not supported by the record nor do the cases cited in Plaintiff's Response stand for such proposition. To the contrary, the cases cited by Plaintiff support Artsana's industry-standard based ordinary course of business defense.

Plaintiff's Response attaches a "rebuttal report" without laying any groundwork for its admission to the summary judgment record. This "rebuttal report" should be ignored for the purposes of summary judgment. Even if the Court considers this rebuttal report, it adopts a hyper-rigid framework for evaluating the industry standard, a framework that has been rejected in applicable case law.

Plaintiff alleges that Artsana pressured the Debtors to make the Transfers. Artsana's Cross-Motion presents the undisputed facts, primarily the testimony of Plaintiff's own witness, which shows the Debtors did not make the Transfers in response to anything – including asserted "creditor pressure" from Artsana – other than their own desire to pay existing payables. The Debtors voluntarily chose to make the Transfers on the timeline and in the amounts they elected; and their voluntary actions conclusively demonstrate the Transfers were not made in response to

---

[1]      Capitalized defined terms have the same meaning as in the Cross-Motion.

asserted collection pressure. Artsana stood ready, willing and able to fulfill future prepaid orders without payment of existing arrears.

The Cross-Motion and the evidentiary record establish Artsana's ordinary course defenses. The Transfers cannot be avoided, and Artsana is entitled to summary judgment in its favor.

## ARGUMENT

### A.    The Industry Standard Analysis is Flexible, Not Strictly Formalistic

1.    Plaintiff's Response to the Cross-Motion attempts to critique Artsana's expert report by means of a purported rebuttal report prepared by Edward T. Gavin (the "Rebuttal Report").

2.    Pursuant to Fed. R. Civ. P. 56(c)(1)(A), applicable in this matter pursuant to Fed. R. Bankr. P. 7056, material to be considered on summary judgment must be supported by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."

3.    Expert witness materials may be considered on summary judgment, but only if they are supported by an affidavit or declaration made upon personal knowledge that sets forth admissible facts and shows the declarant is competent to testify to the matters stated. Fed. R. Civ. P. 56(c)(4).

4.    To introduce the testimony of a witness seeking to be qualified as an expert, the party introducing the expert's testimony must qualify that witness as an expert pursuant to F.R.E. 702 by showing the expert is qualified by "knowledge, skill, experience, training, or education" and that their facts and methods of analysis are sufficiently reliable. *See* F.R.E. 702.

5. The Rebuttal Report is not supported by any sworn declaration of Mr. Gavin, or Plaintiff, or any other party attesting to its authenticity or the qualifications of Mr. Gavin to offer the opinions in the Rebuttal Report. It is merely a document attached to Plaintiff's Response.

6. The Rebuttal Report has not been offered into the evidentiary record on the Motion or Cross-Motion consistent with the Federal Rules of Evidence. The Court should disregard the Rebuttal Report entirely.

7. There is another glaring problem with the Rebuttal Report: it states that Mr. Gavin "prepared a preference analysis by contrasting the age of the Preference Transfers against the upper and lower thresholds from RMA." *See* Plaintiff's Response, Ex. E at 19. But this "analysis," if it is included in the Rebuttal Report, can only be the information provided by its "Exhibit B." Exhibit B to the Rebuttal Report merely lists the Transfers and the days between each invoice and the payment thereof. No further "analysis" was included. *See* Plaintiff's Response Ex. E at 54-61. This is not a "preference analysis" at all, but rather simply confirms that payments were made on account of existing invoices (i.e., antecedent debt), an issue which is not contested in this matter.

8. In addition to Mr. Gavin's failure to provide any real factual or other analysis in support of his opinions, Mr. Gavin's opinions are not consistent with established case law with respect to the standard to be employed in considering an industry-standard based ordinary course of business defense.

9. The phrase "ordinary business terms" means "the range of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage, and that only dealing so idiosyncratic as to fall outside the broad range should be deemed extraordinary and therefore outside the [exception]." *In re Powerwave Techs., Inc.*, No. 13-10134 (MFW), 2017 WL 1373252, at *8 (Bankr. D. Del. Apr. 13, 2017). The defense applies when the transfer

3

"comports with practices in the relevant industry." *Id.* The objective prong of the ordinary course defense "is not an exacting standard." *Id.* Artsana is entitled to "considerable latitude in defining what the relevant industry is" and "departures from that relevant industry's norms which are not so flagrant as to be 'unusual' remain within" the defense. *Id.* The evidentiary standard in proving the defense is "**not formidable**." *In re Am. Home Mortg. Holdings, Inc.*, 476 B.R. 124, 141 (Bankr. D. Del. 2012) (emphasis added).

10.     In *In re Ctr. City Healthcare, LLC*, 664 B.R. 208 (Bankr. D. Del. 2024), aff'd, No. AP 21-50920 (MFW), 2025 WL 3205002 (D. Del. Nov. 17, 2025), the defendant's expert conducted an analysis of RMA data and determined the applicable "industry standard range" was 28 to 76 days. *Id*. at 212. The plaintiff-debtor attempted to rebut this argument, arguing that an expert was required to use "an average statistical range which included only the middle 50% of the data points, thereby excluding outliers... Had [defendant's expert] done so, the Debtors assert that he would have concluded that the applicable industry range is 28 to 55 days…" *Id*. at 215. That court rejected the plaintiff-debtor's argument, holding that the defense expert's use of an "accommodating and flexible approach to establishing an industry standard for ordinary business terms warrants acceptance of [defendant's expert's] conclusions." *Id*.

11.     If Mr. Gavin's Rebuttal Report were to be accepted by the Court, a dispute largely identical to that resolved in the preference defendant's favor in *Ctr. City Healthcare* is presented. Plaintiff's Rebuttal Report asserts that the middle 50% of RMA data sets the absolute boundaries for the industry standard. Mr. Shaeffer's report, like the expert report accepted by the bankruptcy court in *Ctr. City Healthcare,* uses that middle 50% as a starting point to perform a more detailed and informative analysis. As explained in the Cross-Motion, starting from the middle 50%, Mr. Schaeffer analyzed the credit terms in the industry and opined that, since the industry uses net-30

and net-60 credit terms, while Artsana used net-60 credit terms, the high end of the middle 50% range, 68 days "supplied by RMA will always be more restrictive in a range spread than what would be the actual past due payment range." *See* Cross-Motion Ex. A at 5.

12. Mr. Schaeffer then adjusted this starting point to account for the variable credit terms in the RMA data. Mr. Shaeffer's adjustments to the middle 50% of RMA data are thoroughly explained in his report, and amply support a finding that all the Transfers were made in accordance with ordinary business terms.

13. This Court should follow the existing case law, which mandates liberality, flexibility and a forgiving approach towards the industry standard, not the rigid formalism embodied in the Rebuttal Report – and rejected in *Ctr. City Healthcare* and other decisions cited above.

**B.   Creditor Collections Efforts Remain Irrelevant to the Objective Ordinary Course Defense**

14. Plaintiff's Response repeats, again erroneously, the argument that creditor pressure can defeat the objective ordinary course defense. Plaintiff's attempts to support this argument are based on a misreading of applicable case law.

15. As discussed at length in the Cross-Motion, pre-BAPCPA case law is not informative on this point, because BAPCPA added a disjunctive between the subjective and objective ordinary course defenses. Where creditor pressure (relevant to a subjective ordinary course analysis) was often discussed alongside the objective analysis in pre-BAPCPA case law, no post-BAPCPA case known to Artsana has considered creditor pressure in its objective analysis.

16. In its attempt to support its erroneous argument Plaintiff deceptively cites to the Delaware District Court's decision affirming the bankruptcy court in *In re Ctr. City Healthcare*, LLC, No. AP 21-50920 (MFW), 2025 WL 3205002, at *8 (D. Del. Nov. 17, 2025). The Delaware

District Court, in dicta not related to the issues on appeal, stated there was no evidence of creditor pressure, even "[a]ssuming that 'extraordinary collection activity' may defeat an objective ordinary course defense…" *Id*. Plaintiff omits the associated footnote, where the Delaware District Court also noted that "The Bankruptcy Court held that 'any evidence of the Defendant's collection activity, even if extraordinary or unusual, is not relevant to the objective ordinary course of business defense.'" *Id. citing In re Center City Healthcare*, 664 B.R. at 217. Thus, the Delaware District Court's opinion does not support Plaintiff's argument; rather, Plaintiff disingenuously cites dicta while ignoring the actual holding from the Bankruptcy Court. Of course, the Delaware District Court affirmed the bankruptcy court's decision in all respects.[2]

17.     Plaintiff's Response's reliance on *In re Fred's Inc.*, No. 19-11984 (CTG), 2025 WL 208536 (Bankr. D. Del. Jan. 15, 2025) is also misplaced. In short, that court rejected a comparison of the defendant's collection practices with collections practices applied in the industry to distressed companies; the *Fred's* court properly held that the appropriate comparison is to industry practices involving a "healthy debtor." *See Id*. at *8.

18.     Plaintiff's reliance on *Fred's* entirely misses the point. Artsana **did not** compare its own activity to distressed collections. It compared its preference period activity to the healthy industry standard, and the evidence shows that the payment of the Transfers was consistent with that standard.

19.     Plaintiff's Response makes one last attempt to muddy the waters, asserting that a switch to prepayment itself is outside the industry standard but makes such assertion without the

---

[2]     Like Plaintiff here, the plaintiffs in *Center Cty.* argued in their briefing to the Delaware District Court that creditor pressure had to be considered in the determination of an industry-standard based ordinary course of business defense. That argument, which had been rejected by the bankruptcy court, also was rejected by the Delaware District Court.

benefit of any industry evidence in support. But this Court must reject Plaintiff's argument for the simple reason that adopting it, in effect, would re-impose a subjective component onto the objective ordinary course analysis, undoing the legislative intent behind BAPCPA.  Creditor collections efforts are not relevant to the objective ordinary course defense.

**C.     The Transfers Were Made in the Ordinary Course of Business Between the Debtors and Artsana**

20.     Unwarranted or extraordinary creditor pressure can defeat the subjective ordinary course defense, but the evidence in this case shows there was no such pressure.

21.     The evidence in the record definitively shows that the Debtors did not feel pressured by Artsana's mild collections activities.  The Debtors' employees responsible for payment never communicated internally about the order freeze, because the order freeze in early January did not pressure the Debtors into making payment in late February.  The Debtors never discussed and were not impacted by the switch to pre-payment for go-forward orders in respect of payments they made on existing invoices.  Moreover, Artsana's "collection efforts" with respect to the existing invoices were not extraordinary; it took no actions other than sending a few emails requesting payment, which all creditors do and is not extraordinary or unwarranted.

22.     Ms. Crossen, the only witness with direct insight into the Debtors' internal processes, was asked repeatedly about asserted creditor pressure.  She repeatedly testified that an order freeze and switch to prepayment was not actual but only hypothetical pressure. Ms. Crossen did not testify that Artsana put any actual "pressure" on Debtors or that Debtors were induced by "pressure" to make payments..

23.     Ms. Crossen's testimony about what really occurred shows that these hypotheticals simply did not factor into the Debtors' actual decision to make the Transfers.  The shipment freeze

7

did not cause the Debtors to make a payment towards existing arrearages. Crossen Trans. at 42:17. The switch to prepayment was not conditioned on payment of arrears  *Id*. at 58:9-59:1.  The Debtors did not believe Artsana would hold prepaid orders if arrears were not paid. *Id*. at 69:17-70:6.

24.     In the clearest testimony on this point, Mr. Crossen stated that the Debtors specifically **did not** feel pressured to make the Transfers. *Id*. at 61:6-24.

25.     Plaintiff attempts to salvage the "creditor pressure" argument with an unsupported assertion that prepayments for new orders were linked to payment of arrears; but there is absolutely no evidence in the record of this. Ms. Crossen could not explain how the switch to prepayment was negotiated and did not assert that the switch was linked to payment of existing invoices. *Id*. at 57:2-22; Gwiazdowski Decl. ¶ 10 ("Artsana did not condition the fulfillment of any orders placed after January 10, 2023 upon the payment of any amount then owing, only upon the prepayment of the value of a new order.")

26.     Ms. Crossen was clear that Artsana did not make payment of existing invoices a condition to fulfill prepaid orders, Crossen Trans. at 58:9-59:1; and the Debtors did not believe Artsana would hold prepaid orders if arrears were not paid, *Id*. at 69:17-70:6.

27.     To the contrary, the Transfers were entirely voluntary: the Debtors felt responsible to pay their vendor creditors, and paid towards the existing arrearage voluntarily when they had sufficient funds to do so. *Id*. at 73:18-74:6.

28.     The first prepayment amount was included in the same wire transfer that also paid existing invoices, and that the payment toward existing invoices was equal to 50% of the amount prepaid.  These were voluntary decisions by the Debtors, made for the Debtors' own convenience. Artsana made no demands as to either the amount of the prepayment (which was based on the

8

Debtors' orders to Artsana) or the amount paid on existing invoices. There is not a single item of evidence in the record that suggests Artsana required these terms as a condition of new prepaid orders.  All evidence in the records shows the opposite: Artsana did not undertake extraordinary collections efforts, and the Debtors did not feel pressured to make the Transfers.

29.     The Cross-Motion includes two different frameworks for assessing the subjective ordinary course defense, one supported by an expert report by Mr. Schaeffer and another by counsel.

30.     Plaintiff quibbles with Mr. Shaeffer's use of seasonality, and the particular windows of time he felt were appropriate for historical comparison.  However, Mr. Shaeffer explained the rationale for these choices in his report, including: (i) the applicable industry experiences seasonal differences in ordering and payments, and (ii) governmental support and changing purchasing patterns made periods impacted by COVID-19 suboptimal, in Mr. Schaeffer's opinion, for comparison.

31.     Plaintiff's expert disagrees, but this is a mere difference of opinion between experts over methodology.  It is not a dispute over facts, and Plaintiff offers no case law showing that Mr. Shaeffer's methodology described in the Cross-Motion has been rejected in any case, or that it otherwise unreliable.

32.     The Cross-Motion also includes a subjective ordinary course analysis that contains none of the purported issues to which Plaintiff takes issue in connection with Mr. Shaeffer's analysis.  See Cross-Motion ¶¶ 62-67 and Exhibit D.

33.      Plaintiff's Response does not even attempt to counter counsel's analysis (except by reference to the nonexistent "creditor pressure").  See Plaintiff's Response at 11 ("Plaintiff stipulates to the accuracy of the historical and preference period invoice and payment detail (for

example, invoice dates and amounts and corresponding payment dates and amounts) and does not disagree with the mathematical calculations of average and standard deviation cited therein.")

34.     The calculations in counsel's analysis (which are simple arithmetic in nature) provide an alternative basis for a finding that a large portion of the Transfers were made in the ordinary course: at most $131,985.69 of the Transfers were paid later than the historical average of 90 days from invoicing and only $17,284.25 of the Transfers were paid more than 14 days outside one standard deviation from the parties' historical practices.  *See, e.g. Forman v. Moran Towing Cop. (In re AES Thames, LLC)*, 547 B.R. 99, 105 (Bankr. D. Del. 2016) (deviation of over 15 days from historical average was subjectively ordinary).

35.     As noted in the Cross-Motion, these ranges are consistent with the findings in other cases, and demonstrate that the vast majority of the Transfers occurred, subjectively, in the ordinary course.

## CONCLUSION

For the reasons set forth above, and in the Cross-Motion, Artsana respectfully submits that the Court should  enter judgment in Artsana's favor and against Plaintiff on all counts in the Complaint.

SAUL EWING LLP

*/s/ Turner N. Falk*
Turner N. Falk, Esq.
1735 Market Street, 34th Floor
Philadelphia, PA 19103
Telephone: (215) 972-7777
Email: turner.falk@saul.com

*Counsel for Artsana USA, Inc.*